UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                        :

UNITED STATES OF AMERICA     :    SEALED
                        :    INDICTMENT

     - v. -          :

                        :    18 Cr. ___ (___)

DAVID MIDDENDORF,        :
THOMAS WHITTLE,
DAVID BRITT,
CYNTHIA HOLDER, and
JEFFREY WADA,

    Defendants.

- - - - - - - - - - - - - - - - x

**18 CRIM 036**

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 1/17/18

**COUNT ONE**
**(Conspiracy to Defraud the United States)**

The Grand Jury charges:

**Relevant Entities and Background**

The United States Securities and Exchange Commission and
The Auditing of Publicly Traded Companies

1.    The United States Securities and Exchange Commission (the "SEC") is an agency of the United States.  The SEC is vested with the responsibility and authority, *inter alia*, to implement and enforce securities-related laws, including provisions of the Sarbanes-Oxley Act of 2002 ("SOX") and to protect investors by ensuring that they receive accurate audited financial information with respect to publicly traded companies ("Issuers").

2.    In general, in order to register securities with the SEC, Issuers must disclose annual audited financial statements.

These financial statements are audited by a registered public accounting firm (an "Auditor") that examines the Issuer's financial statements and other documentation in order to ascertain whether the financial statements are accurate, truthful, and complete in accordance with Generally Accepted Accounting Principles ("GAAP") and (in the case of larger public companies), whether the Issuer maintained effective internal controls over financial reporting. After completing an examination of an Issuer's financial statements, an Auditor issues a written audit report, opining as to whether the financial statements are fairly stated and comply in all material respects with GAAP, and (in the case of larger public companies) whether the Issuer maintained effective internal controls over financial reporting.

3.     Pursuant to relevant accounting standards, and with limited exceptions, an Auditor must complete its review of the financial statements prior to issuing its audit report, but may document previously completed work within the 45-day period following the issuance of the audit report (the "Documentation Period"). After the conclusion of the Documentation Period, an Auditor is generally prohibited from altering or adding to its work papers for a given audit. In the event that an Auditor must perform additional audit work following the issuance of the

audit report, an Auditor is required to clearly document the date and nature of any such additional work.

### The Public Company Accounting Oversight Board and The Auditor Inspection Process

4.    The Public Company Accounting Oversight Board (the "PCAOB" or the "Board") is a nonprofit corporation created by SOX and modelled after self-regulatory organizations in the securities industry that regulate and discipline their own members.  Among other responsibilities, the PCAOB conducts a continuing program of inspections of Auditors in order to ensure that such firms comply with SOX, SEC and PCAOB rules, and professional standards, in connection with their performance of audits and the issuance of audit reports of Issuers.  These inspections usually entail the PCAOB examining the work that the Auditor has performed with respect to particular audits of Issuers, or brokers or dealers.

5.    The PCAOB conducts inspections of Auditors pursuant to two programs: (i) the Global Network Firm ("GNF") program, which annually inspects the six largest United States accounting firms and their global affiliates; and (ii) a second program for all other firms.  The PCAOB maintains a dedicated team of inspectors for each of the firms in the GNF program.  Each firm in the GNF program is required to provide information to the PCAOB on an

annual basis, including about each audit of an Issuer conducted by the firm during the year.

6.    Typically, in the winter of each year, the PCAOB selects which of a GNF firm's audits will be closely reviewed as part of the annual inspection of that GNF firm.  Issuers whose audits are selected for review by the PCAOB are colloquially referred to as having themselves been selected for inspection.  The PCAOB's selection is based on information provided by the GNF firms and months of analysis of a variety of factors, including how long it has been since an audit of a particular Issuer was inspected, the risk factors for the audit, and an interest in including some randomly selected engagements, among others.

7.    In order to track the various factors considered in making inspection decisions, as well as to track which engagements have been selected for inspection, the PCAOB maintains a planning spreadsheet, often referred to as the "GNF Planning Spreadsheet," for each GNF firm.  The GNF Planning Spreadsheet is updated throughout the inspection planning process.

8.    The PCAOB treats as highly confidential its internal list of audits selected for inspection.  To that end, the PCAOB will generally only inform an Auditor of an upcoming inspection after the Documentation Period has closed, so that the work papers for each audit will have already been finalized, and

cannot be edited or improved upon in anticipation of a scheduled PCAOB inspection.

9.   As required by SOX, once the PCAOB inspection of an accounting firm is completed, the PCAOB prepares a written inspection report (the "Inspection Report") containing the findings of the PCAOB.  An Inspection Report contains two sections.  Part I of an Inspection Report summarizes the PCAOB's "comments" or findings with respect to individual audits for which deficiencies were identified.  Barring appeal by an accounting firm, Part I of an Inspection Report becomes public 30 days after it is issued.  Part II of an Inspection Report generally addresses systemic deficiencies in the accounting firm's overall system of quality control.  Accounting firms are given a one-year period to remedy any deficiencies identified in Part II of the Inspection Report.  Part II of an Inspection Report becomes public only if an accounting firm fails to remedy any deficiencies to the PCAOB's satisfaction within the one-year period.

The SEC's Oversight of the PCAOB and the SEC's Reliance on
PCAOB Inspection Reports in Performing its Duties

10.   The SEC directly oversees the operations of the PCAOB, which itself oversees various individuals and entities, including Auditors.  In addition to overseeing the PCAOB inspections process, the SEC maintains the authority and

responsibility to appoint and remove Board members, approve the PCAOB's budget and rules, and entertain quasi-appeals resulting from the PCAOB's issuance of Inspection Reports and disciplinary actions.

11.   Pursuant to SOX, the SEC also receives from the PCAOB all Inspection Reports at the time of issuance.  The SEC, in turn, utilizes these Inspection Reports to carry out its regulatory, oversight, and enforcement functions.  For example, the SEC Office of the Chief Accountant ("OCA") reviews Inspection Reports to monitor Auditor quality.  Negative inspection results carry various consequences for accounting firms.  OCA also reviews Inspection Reports to identify any comments revealing weaknesses with respect to the financial statements of particular Issuers and refers such matters to the SEC's Division of Corporation Finance and the SEC's Division of Enforcement.

<u>PCAOB Rules Relating to Confidentiality</u>

12.   SOX commands that the PCAOB establish rules (the "PCAOB Rules"), subject to the rulemaking procedures and approval by the SEC.  The PCAOB must establish, among other rules, ethics rules and standards of conduct for Board members and staff.  SOX also provides that a violation of the PCAOB Rules shall be treated as a violation of rules promulgated pursuant to the Securities Exchange Act of 1934 (the "Exchange

Act"), and that any person violating SOX or the PCAOB Rules will be subject to the same penalties applied to a violation of the Exchange Act or the rules promulgated thereunder.

13. As part of its Ethics Code, the PCAOB promulgated, and the SEC approved, Ethics Code 9 ("EC 9"), entitled "Nonpublic Information." EC 9 imposes a lifetime prohibition on current or former PCAOB employees sharing confidential PCAOB information gained during the course of their employment at the PCAOB. EC 9 states:

> Unless authorized by the Board, no Board member or staff shall disseminate or otherwise disclose any information obtained in the course and scope of his or her employment, and which has not been released, announced, or otherwise made available publicly. The provisions of this Section shall continue in effect after the termination of employment or Board membership.

14. Prior to the commencement of employment at the PCAOB, employees are required to sign a formal offer letter, which states that employment is contingent on compliance with the PCAOB Ethics Code. Upon commencement of employment, and at regular intervals thereafter, PCAOB employees are required to attend ethics trainings which, among other things, emphasize the importance of protecting confidential PCAOB information, and make clear that information about which Issuers' audits are to be inspected is unequivocally confidential. In addition to attending ethics trainings, PCAOB employees must sign annual certifications affirming their compliance with the Ethics Code.

KPMG

15.   KPMG is a professional service company and accounting
firm providing audit, tax, and advisory services and is
headquartered in Manhattan, New York.   In its audit practice,
KPMG serves as the auditor for more than 600 Issuers each year.
Because KPMG is among the six largest auditors in the United
States, KPMG is inspected as part of the PCAOB's GNF program.

16.   KPMG fared poorly in its PCAOB inspections in or about
2013 and 2014.   In or about 2014, KPMG received approximately 28
comments in connection with the approximately 51 audits
inspected by the PCAOB that year.   This was approximately twice
as many comments as the average number of comments received by
KPMG's competitors.   A significant percentage of the comments
pertained to KPMG's banking clients and, in particular, to the
treatment of allowance for loan and lease losses ("ALLL").
ALLL, which is a calculated reserve maintained by financial
institutions for estimated credit risks within an institution's
assets, is often a critical issue in the auditing of a financial
institution, as it implicates a bank's earnings and implicates
its safety and soundness and impacts earnings.

17.   Inspection results for the largest U.S. accounting
firms, among others, affect the firms' abilities to attract and
maintain audit clients and are routinely reported and discussed
in the financial press.   Inspection results were therefore

closely tracked by, and important to, KPMG.  Indeed, KPMG
routinely touted positive inspection results in new client
pitches.

18.  Accordingly, by at least in or about 2015, KPMG was
engaged in efforts to improve its performance in PCAOB
inspections.  Among other steps, KPMG (i) recruited and hired
former PCAOB personnel, including but not limited to CYNTHIA
HOLDER, the defendant, and Brian Sweet; (ii) retained a data
analytics firm (the "Data Firm") to assist in predicting which
of KPMG's engagements would be inspected by the PCAOB; (iii)
implemented a financial incentive system that awarded bonuses to
members of engagement teams that received no comments during an
inspection; and (iv) implemented internal monitoring programs to
oversee certain audit areas, including ALLL.  Of note, the ALLL
monitoring program was designed principally to provide real-time
assistance to engagement teams working on ALLL issues during a
live audit, with only limited additional assistance as needed in
the Documentation Period.

19.  KPMG's audit practice was supervised by the Vice Chair
of Audit.  Within the audit practice, the Department of
Professional Practice ("DPP") was responsible for maintaining
audit quality at KPMG.

20.  Several subsidiary groups fell under DPP, including
the DPP Audit Group and the DPP Inspections Group.  The DPP

Audit Group was responsible for setting audit policy and training KPMG personnel on new and existing audit standards. The DPP Inspections Group was responsible for conducting internal quality control inspections as well as for overseeing external inspections by the PCAOB.

### Relevant Individuals

21.   Between approximately 2009 and approximately April 24, 2015, Brian Sweet was an employee of the PCAOB, and was, for much of that time, assigned to the team tasked with inspecting KPMG, where he had expertise in the inspection of banking Issuers.  Throughout his tenure at the PCAOB, Sweet received regular ethics trainings concerning, among other things, EC9 and the prohibition on sharing confidential PCAOB information. While at the PCAOB, Sweet signed annual certifications attesting to his compliance with the PCAOB Ethics Code.  At the time Sweet left the PCAOB, Sweet was an Associate Director.  Beginning in or about 2014, KPMG began attempting to recruit Sweet from the PCAOB.  On or about May 4, 2015, Sweet began working at KPMG as an Audit Partner in the DPP Inspections Group, where Sweet reported to THOMAS WHITTLE, the defendant.  While employed at KPMG, much of Sweet's work focused on banking clients.  Sweet was separated from KPMG in or about March 2017.

22.   Between approximately December 2011 and approximately July 2015, CYNTHIA HOLDER, the defendant, was an employee of the

PCAOB, and was, at times, assigned to the team tasked with inspecting KPMG, where she too had expertise in the inspection of banking Issuers.  Throughout her tenure at the PCAOB, HOLDER received regular ethics trainings concerning, among other things, EC9 and the prohibition on sharing confidential PCAOB information. While at the PCAOB, HOLDER signed annual certifications attesting to her compliance with the PCAOB Ethics Code.  At the time HOLDER left the PCAOB, she was an Inspections Leader.  On or about August 1, 2015, HOLDER began working at KPMG as an Executive Director in Risk and Regulatory, within the DPP Inspections Group, where she reported to Brian Sweet.  While employed at KPMG, much of HOLDER's work focused on banking clients.  HOLDER was separated from KPMG in or about April 2017.

23.   Between approximately 2004 and approximately March 2017, JEFFREY WADA, the defendant, was an employee of the PCAOB. Throughout his tenure at the PCAOB, WADA received regular ethics trainings concerning, among other things, EC9 and the prohibition on sharing confidential PCAOB information. While at the PCAOB, WADA signed annual certifications attesting to his compliance with the PCAOB Ethics Code.  At the time WADA was separated from the PCAOB in or about March 2017, he was an Inspections Leader.

24.   At all times relevant to this Indictment, DAVID MIDDENDORF, the defendant, was the head of DPP and the National

Managing Partner for the Audit Quality and Professional Practice Group.  MIDDENDORF was separated from KPMG in or about April 2017.

25.  At all times relevant to this Indictment, THOMAS WHITTLE, the defendant, was a KPMG Audit Partner in DPP and was the National Partner-in-Charge for Quality Measurement.  WHITTLE reported to DAVID MIDDENDORF, the defendant.  WHITTLE was separated from KPMG in or about April 2017.

26.  At all times relevant to this Indictment, DAVID BRITT, the defendant, was an Audit Partner in DPP, Banking and Capital Markets.  BRITT reported to KPMG's Chief Auditor, who reported to DAVID MIDDENDORF, the defendant.  BRITT was separated from KPMG in or about April 2017.

### Overview of the Conspiracy

27.  From at least in or about 2015 through in or about 2017, DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER, and JEFFREY WADA, the defendants, Brian Sweet, and others known and unknown, conspired to defraud the SEC, by fraudulently attempting to affect the outcome of PCAOB inspection results, knowing that such results are reported to and utilized by the SEC to perform its oversight and regulatory functions.  More specifically, the defendants participated in a scheme to acquire confidential PCAOB information from current and former PCAOB employees, in violation of the legal

obligations of those employees and former employees, principally concerning which KPMG Issuer audits the PCAOB planned to inspect in 2015, 2016, and 2017, and to then utilize that highly confidential PCAOB information to improve KPMG's inspection results.

### Sweet is Recruited by KPMG and Takes Confidential PCAOB Information to KPMG

28.   Beginning in at least July 2014, KPMG - in an effort spearheaded by DAVID MIDDENDORF and THOMAS WHITTLE, the defendants, among others - initiated efforts to recruit Brian Sweet to leave the PCAOB and to join KPMG.

29.   In or about April 2015, in response to those recruitment efforts, Brian Sweet traveled to New York to interview at KPMG.   Sweet interviewed with DAVID MIDDENDORF and THOMAS WHITTLE, the defendants, and with MIDDENDORF's supervisor, the Vice Chair of Audit, among others.   Following the interviews, Sweet was offered a position as a direct-entry partner at KPMG.

30.   In or about late April 2015, shortly before Brian Sweet's last day of employment at the PCAOB, Sweet copied various confidential documents from the PCAOB internal network (the "Network Documents") to the hard drive of Sweet's PCAOB computer.   Sweet then copied the Network Documents, as well as other confidential documents, from Sweet's PCAOB computer to a

personal hard drive.  Sweet took the personal hard drive, as well as certain hard copy documents, with him when he left the PCAOB.  The confidential electronic and hard copy documents taken by Sweet included, among other documents: (i) internal PCAOB manuals and guidance; (ii) comment forms issued in connection with inspections on which Sweet had worked; (iii) a list of KPMG engagements to be inspected by the PCAOB in 2015; and (iv) the 2015 GNF Planning Spreadsheet for KPMG.

31.  Shortly before Brian Sweet had even begun employment at KPMG, THOMAS WHITTLE, the defendant, asked Sweet to prepare a list of other PCAOB personnel who could be recruited to work for KPMG.

### Sweet is Asked for and Provides the 2015 Inspection List to MIDDENDORF, WHITTLE, BRITT, and Others

32.  On or about May 4, 2015, during Brian Sweet's first week of work at KPMG, Sweet attended a welcome lunch with DAVID MIDDENDORF and DAVID BRITT, the defendants, among others. During the lunch, MIDDENDORF asked Sweet (i) whether a particular Issuer would be the target of a PCAOB inspection; and (ii) more generally, which KPMG engagements would be subject to inspection that year.  Sweet implicitly acknowledged that the audit of the identified Issuer would be inspected but did not respond to MIDDENDORF's request for other inspection targets.

33.   Later that week, in a separate conversation, DAVID MIDDENDORF, the defendant, told Sweet to remember where Sweet's paycheck came from and to be loyal to KPMG.

34.   On or about May 7, 2015, Brian Sweet attended a second welcome lunch with THOMAS WHITTLE, the defendant, and others. While walking back from lunch, and out of the earshot of anyone else, WHITTLE asked Sweet for the list of engagements to be inspected by the PCAOB in 2015, most of which had not yet been officially noticed for inspection by the PCAOB.  WHITTLE told Sweet that Sweet was most valuable to KPMG at that moment and would soon be less valuable.  Sweet acknowledged to WHITTLE that Sweet had the list of KPMG engagements to be inspected by the PCAOB in 2015 (the "2015 List").

35.   Later that day, THOMAS WHITTLE, the defendant, came in person to Brian Sweet's office and asked to see the 2015 List. Sweet showed WHITTLE a hard copy of the list.  After WHITTLE reviewed the confidential 2015 List, Sweet took back the copy.

36.   The next day, on or about May 8, 2015, THOMAS WHITTLE, the defendant, emailed Brian Sweet asking Sweet to send WHITTLE the "banking inspection list."  Sweet responded by email asking, "Just to clarify, are you referring to the expected PCAOB banking selections?  If so I can email you something that may be easier to use (rather than a scanned version)."  WHITTLE confirmed that he was talking about the "selection list."  Sweet

then emailed a copy of the 2015 List.  Sweet also emailed
WHITTLE explaining:    "Just so you know, it is actually the full
list of anticipated inspections (including non-banks).  I'd
appreciate the team's discretion to make sure it isn't too
widely disseminated."  WHITTLE responded:  "Got it and
understand the sensitivity."

37.  That same day, THOMAS WHITTLE, the defendant,
forwarded the list to DAVID MIDDENDORF, the defendant, and said,
"The complete list.  Obviously, very sensitive.  We will not be
broadcasting this."

38.  On or about June 15, 2015, Brian Sweet had a
conversation with DAVID BRITT, the defendant, in which Sweet and
BRITT discussed engagements on the 2015 List.

39.  The following day, on or about June 16, 2015, DAVID
BRITT, the defendant, emailed Brian Sweet thanking Sweet for
their conversation the previous day and saying, "I thin[k] when
we were going through the list of Bank selections, you couldn't
recall the last 3 Bank names without your notes, would you be
able to get me the last three for 2015."  Sweet responded by
providing the engagements on the 2015 List.  In the email, Sweet
wrote:  "Please note there is some sensitivity with these, and
some of the teams have not yet been officially notified by the
PCAOB, so please use your discretion with this info."

40.   In addition to sharing the 2015 List with DAVID

MIDDENDORF, THOMAS WHITTLE, and DAVID BRITT, the defendants,

Brian Sweet also (i) told at least one KPMG engagement partner

who had not yet received notification from the PCAOB that the

partner's engagement would be subject to inspection in 2015; and

(ii) showed the 2015 GNF Planning Spreadsheet to certain KPMG

partners and used it to explain why the PCAOB had selected

certain engagements for inspection.

41.   In May and June of 2015, when Brian Sweet shared

confidential information about the 2015 List with DAVID

MIDDENDORF, THOMAS WHITTLE, and DAVID BRITT, the defendants,

among others, the audits selected for inspection in 2015 were

already past the Documentation Period and the work papers had

been archived.   Accordingly, the confidential PCAOB information

served the purpose of providing engagement partners extra time

to prepare for the inspections of their audits, including

preparing for their opening presentations to the PCAOB.

## Sweet Shares Other Confidential PCAOB Information With KPMG Personnel in 2015

42.   Throughout 2015, Brian Sweet continued to share

confidential PCAOB information with DAVID MIDDENDORF, THOMAS

WHITTLE, and DAVID BRITT, the defendants, among other KPMG

personnel.   The confidential information consisted of both (i)

information Sweet had taken from the PCAOB at the time of

Sweet's departure; and (ii) information Sweet learned after leaving the PCAOB through direct communications with PCAOB personnel.  For example:

a. In or about August 2015, Sweet had a conversation with another KPMG DPP Partner ("Partner-1") about whether the PCAOB would be inspecting FDIC-insured Issuers whose annual reports were submitted to the FDIC, rather than the SEC.  Following that conversation, on or about August 5, 2015, Sweet emailed Partner-1, writing:  "I checked my old planning notes and can confirm that [the issuers in question] are "NOT on the PCAOB's planning radar," and that because the Issuers had not been included in the Issuer count they had a "very remote chance of ever being evaluated for inspection."  Partner-1 forwarded the email to DAVID BRITT, the defendant, among others.

b. On or about October 20, 2015, Sweet emailed BRITT and other KPMG personnel, writing:

> I got a call from an old colleague over the weekend and they let me know a decision has been made to inspect a 'big bank' in both [] Switzerland and Japan next year (so obviously [Swiss Bank-1] and [Japanese Bank-1]) . . . They weren't sure if that meant that Germany would not have a bank inspected due to resource constraints the PCAOB will have, but the likelihood is somewhat lower.  The Board won't formally approve the inspection plan for KPMG globally until early February, so it is possible something could change, but I wanted to give you a heads up on this info as it may impact where we devote the most time and attention in the coming months.

c. On or about November 10, 2015, Sweet replied to the

above email, adding THOMAS WHITTLE and DAVID MIDDENDORF, the

defendants, among others, as recipients.  In that email, Sweet

said to BRITT, WHITTLE and MIDDENDORF:

> The PCAOB has decided to move up its inspection of KPMG
> Japan forward to January 2016 (they just notified the
> firm).  As a result of this timing, I've been told the
> PCAOB has decided NOT to look at a bank in Japan.
> Instead they are replacing it with a bank in Germany (so
> it looks like [German Bank] in lieu of [Japanese Bank-
> 1]).  Also, the PCAOB is also currently planning on doing
> a bank inspection in Col[o]mbia next year.

### Sweet Provides Confidential PCAOB Information to KPMG Personnel to Assist the Data Firm in Predicting Engagements to be Inspected

43.   In or about April 2015, prior to hiring Brian Sweet,

KPMG retained the Data Firm pursuant to an approximately

$250,000 contract, contingent on a certain rate of success, to

assist KPMG in predicting which of its engagements were likely

to be inspected by the PCAOB.

44.   In or about June 2015, DAVID MIDDENDORF, the

defendant, asked Brian Sweet to get involved in the Data Firm

project and to share with KPMG personnel working on the Data

Firm project and with the Data Firm itself whatever information

Sweet had.

45.   Accordingly, on or about June 29, 2015, Brian Sweet

spoke by telephone with the KPMG partner ("Partner-2") tasked

with leading the project with the Data Firm.  During the call,

Sweet read portions of a PCAOB planning document to Partner-2, specifically, a list of dozens of internal, confidential risk factors used by the PCAOB in making inspection selections. Partner-2, in turn, provided these risk factors to the Data Firm for use in its work.

46.    On or about September 3, 2015, Partner-2, Brian Sweet, and others met with the Data Firm.  Following the meeting, Partner-2 emailed Sweet reminding him that Partner-2 and the Data Firm were still waiting for Sweet to provide, among other information, the "2015 random selections."  The information sought was the identification of which engagements on the 2015 List had been chosen at random as opposed to those selected based on risk factors.  The requested information was useful to the Data Firm, and thus to KPMG, because engagements that had been chosen at random were of little utility in predicting future inspection selections and so should be given limited value in any Data Firm model.  The requested information was also treated as highly confidential by the PCAOB, reflected the deliberative process of the PCAOB, and was never disclosed to KPMG by the PCAOB even after KPMG was notified that those audits would be inspected.  Sweet provided Partner-2 with the requested information.

## HOLDER Provides Confidential PCAOB Information to Sweet While Seeking Employment at KPMG

47.  In or about April 2015, while still employed at the PCAOB and assigned to the KPMG inspection team, CYNTHIA HOLDER, the defendant, and Brian Sweet (who had accepted an offer of employment at KPMG but had not yet left the PCAOB) began discussing the possibility of Sweet assisting HOLDER in obtaining employment at KPMG.  For example, on or about April 16, 2015, Sweet emailed HOLDER a copy of Sweet's resumé to use as an example in preparing HOLDER's resumé to apply to KPMG.

48.  After Brian Sweet commenced employment at KPMG, Sweet continued to work to assist CYNTHIA HOLDER, the defendant, in obtaining employment at KPMG.  For example:

a. On or about May 4, 2015, Sweet's first day of employment at KPMG, HOLDER emailed Sweet to wish Sweet well and wrote:  "Please let me know how it goes (and what else you might need from me) ???????"  Sweet responded to HOLDER: "I've got a meeting set up with the head of the group tomorrow, and pulled together a list of potential hires . . . and put you as the #1 target!!!!) I really think we can make this work, and am very optimistic.  I'll fill you in after the convo tomorrow."

b. On or about May 9, 2015, HOLDER emailed Sweet a copy of her resumé, which incorporated comments previously provided by Sweet.  HOLDER said that she had been unable to open the

resumé earlier because she was traveling for work and did not want to open the document on her PCAOB computer.

    c. On or about Monday, May 11, 2015, Sweet emailed HOLDER to tell her that he would give her resumé to THOMAS WHITTLE, the defendant, on Wednesday because WHITTLE was out the next day and Sweet wanted to "hand deliver" it and "make a sell again."

49.  On or about May 20, 2015, CYNTHIA HOLDER, the defendant, emailed the PCAOB Ethics Office that she was "contacted today by a recruiter for KPMG asking if I would be interested in a job at the Firm.  I told them that I was not interested . . ."  Because HOLDER falsely indicated that she was not interested in pursuing employment at KPMG, the PCAOB Ethics Office told her that no further action was required.  In truth and in fact, and as HOLDER well knew, HOLDER was actively pursuing employment at KPMG and was very interested in acquiring such employment.  Had HOLDER made an accurate disclosure to the Ethics Office, the Ethics Office would have instructed her, among other things, that she had to immediately be removed from working on KPMG's matters.

50.  Instead, while actively pursuing employment at KPMG, CYNTHIA HOLDER, the defendant, also remained actively employed on the PCAOB team tasked with inspecting KPMG, and used that position to acquire confidential PCAOB information concerning

KPMG, which she repeatedly shared with Brian Sweet.   For
example:

a. In or about May 2015, in preparation for a meeting
with other KPMG personnel, Sweet asked HOLDER to provide Sweet
with an internal, confidential PCAOB Part II deficiencies
comment form.   On or about May 12, 2015, HOLDER used her
personal email address to email Sweet at his personal email
address and provided the requested document.   The subject line
of the email read "Anonymous Email."   The body of the email
consisted solely of an image of a winking-smiley face, and
attached the confidential document Sweet requested.

b. On another occasion in or about May 2015, HOLDER
advised Sweet that KPMG should do a pre-review of a particular
audit because it was likely to be inspected by the PCAOB.

c. On a third occasion in or about May 2015, HOLDER
called Sweet while HOLDER was in the field working on a KPMG
inspection.   During the call, HOLDER asked Sweet if she could
run a "technical issue" past Sweet and indicated that she was
unsure as to whether to write a comment.   Sweet suggested that
HOLDER should not write a comment and pointed her towards other
ostensibly similar situations in which no comment had been
written.   Sweet told THOMAS WHITTLE, the defendant, that a
member of the PCAOB inspections team had sought his advice and
that Sweet had suggested no comment be written.   WHITTLE was

pleased and asked whether Sweet had opened his drawer, seen where his paycheck came from, and then advised the PCAOB employee not to write a comment.

   d. On a fourth occasion in or about May or June 2015, HOLDER told Sweet about internal PCAOB deliberations concerning an ongoing KPMG inspection. In particular, HOLDER told Sweet that a PCAOB IT inspector wanted to write a comment, but that HOLDER did not want to do so and that there was dissention on the PCAOB inspection team.  Sweet told HOLDER that he would share the information with WHITTLE, which Sweet did.

   51.  On or about June 1, 2015, CYNTHIA HOLDER, the defendant, attended her first round of interviews at KPMG.  One of the individuals with whom she interviewed was Brian Sweet.

   52.  In or about mid-June 2015, following her first round of interviews at KPMG, CYNTHIA HOLDER, the defendant, told Brian Sweet that the PCAOB would be cancelling the inspection of a particular Issuer ("Issuer-1") and would not be replacing it. On or about June 17, 2015, Sweet emailed THOMAS WHITTLE, the defendant, and shared the information provided by HOLDER.  The PCAOB subsequently notified KPMG that it would not inspect Issuer-1.

   53.  On or about June 29, 2015, CYNTHIA HOLDER, the defendant, received an email inviting her to participate in a

second round of interviews with KPMG.  HOLDER forwarded the

email to Brian Sweet's personal email account.

54.   During the pendency of CYNTHIA HOLDER's, the

defendant's, KPMG job application, Brian Sweet told THOMAS

WHITTLE, the defendant, that HOLDER was the PCAOB employee who

had provided Sweet with certain confidential PCAOB information.

Sweet did so in order to encourage WHITTLE to hire HOLDER.

### HOLDER is Hired by KPMG and Takes Confidential PCAOB Information When She Leaves the PCAOB

55.   In or about July 2015, CYNTHIA HOLDER, the defendant,

was offered a non-partner position at KPMG as an Executive

Director in DPP.  Notwithstanding that non-partners in DPP were

generally required to relocate to New York, HOLDER was permitted

to commute from her home in Texas.

56.   Prior to leaving the PCAOB, CYNTHIA HOLDER, the

defendant, copied confidential PCAOB information onto a thumb

drive.  HOLDER later copied the contents of the thumb drive to

her home computer.  In order to avoid detection, HOLDER did not

copy the contents of the thumb drive to her KPMG computer.

57.   After commencing employment at KPMG, CYNTHIA HOLDER,

the defendant, made Brian Sweet aware that she had taken and was

in possession of confidential PCAOB information.  For example,

in or about June 2016, following a conversation between Sweet

and HOLDER about a particular PCAOB inspector, HOLDER emailed

Sweet an internal PCAOB comment form written by that inspector.

### Shortly After Joining KPMG, HOLDER Receives Confidential PCAOB Information from WADA

58.   After leaving the PCAOB for KPMG, CYNTHIA HOLDER, the

defendant, remained in frequent contact with JEFFREY WADA, the

defendant.   On several occasions between approximately August

2015 and March 2016, WADA – who was still employed at the PCAOB

– provided HOLDER with additional confidential PCAOB

information.   For example:

a. In or about November 2015, WADA told HOLDER that WADA

would be the team leader on a KPMG inspection in Japan.   WADA

also provided HOLDER with the dates of the inspection.   This

information permitted HOLDER to identify the specific Issuer

subject to inspection.   HOLDER shared the information with Brian

Sweet, who in turn shared it with relevant KPMG personnel.

b. On another occasion, prior to the inception of an

inspection, WADA told HOLDER that a particular Issuer had an

unidentified fraud risk.   This was useful information because it

permitted the engagement team to prepare a response concerning

why they had not identified such a risk.

### The SEC Initiates a Meeting with KPMG Concerning its Poor Inspection Results

59.   In or about early 2016, the SEC's OCA was frustrated

with KPMG, especially in light of concerns about audit quality

stemming from KPMG's poor PCAOB inspection results, and KPMG's lack of communication, among other matters. Accordingly, OCA asked KPMG leadership to meet with the SEC's Chief Accountant (the "Chief Accountant") at the SEC's headquarters.

60. On or about February 9, 2016, KPMG's CEO, KPMG's Vice Chair of Audit, and DAVID MIDDENDORF, the defendant, attended a meeting with the Chief Accountant and other members of OCA. During the meeting, the Chief Accountant told KPMG that KPMG should be in more regular contact with OCA and laid out the SEC's concerns about audit quality at KPMG. The representatives of KPMG acknowledged the audit quality issues, and in particular the need to improve quality with respect to ALLL issues.

61. Following this initial meeting, OCA had additional meetings with KPMG personnel to discuss KPMG's treatment of ALLL. DAVID BRITT, the defendant, was among the KPMG personnel in attendance at these meetings.

**WADA Becomes Increasingly Frustrated in His Job in 2016 and Provides Additional Confidential PCAOB Information to HOLDER**

62. In or about early 2016, JEFFREY WADA, the defendant, failed to obtain a promotion within the PCAOB. WADA communicated by email with CYNTHIA HOLDER, the defendant, and other PCAOB employees, among others, about his frustration with the lack of promotion. For example:

a. On or about March 1, 2016, PCAOB's head of inspections sent a PCAOB-wide email congratulating PCAOB personnel who had been promoted that year. WADA was not included among the individuals who had been promoted. WADA forwarded the email to HOLDER's personal email account. HOLDER forwarded the email to Brian Sweet's personal email account.

b. On or about March 10, 2016, WADA emailed another PCAOB employee who had also failed to obtain a promotion and complained that "I can't believe we both got screwed last year." Included in the email was a cartoon depicting a man with a screw in his back.

c. On or about March 24, 2016, WADA emailed a second PCAOB employee and said, apparently in reference to himself, that "Jeff v.2.0 was a failure and it ended up getting my promotion delayed so I buried it and came up with v.3.0."

63. Also in or about March 2016, JEFFREY WADA and CYNTHIA HOLDER, the defendants, spoke by telephone. During the call, WADA provided HOLDER with a confidential list of 12 Issuers audited by KPMG, that would be inspected by the PCAOB in 2016 (the "2016 List"). The vast majority of the Issuers on the list were banks.

64. On or about March 28, 2016, CYNTHIA HOLDER, the defendant, spoke to Brian Sweet by telephone. During the call, HOLDER told Sweet that she had received a call from JEFFREY

WADA, the defendant, and that WADA had provided HOLDER with the 2016 List, which consisted of 10 banking Issuers, and two non-banking Issuers.

65.    In an effort to demonstrate the reliability of the 2016 List, both during the call and in subsequent conversations, CYNTHIA HOLDER, the defendant, told Brian Sweet that JEFREY WADA, the defendant, had read the list of Issuers on the 2016 List in the chronological order in which the Issuers would be inspected, which made it clear to HOLDER that WADA was reading aloud from the PCAOB's internal inspection schedule for KPMG. Because WADA was not on the KPMG inspections team, he had no legitimate reason to access the PCAOB's internal inspection schedule for KPMG.

**MIDDENDORF, WHITTLE, BRITT and Sweet Initiate Stealth Re-Reviews Based On Confidential PCAOB Information Obtained from WADA**

66.    On or about March 28, 2016, after speaking with CYNTHIA HOLDER, the defendant, Brian Sweet spoke individually to both THOMAS WHITTLE and DAVID BRITT, the defendants.  Sweet told both WHITTLE and BRITT that Sweet had obtained the 2016 List from a former colleague at the PCAOB.  WHITTLE proposed an immediate conference call with Sweet, BRITT, and DAVID MIDDENDORF, the defendant, and indeed, proposed pulling MIDDENDORF out of a meeting to set up the call.

67.   Later that same day, Brian Sweet participated in a
conference call with DAVID MIDDENDORF, THOMAS WHITTLE, and DAVID
BRITT, the defendants.  During the call, MIDDENDORF, WHITTLE,
BRITT, and Sweet discussed the status of the audits on the 2016
List and the extent to which they were at risk of receiving
comments.  MIDDENDORF emphasized that the top priority was
protecting KPMG's monitoring programs.  This was because, while
any failed inspection of a particular audit would be bad, a
failed inspection for an audit subject to a monitoring program
would demonstrate that the monitoring programs were not working
and would represent a systemic failure.  Accordingly,
MIDDENDORF, WHITTLE, BRITT, and Sweet agreed to conduct "stealth
reviews" to re-review the audits on the 2016 List.  At the
direction of MIDDENDORF, WHITTLE, and BRITT, Sweet took charge
of organizing a re-review of the audits on the 2016 List that
were part of the existing ALLL monitoring program.  Sweet also
identified a small group of individuals, including Sweet and
CYNTHIA HOLDER, the defendant, who would serve as the best re-
reviewers (the "Re-reviewers").  BRITT assumed responsibility
for notifying engagement partners for audits on the 2016 List
that were not subject to the ALLL monitoring program.  Before
the call ended, both MIDDENDORF and WHITTLE emphasized the need
to keep the 2016 List and the nature and extent of the stealth
re-reviews a secret.

68.  That same day, DAVID BRITT, the defendant, had conversations with at least two additional individuals concerning the use of the 2016 List.

a. First, BRITT had a conversation with an engagement partner ("Partner-3") whose engagement was on the 2016 List but was not a part of any monitoring program.  During that conversation, Britt told Partner-3 that Partner-3's engagement would be inspected and that BRITT could not tell Partner-3 the source of BRITT's knowledge.  BRITT also told Partner-3 not to tell any other members of Partner-3's team.  BRITT directed Partner-3 to participate in a call with Brian Sweet and other Re-reviewers the following day.

b. That same day, BRITT emailed Brian Sweet asking Sweet to include Partner-3 on Sweet's call with the Re-reviewers. Sweet asked if BRITT had already spoken to Partner-3 about the call and BRITT responded that he "told [Partner-3] that the others on the call did not know what I told him and he had to keep his mouth shut."

c. At a dinner later that same night, Partner-3 spoke to DAVID MIDDENDORF, the defendant.  During the conversation, MIDDENDORF asked Partner-3 if BRITT had spoken to Partner-3 and reiterated that Partner-3's engagement would be inspected.

d. In addition to Partner-3, BRITT also spoke with Partner-1 about the 2016 List.  BRITT provided Partner-1 with a

false reason for the re-reviews, namely that a review of all the engagements in the ALLL Monitoring program was going to be conducted to confirm that the comments being made by the monitors were being properly addressed. In reality, only the audits on the 2016 List were being re-reviewed. BRITT told Partner-1 that BRITT wanted to include Partner-1 to consult as necessary in light of his significant institutional knowledge at KPMG. Partner-1 indicated that he had limited availability, but agreed to be available for consultations.

69. Also on March 28, 2016, DAVID BRITT, the defendant, sent an email to all KPMG partners whose audits were part of the ALLL monitoring program, and copied DAVID MIDDENDORF, the defendant, among others. In the email, BRITT wrote that "[a]s part of our wrap up and reporting of the results of the ALLL monitoring program" KPMG needed to gather additional information as soon as possible from eAudit (electronic audit program) files of engagements subject to the ALLL Monitoring Program and, accordingly, requested that the Re-reviewers, BRITT, and Partner-1 be given access to the audit files.

70. In truth and in fact, there was no intention to review each of the audits in the ALLL Monitoring Program. Nor was the extent of the re-reviews limited to the ALLL area. The request for access to all of the audits in the ALLL Monitoring Program was a method to cover up that only certain audits in the program

— those on the 2016 List — were being re-reviewed and to hide the extent of the re-reviews. Nor did DAVID BRITT, the defendant, intend that he or Partner-1 would participate in the re-reviews. Their inclusion in the access request was merely an effort to make the re-reviews look legitimate. Partner-1 was never consulted during the stealth re-reviews.

71. Finally, in or about March or April 2016, THOMAS WHITTLE, the defendant, asked another KPMG partner ("Partner-4") to take a second look at the work papers of an Issuer ("Issuer-2") that was on the 2016 List but not subject to any monitoring.

### Stealth Re-Reviews Identify Problems in Certain Audits and Result in Additional Audit Work

72. At the time of the theft and conveyance of the 2016 List, the audits on the 2016 List were largely in the Documentation Period and applicable accounting standards prohibited new audit work except for in certain limited circumstances. Re-reviews of the audits on the 2016 List accordingly focused on improving the documentation of the audit work that had already taken place in an effort to avoid receiving any PCAOB comments. Notwithstanding the focus of the effort on documentation, the re-reviews occasionally uncovered significant problems with an audit on the 2016 List and/or

resulted in the performance of additional audit work.  For example:

a.  The re-review of Issuer-2 revealed that Issuer-2 had failed to obtain required information from a third-party vendor concerning the vendor's own internal controls.  KPMG had failed to identify this deficiency during the audit of Issuer-2.  As a result of the identification of this deficiency during the re-review, THOMAS WHITTLE, the defendant, and others, decided to withdraw KPMG's opinion with respect to Issuer-2's internal controls.

b. Shortly after the decision to withdraw its opinion with respect to Issuer-2, KPMG was formally notified by the PCAOB that Issuer-2 would be inspected.

c. WHITTLE directed Brian Sweet to attempt to convince the PCAOB team leader responsible for the inspection of KPMG (the "Team Leader") not to inspect Issuer-2.  For reasons unrelated to this request, the audit of Issuer-2 was ultimately not inspected.

d. The re-review of the audit of another Issuer ("Issuer-3") revealed that the engagement team had, in certain instances, used 2016, rather than 2015, information in conducting an audit of the 2015 financial statements of Issuer-3.  As a result, KPMG personnel utilized the correct 2015 information to conduct additional substantive audit work during the Documentation

Period.  Although the fact of this additional audit work was documented, the documentation falsely stated that the error had been located "[d]uring the final review [conducted] in conjunction with the close-out" of the audit file.

e. During the re-review of the audit of another Issuer ("Issuer-4"), CYNTHIA HOLDER, the defendant, directed that the engagement team perform additional audit work with respect to the point at which certain stress tests would meet the materiality threshold.  Although such procedures were performed after the issuance of the audit opinion and during the Documentation Period, the fact that new audit work had been performed was not documented as required by applicable auditing standards.  Instead, KPMG personnel noted the additional work in an existing spreadsheet, concealing the fact that new audit work had been performed.

## WADA Conveys Confidential PCAOB Information About the PCAOB's Preliminary Inspection Selections for 2017

73.  On or about January 9, 2017, JEFFREY WADA and CYNTHIA HOLDER, the defendants, spoke by telephone.  During that conversation, WADA read HOLDER a confidential list of Issuers likely to be subject to inspection by the PCAOB in 2017 (the

"2017 Preliminary List"). HOLDER copied down the 2017
Preliminary List into a notebook.

74. On or about January 9, 2017, CYNTHIA HOLDER, the
defendant, spoke to Brian Sweet in person in KPMG's New York
office and told Sweet that she had received the 2017 Preliminary
List from JEFFREY WADA, the defendant.

75. Later that day, Brian Sweet met in person with THOMAS
WHITTLE and DAVID BRITT, the defendants, and told WHITTLE and
BRITT that Sweet had received a preliminary list of Issuers
likely to be subject to inspection from a former colleague at
the PCAOB. WHITTLE, BRITT, and Sweet discussed how to make use
of the information – which pertained to live audits for which an
audit opinion had not yet been issued – and agreed (i) to notify
certain partners that their engagements were on the 2017
Preliminary List; and (ii) to assign additional personnel to
review the audits of each of the banks on the 2017 Preliminary
List. In order to disguise these efforts, WHITTLE directed
Sweet to alter an internal inspection prediction list maintained
by Sweet to add any banks that appeared on the 2017 Preliminary
List but were not already on the internal list. Sweet did as
WHITTLE directed.

76. During the conversation, Brian Sweet emphasized to
THOMAS WHITTLE and DAVID BRITT, the defendants, that the
confidential 2017 Preliminary List was only preliminary and

could well be subject to change.  WHITTLE responded, in sum and
in substance, by asking Sweet to confirm that they would also
get the final list.   Sweet subsequently relayed WHITTLE's
comment to CYNTHIA HOLDER, the defendant, with the expectation
that HOLDER would obtain the final confidential list from
JEFFREY WADA, the defendant.

77.  Shortly thereafter, THOMAS WHITTLE, the defendant,
told DAVID MIDDENDORF, the defendant, about the existence of the
2017 Preliminary List and about the plan to assign additional
personnel to review the engagements on the 2017 Preliminary
List.

78.  Following Brian Sweet's January 9, 2017 conversation
with THOMAS WHITTLE and DAVID BRITT, the defendants, WHITTLE,
BRITT, and DAVID MIDDENDORF, the defendant, variously
participated in recruiting or assigning additional KPMG
personnel to take an extra look at the engagements on the 2017
Preliminary List, the audits of which were still underway.

### WADA Seeks Employment at KPMG

79.  Following his failure to obtain a promotion in March
2016, JEFFREY WADA, the defendant, continued to seek a promotion
within the PCAOB and shared his frustration with CYNTHIA HOLDER,
the defendant, among others.  By at least January 2017,
understanding that he would again fail to obtain a promotion,

WADA made efforts to obtain employment at KPMG, which he discussed with HOLDER, among others.  For example:

     a. On or about January 10, 2017, one day after providing HOLDER with the confidential 2017 Preliminary List, WADA emailed HOLDER on her personal email account, and wrote:  "It's funny how I was on the fast track to partner and clearly recognized for my talents at [WADA's previous employer] and then I end up in this [expletive] place with all the [expletive] politicking that I loathe and now I can't get a [expletive] promotion to save my life just because I refuse to kiss people's [expletive] and spread the political rhetoric.  God this place sucks.  Please let me know what else you need from me."  WADA attached his resumé to the email.  HOLDER forwarded WADA's email to Brian Sweet.

     b. That same day, WADA communicated via text message with HOLDER and said that he "had a vision he worked for KPMG."

     c. On or about January 24, 2017, WADA communicated via text message with HOLDER, and asked if she "had a chance to unofficially ask around about a position?" and said that if the PCAOB was "so desperate to hold on to me they should have [expletive] promoted me."

     d. On or about January 30, 2017, WADA again communicated via text message with HOLDER and asked if she had received his

revised resumé, and said that he was "ready to turn a page in [his] career."

## WADA Conveys Confidential PCAOB Information
## About Engagements to Be Inspected in 2017

80.   On or about February 2, 2017, JEFFREY WADA, the defendant, sent two text messages to CYNTHIA HOLDER, the defendant, stating first, "Okay, I have the grocery list" and then, one minute later, "All the things you'll need for the year."

81.   The following day, on or about February 3, 2017, JEFFREY WADA and CYNTHIA HOLDER, the defendants, had an approximately 48-minute telephone conversation.   During the conversation, WADA read HOLDER a list of approximately 50 stock ticker symbols, representing the full confidential list of KPMG clients to be inspected by the PCAOB in 2017 (the "2017 Final List").   WADA also provided HOLDER with the areas of focus for each engagement, in addition to other information.

82.   That same day, CYNTHIA HOLDER, the defendant, called Brian Sweet and told him that she had received the confidential 2017 Final List from JEFFREY WADA, the defendant.   HOLDER read the list to Sweet, together with the focus areas, while Sweet wrote the information down.

83.   That day, and in the ensuing several days, Brian Sweet discussed the 2017 Final List on multiple occasions with DAVID

MIDDENDORF, THOMAS WHITTLE, and DAVID BRITT, the defendants, among others.  For example:

     a. On or about February 3, 2017, Sweet spoke to WHITTLE, and provided WHITTLE with the 2017 Final List.  WHITTLE and Sweet briefly discussed which engagement partners should be notified that their engagements had been selected for inspection.  They agreed to convene a call to discuss the matter further on Monday, February 6, 2017.

     b. Also on or about February 3, 2017, Sweet spoke to BRITT and provided BRITT with the 2017 Final List and the focus areas.  BRITT copied down portions of the 2017 Final List and the focus areas.

     c. Between approximately February 3, 2017 and February 6, 2017, and at WHITTLE's direction, Sweet notified several engagement partners whose engagements were on the 2017 Final List that their engagements were going to be inspected.

     d. On or about February 6, 2017, BRITT and Sweet spoke on the telephone and discussed the import of the focus areas for the Issuers on the 2017 Final List, among other matters.  BRITT expressed regret that he was unavailable to join the conference call scheduled later that day.

     e. That same day, MIDDENDORF, WHITTLE, and Sweet participated in an approximately 90-minute call to discuss the 2017 Final List.  Sweet again read through the list of Issuers

and focus areas.  MIDDENDORF copied down the list in the notes
function of his cellular telephone.  During the call,
MIDDENDORF, WHITTLE, and Sweet again discussed the notification
of engagement partners and the need to keep secret their
possession of the 2017 Final List.  For example, with respect to
a particular engagement, WHITTLE noted that the inspection of
that particular engagement had been cancelled the prior year as
the result of concerns about the Zika virus and that the
cancellation could be used as a pretext for their belief that
the engagement would be inspected in 2017.  At one point in the
call, MIDDENDORF said, in sum and substance, that the
information was simply too good to pass up.

### The Existence of the 2017 Final List is Reported to
### KPMG's General Counsel;
### HOLDER and Sweet Attempt a Cover Up

    84.  On or about February 6, 2017, an engagement partner
("Partner-5"), who had been informed by Brian Sweet that
Partner-5's engagements would be inspected by the PCAOB,
reported the conversation to Partner-5's supervisor.  Partner-
5's supervisor reported the matter further and by February 13,
2017, the matter had been reported to KPMG's General Counsel.
Shortly thereafter, members of KPMG's Office of the General
Counsel ("OGC") reached out to speak to both Sweet and CYNTHIA
HOLDER, the defendant.

85.  Prior to speaking to OGC, CYNTHIA HOLDER, the
defendant, spoke to Brian Sweet.  During the conversation,
HOLDER told Sweet that she intended to tell OGC that she had
received the 2017 Final List anonymously in the mail and that
she would reveal only that she had received the list of Issuers,
but would not admit she had also received the focus areas.
HOLDER further stated that she had promised JEFFREY WADA, the
defendant, that she would not reveal his involvement.  HOLDER
asked Sweet to tell the same lies to OGC.  Holder also counseled
Sweet on how to handle questioning from OGC personnel.

86.  In approximately mid-February 2017, Brian Sweet spoke
to OGC personnel.  During the conversation, OGC personnel asked
Sweet for his handwritten copy of the 2017 Final List.  Sweet's
copy of the 2017 Final List, however, contained both the Issuers
and the focus areas, which was inconsistent with the lies
CYNTHIA HOLDER, the defendant, and Sweet had agreed to tell.  In
order to maintain the lies, Sweet created a second copy of the
2017 Final List containing only the Issuer names and
deliberately omitting the focus areas, and provided this fake
list to OGC personnel.  In doing so, Sweet falsely represented
that this was the list Sweet had originally created when he
received the information.  Sweet then burned the true copy of
the 2017 Final List.  Sweet told HOLDER that Sweet had burned
the original list and provided a false list to OGC.  HOLDER

responded that OGC personnel had similarly asked her for her copy of the 2017 Final List but that she had falsely told OGC that she had shredded it.

87.  Shortly thereafter, CYNTHIA HOLDER, the defendant, contacted Brian Sweet and told him that HOLDER had become aware that OGC was monitoring their email communications.  Sweet worried that Sweet had saved confidential PCAOB information to Sweet's KPMG computer.  HOLDER told Sweet that it was a mistake to have saved confidential PCAOB information to Sweet's KPMG computer and that she had maintained the confidential PCAOB information she had stolen on a flash drive in her residence. HOLDER advised that Sweet should delete some of the illicit information on his KPMG computer but not all of it, as that would appear suspicious.  In light of HOLDER's advice, Sweet deleted only some of the confidential PCAOB information from Sweet's KPMG computer.  HOLDER later reminded Sweet that HOLDER had emailed Sweet confidential PCAOB Part II comments and directed Sweet to delete that email as well.

88.  In or about the end of February 2017, OGC personnel requested that CYNTHIA HOLDER, the defendant, and Sweet, among others, provide their cellular telephones to OGC.  In response, HOLDER deleted all of her text messages with JEFFREY WADA, the defendant.  HOLDER and Sweet discussed the request and HOLDER told Sweet that she had deleted her communications with WADA,

43

and directed Sweet to similarly delete any text messages concerning WADA.

89.   In a further effort to hide their ongoing communications, CYNTHIA HOLDER, the defendant, suggested that she and Brian Sweet obtain "burner telephones," that is, prepaid cellular telephones that could not be traced to HOLDER or Sweet. HOLDER also suggested that she and Sweet could communicate through their spouses' cellular telephones to avoid detection. Finally, HOLDER suggested that she and Sweet use a code to communicate.   HOLDER and Sweet agreed that either one could communicate by posting a photo relating to a specified college football team on Instagram, following which they would each dial in to a designated KPMG conference call number.

### Statutory Allegations

90.   From at least in or about April 2015, up to and including in or about February 2017, in the Southern District of New York and elsewhere, DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER, and JEFFREY WADA, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, the SEC, in violation of Title 18, United States Code, Section 371.

91.   It was a part and an object of the conspiracy that DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER,

and JEFFREY WADA, the defendants, and others known and unknown, willfully and knowingly, using deceit, craft, trickery and dishonest means, would and did defraud the United States and an agency thereof, to wit, the SEC, by misappropriating, embezzling, obtaining, sharing, and using confidential information from the PCAOB in order to fraudulently affect PCAOB inspection outcomes, the results of which the defendants knew were reported to the SEC and utilized by the SEC to carry out its regulatory and enforcement functions, thereby impeding, impairing, defeating, and obstructing the lawful function of the SEC, in violation of Title 18, United States Code, Section 371.

## Overt Acts

92.   In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about May 2015, THOMAS WHITTLE, the defendant, sent an email from KPMG's Manhattan office, soliciting confidential PCAOB information concerning which of KPMG's engagements would be subject to inspection by the PCAOB in 2015.

b.   In or about June 2015, DAVID BRITT, the defendant, sent an email from KPMG's Manhattan office, soliciting confidential PCAOB information concerning which of

KPMG's engagements would be subject to inspection by the PCAOB in 2015.

        c.   In or about March 2016, JEFFREY WADA, the defendant, called CYNTHIA HOLDER, the defendant, and provided confidential PCAOB information concerning the identity of certain of KPMG's engagements that would be subject to inspection by the PCAOB in 2016.

        d.   On or about March 28, 2016, during the Documentation Period for most of the engagements at issue, DAVID MIDDENDORF, the defendant, WHITTLE, BRITT, and others, participated in a conference call in KPMG's Manhattan office during which they discussed the utilization of valuable confidential PCAOB information concerning the identity of certain of KPMG's engagements that would be inspected by the PCAOB in 2016.

        e.   On or about March 28, 2016, BRITT sent an email from KPMG's Manhattan office directing that access be given to various audit files in order to allow secret re-reviews to occur.

        f.   In or about January 2017, WADA and HOLDER spoke on the telephone, during which conversation WADA shared valuable confidential PCAOB information concerning the identity of KPMG's engagements that would likely be subject to inspection by the PCAOB in 2017.

g.    In or about February 2017, WADA and HOLDER spoke on the telephone, during which conversation WADA shared valuable confidential PCAOB information concerning the identity of certain of KPMG's engagements that would be subject to inspection by the PCAOB in 2017.

h.    In or about February 2017, MIDDENDORF, WHITTLE, and others participated in a conference call in KPMG's Manhattan office during which they acquired and discussed the utilization of valuable confidential PCAOB information concerning the identity of certain of KPMG's engagements that would be subject to inspection by the PCAOB in 2017.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Conspiracy to Commit Wire Fraud)**

The Grand Jury further charges:

93.   The allegations contained in paragraphs 1 through 89 and 92 of this Indictment are repeated and realleged as if fully set forth herein.

94.   From at least in or about April 2015, up to and including in or about February 2017, in the Southern District of New York and elsewhere, DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER, and JEFFREY WADA, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other

to commit wire fraud in violation of Title 18, United States Code, Section 1343.

95.   It was a part and an object of the conspiracy that DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER, and JEFFREY WADA, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice,  in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
### (Wire Fraud – 2015)

The Grand Jury further charges:

96.  The allegations contained in paragraphs 1 through 89 and 92 of this Indictment are repeated and realleged as if fully set forth herein.

97.   From at least in or about April 2015 through at least in or about May 2015, in the Southern District of New York and elsewhere, DAVID MIDDENDORF, THOMAS WHITTLE, and DAVID BRITT,

the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MIDDENDORF, WHITTLE, and BRITT participated in a scheme to defraud the PCAOB by misappropriating, embezzling, obtaining, sharing, and using the PCAOB's property in the form of valuable confidential information and documents concerning planned PCAOB inspections in 2015, and by transmitting such information by email, all in breach of duties of confidentiality and other duties owed by former or current PCAOB employees to the PCAOB.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
### (Wire Fraud – 2016)

The Grand Jury further charges:

98.   The allegations contained in paragraphs 1 through 89 and 92 of this Indictment are repeated and realleged as if fully set forth herein.

99.   From at least in or about March 2016 through at least in or about May 2016, in the Southern District of New York and

elsewhere, DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT,

CYNTHIA HOLDER, and JEFFREY WADA, the defendants, willfully and

knowingly, having devised and intending to devise a scheme and

artifice to defraud, and for obtaining money and property by

means of false and fraudulent pretenses, representations, and

promises, transmitted and caused to be transmitted by means of

wire, radio, and television communication in interstate and

foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, to wit,

MIDDENDORF, WHITTLE, BRITT, HOLDER, and WADA participated in a

scheme to defraud the PCAOB, by misappropriating, embezzling,

obtaining, sharing, and using the PCAOB's property in the form

of valuable confidential information and documents concerning

planned PCAOB inspections in 2016, and by transmitting such

information by email and telephone, all in breach of duties of

confidentiality and other duties owed by former or current PCAOB

employees to the PCAOB.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Wire Fraud - 2017)

The Grand Jury further charges:

100. The allegations contained in paragraphs 1 through 89

and 92 of this Indictment are repeated and realleged as if fully

set forth herein.

101. From at least in or about January 2017 through at least in or about February 2017, in the Southern District of New York and elsewhere, DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER, and JEFFREY WADA, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MIDDENDORF, WHITTLE, BRITT, HOLDER, and WADA participated in a scheme to defraud the PCAOB, by misappropriating, embezzling, obtaining, sharing, and using the PCAOB's property in the form of valuable confidential information and documents concerning planned PCAOB inspections in 2017, and by transmitting such information by email and telephone, all in breach of duties of confidentiality and other duties owed by former or current PCAOB employees to the PCAOB.

(Title 18, United States Code, Sections 1343 and 2.)

**FORFEITURE ALLEGATIONS AS TO COUNTS TWO THROUGH FIVE**

102. As a result of committing the offenses alleged in Counts Two through Five of this Indictment, DAVID MIDDENDORF, THOMAS WHITTLE, DAVID BRITT, CYNTHIA HOLDER, and JEFFREY WADA,

the defendants, shall forfeit to the United States pursuant to
Title 18, United States Code, Section 981(a)(1)(C) and Title 28,
United States Code Section 2461(c), any and all property, real
and personal, that constitutes or is derived from proceeds
traceable to the commission of said offenses, including but not
limited to a sum of money in United States currency representing
the amount of proceeds traceable to the commission of said
offense that the defendants personally obtained.

Substitute Assets Provision

103. If any of the above-described forfeitable property, as
a result of any act or omission by any of the defendants:

      a.   cannot be located upon the exercise of due
diligence;

      b.   has been transferred or sold to, or deposited
with, a third person;

      c.   has been placed beyond the jurisdiction of the
Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which
cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), and Title 28, United States
Code Section 2461(c), to seek forfeiture of any other property of

the defendants up to the value of the above forfeitable

property.

> (Title 18, United States Code, Section 981;
> Title 21, United States Code, Section 853;
> Title 28, United States Code, Section 2461.)


_____
GRAND JURY FOREPERSON

_____
GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v. –

DAVID MIDDENDORF,
THOMAS WHITTLE,
DAVID BRITT,
CYNTHIA HOLDER,
and JEFFREY WADA,

Defendants.

### SEALED INDICTMENT

18 Cr. _____  (___)

(Title 18, United States Code, Sections
371, 1349, 1343, and 2.)

_____          GEOFFREY S. BERMAN
Foreperson                               U.S. Attorney.

1/17/18 – Filed Sealed Indictment
ae      W/W's issued

J Petman
U.SMJ

54