UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     v.

DAVID MIDDENDORF, et al.,

               Defendants.

Case No. 18 Cr. 36 (JPO)

**JOINT MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS DAVID MIDDENDORF, THOMAS WHITTLE,
AND DAVID BRITT'S MOTION TO DISMISS THE INDICTMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

STATUTORY AND FACTUAL BACKGROUND ................................................................... 3

    The History and Role of the PCAOB ................................................................................... 3

    Criminalization (or Lack Thereof) of PCAOB Rules .......................................................... 4

    The Allegations in the Indictment ....................................................................................... 6

ARGUMENT .............................................................................................................................. 9

I.   The Conspiracy to Defraud the United States Count Fails to State an Offense. ................. 9

    A.   The Court Must "Scrutinize Carefully" an Indictment Charging a Conspiracy to
          Defraud the United States. ...................................................................................... 10

    B.   The Indictment Does Not Allege a Conspiracy "Targeted" at the SEC's Lawful
          Functions. ................................................................................................................. 11

    C.   The Indictment Does Not Allege an Agreement to Use Deceitful or Dishonest
          Means to Defraud the SEC. ..................................................................................... 15

    D.   The Government's Theory of Defrauding the United States Is Unconstitutionally
          Vague. ...................................................................................................................... 20

        1.   The Indictment's application of Section 371's defraud clause is
             unconstitutionally vague. ............................................................................ 20

        2.   At a minimum, as a matter of constitutional avoidance, any permissible "core"
             of Section 371 does not include the conduct charged here. .......................... 23

II.  The Wire Fraud Counts Fail Because the PCAOB Information at Issue Here Is an Intangible
    Regulatory Interest, Not "Money or Property." .................................................................. 26

    A.   The Mail and Wire Fraud Statutes' Protection of "Property" Does Not Include
          Intangible Regulatory Interests. .............................................................................. 26

    B.   The PCAOB's Nonpublic Regulatory Information Is Not "Property" under the
          Wire Fraud Statute. ................................................................................................. 29

    C.   The Government's Unprecedented Theory of "Property" Violates Clear Statement
          Principles of Statutory Construction and the Rule of Lenity. ................................. 37

    D.   The Government's Theory of Wire Fraud Is Unconstitutionally Vague. ................. 41

CONCLUSION .......................................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.*,
  198 U.S. 236 (1905)................................................................................33

*Boos v. Barry*,
  485 U.S. 312 (1988)................................................................................41

*Carpenter v. United States*,
  484 U.S. 19, 25 (1987)................................................................32, 33, 34

*Cleveland v. United States*,
  531 U.S. 12 (2000)......................................................................... *passim*

*Dennis v. United States*,
  384 U.S. 855 (1966)........................................................................11, 16, 21

*Dep't of Homeland Sec. v. MacLean*,
  135 S. Ct. 913 (2015)..............................................................................6

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988)................................................................................31

*Dirks v. SEC*,
  463 U.S. 646 (1983)................................................................................33

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010)....................................................3, 4, 6, 12, 30, 31

*Glasser v. United States*,
  315 U.S. 60 (1942)................................................................................24

*Haas v. Henkel*,
  216 U.S. 462 (1910)................................................................................24

*Hammerschmidt v. United States*,
  265 U.S. 182 (1924)........................................................................10, 16

*Int'l News Serv. v. Associated Press*,
  248 U.S. 215 (1918)................................................................................34

*Johnson v. United States*,
  135 S. Ct. 2551 (2015)............................................................................20

*Jones v. United States,*
    529 U.S. 848 (2000)................................................................................37

*Kolender v. Lawson,*
    461 U.S. 352 (1983)........................................................................20, 22

*Lattanzio v. Deloitte & Touche LLP,*
    476 F.3d 147 (2d Cir. 2007)..............................................................25

*Lebron v. Nat'l R.R. Passenger Corp.,*
    513 U.S. 374 (1995)...........................................................................12

*Marinello v. United States,*
    138 S. Ct. 1101 (2018).................................................................23, 40

*McNally v. United States,*
    483 U.S. 350 (1987)...........................................2, 24, 27, 38, 41

*Neder v. United States,*
    527 U.S. 1 (1999)...............................................................................16

*New York Times Co. v. United States,*
    403 U.S. 713 (1971)...........................................................................31

*Pasquantino v. United States,*
    544 U.S. 349 (2005).....................................................................27, 36

*Ruckelshaus v. Monsanto,*
    467 U.S. 986 (1984)...........................................................................33

*Sekhar v. United States,*
    133 S. Ct. 2720 (2013).......................................................................42

*Skilling v. United States,*
    561 U.S. 358 (2010)...............................................22, 23, 24, 41

*Tanner v. United States,*
    483 U.S. 107 (1987)...............................10, 11, 12, 13, 16, 18

*United States v. Adkinson,*
    158 F.3d 1147 (11th Cir. 1998) ......................................................12

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012)..................................................................9

*United States v. Alston,*
    77 F.3d 713 (3d Cir. 1996)...............................................................10

iii

*United States v. Ballistrea,*
    101 F.3d 827 (2d Cir. 1996)........................................................................18

*United States v. Bengis,*
    631 F.3d 33 (2d Cir. 2011).........................................................................36

*United States v. Caldwell,*
    989 F.2d 1056 (9th Cir. 1993) ..............................................................16, 22

*United States v. Caso,*
    935 F.2d 1288, 1991 WL 101559 (4th Cir. June 14, 1991)......................16

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012)................................10, 17, 18, 21, 23, 25

*United States v. Finnerty,*
    533 F.3d 143 (2d Cir. 2008).......................................................................19

*United States v. Goldberg,*
    105 F.3d 770 (1st Cir. 1997) ................................................................11, 12

*United States v. Gradwell,*
    243 U.S. 476 (1917)...................................................................................11

*United States v. Grossman,*
    843 F.2d 78 (2d Cir. 1988).........................................................................35

*United States v. Hedaithy,*
    392 F.3d 580 (3d Cir. 2004).......................................................................35

*United States v. Hope,*
    901 F.2d 1013 (11th Cir. 1990) .................................................................17

*United States v. Klein,*
    247 F.2d 908 (2d Cir. 1957)........................................................10, 14, 16

*United States v. Licciardi,*
    30 F.3d 1127 (9th Cir. 1994) .....................................................................11

*United States v. Murphy,*
    809 F.2d 1427 (9th Cir. 1987) ..............................................................16, 17, 19

*United States v. Nersesian,*
    824 F.2d 1294 (2d Cir. 1987).................................................................16, 19

*United States v. Nixon,*
    418 U.S. 683 (1974)...................................................................................31

*United States v. Pacione*,
    738 F.2d 567 (2d Cir. 1984)..........................................................................6

*United States v. Peltz*,
    433 F.2d 48 (2d Cir. 1970)...........................................................................16

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000)...........................................................................9

*United States v. Rodriguez-Davalos*,
    No. EP-10-CR-2159-KC, 2011 WL 5509542 (W.D. Tex. Nov. 10, 2011) ............................36

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1977)......................................................................11, 21

*United States v. Rosengarten*,
    857 F.2d 76 (2d Cir. 1988)..........................................................................21

*United States v. Shellef*,
    507 F.3d 82 (2d Cir. 2007)..........................................................................16

*United States v. Tuohey*,
    867 F.2d 534 (9th Cir. 1989) ................................................................11, 16, 19

*United States v. Ying Wai Phillip Ng*,
    578 F. App'x 38 (2d Cir. 2014) .....................................................................36

*United States v. Zemlyansky*,
    945 F. Supp. 2d 438 (S.D.N.Y. 2013)................................................................37

*Whitman v. Am. Trucking Ass'n*,
    531 U.S. 457 (2001)................................................................................38

*Yates v. United States*,
    135 S. Ct. 1074 (2015)..............................................................................3

**Statutes**

5 U.S.C. § 552(b) (1982) .............................................................................33, 34

5 U.S.C. § 552a(i) ....................................................................................39

6 U.S.C. § 131 .......................................................................................39

6 U.S.C. § 133(f) ....................................................................................39

15 U.S.C. § 78j(b) ....................................................................................5

15 U.S.C. § 78j-1(g)(9) ...............................................................................5

15 U.S.C. § 78m(*l*) ............................................................................................................5

15 U.S.C. § 78q(a)(1) .........................................................................................................5

15 U.S.C. § 78u(d)(1) ....................................................................................................5, 31

15 U.S.C. § 78u(d)(3) ....................................................................................................5, 31

15 U.S.C. § 78ff(a) .............................................................................................................5

15 U.S.C. § 7202(b)(1) ..................................................................................................5, 31

15 U.S.C. § 7211(a) ......................................................................................................3, 30

15 U.S.C. § 7211(b) ......................................................................................................3, 12

15 U.S.C. § 7211(g)(3) ..................................................................................................6, 31

15 U.S.C. § 7213 ................................................................................................................4

15 U.S.C. § 7214(a) ............................................................................................4, 30, 32

15 U.S.C. § 7214(g) ....................................................................................................4, 19

15 U.S.C. § 7214(h)(1) ......................................................................................................4

15 U.S.C. § 7217(a) ...........................................................................................................4

15 U.S.C. § 7217(b)(2) .......................................................................................................4

15 U.S.C. § 7217(c)(2) .......................................................................................................4

15 U.S.C. § 7219 ................................................................................................................3

15 U.S.C. § 7233 ................................................................................................................5

18 U.S.C. § 2 ...............................................................................................................1, 26

18 U.S.C. § 371 ....................................................................................................... *passim*

18 U.S.C. § 641 ...............................................................................................................39

18 U.S.C. § 793 ...............................................................................................................39

18 U.S.C. § 794 ...............................................................................................................39

18 U.S.C. § 798 ...............................................................................................................39

18 U.S.C. § 1341 ........................................................................................................38, 40

18 U.S.C. § 1343 ...............................................................................................1, 26, 38, 39

18 U.S.C. § 1346 .................................................................................................................22

18 U.S.C. § 1349 ...........................................................................................................1, 26

18 U.S.C. § 1905 .................................................................................................................39

18 U.S.C. § 1961(1)(B) ......................................................................................................41

26 U.S.C. § 7212(a) ............................................................................................................23

42 U.S.C. § 2014(y) ...........................................................................................................39

42 U.S.C. § 2274 ..........................................................................................................39, 40

42 U.S.C. § 2277 .................................................................................................................39

50 U.S.C. § 783 ...................................................................................................................39

Cal. Gov. Code § 1098 .......................................................................................................38

Cal. Gov. Code § 8545 .......................................................................................................38

Cal. Gov. Code § 8545.1 ....................................................................................................38

**Other Authorities**

William Blackstone, Commentaries ....................................................................................32

Brief for Defendant-Appellant Robert Coplan, *United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) (No. 10-583), 2010 WL 3948689 .................................25

John C. Coffee Jr., *Hush!: The Criminal Status of Confidential Information after*
   McNally *and* Carpenter *and the Enduring Problem of Overcriminalization*, 26
   Am. Crim. L. Rev. 121 (1988).................................................................................40

Edward Coke, Institutes of the Laws of England (1797)....................................................32

W. Fletcher, Cyclopedia of Law of Private Corporations (rev. ed. 1986)....................34

Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405
   (1959).........................................................................................................................21

Stephen P. Mulligan & Jennifer K. Elsea, Congressional Research Service, CRS
   R41404, Criminal Prohibitions on Leaks and Other Disclosures of Classified
   Defense Information (2017)......................................................................................39

Order Approving Proposed Code of Ethics,
68 Fed. Reg. 64,672 (Nov. 14, 2003)..........................................................................6

S. Rep. No. 107-146 (2002) ......................................................................................5

S. Rep. No. 107-205 (2002) ..................................................................................4, 5

Whistleblower Protections for Classified Disclosures, 22 Op. O.L.C. 92 (1998) .......................31

## INTRODUCTION

This motion is about the outer boundaries of two generic federal criminal statutes: the "defraud" clause of the conspiracy statute, 18 U.S.C. § 371, and the wire fraud statute, 18 U.S.C. § 1343.

Defendants David Middendorf, Thomas Whittle, and David Britt (the "Defendants"), are former partners of KPMG LLP ("KPMG"), an accounting firm that audits the financial statements of public companies. The Indictment alleges that the Defendants and others obtained confidential information from the Public Company Accounting Oversight Board ("PCAOB") about the identities of the public company audits that the PCAOB planned to examine during its annual regulatory inspections of KPMG and used that information to affect the results of those inspections.

Based on this alleged conduct, the Indictment charges two theories of liability: a fraud on the Securities and Exchange Commission ("SEC") and a fraud on the PCAOB. Count One charges a conspiracy to defraud an agency of the United States—the SEC—in violation of 18 U.S.C. § 371. Counts Two through Five charge defrauding and conspiring to defraud the PCAOB of its property, that is, its confidential information, through use of the wires in violation of 18 U.S.C. §§ 2, 1343, and 1349. Neither theory survives scrutiny.

Count One fails to state the offense of conspiring to defraud the United States. The "defraud" clause of § 371 has been interpreted broadly—and in the view of a recent Second Circuit panel, likely too broadly—as reaching schemes to defraud the United States and its agencies by impairing their lawful functions through deceit. But despite its regulatory function, the PCAOB is a private nonprofit organization, not a federal agency. For this reason, the Indictment does not and cannot rest on a scheme to impair the PCAOB's functions. Instead, the Indictment alleges that the Defendants conspired to impair the functions of the *SEC*.

Framed this way, the Indictment fails to allege two essential elements of a conspiracy to defraud the SEC.  First, it does not allege that the Defendants *targeted* their purported fraud at obstructing the SEC; it merely alleges that they knew the SEC would receive inspection reports from the PCAOB.  Knowledge is not sufficient to allege the necessary element of purpose. Second, the Indictment fails to allege that the Defendants conspired to "defraud" the SEC.  An essential element of a conspiracy to defraud the United States is making a misrepresentation to the government or breaching a duty owed to the government, either directly or through a proxy. The Indictment alleges neither.  And, in the absence of such allegations, the Government's theory of defrauding the SEC by proxy through the PCAOB is not only novel and contrary to precedent, it is unconstitutionally vague.

Counts Two through Five, which charge the Defendants with scheming to defraud the PCAOB, fare no better.  The Supreme Court has repeatedly held that the mail and wire fraud statutes criminalize fraud directed at "money or property" only, not vague, intangible interests like a right to honest services or the efficacy of a regulatory system.  *McNally v. United States*, 483 U.S. 350, 360 (1987); *Cleveland v. United States*, 531 U.S. 12, 18-19, 26-27 (2000).  The Indictment alleges that the Defendants defrauded the PCAOB of its "valuable confidential information and documents concerning planned PCAOB inspections."  Indictment ¶¶ 97, 99, 101.  But the PCAOB's interest in protecting the confidentiality of its planned inspection targets is an intangible regulatory interest not protected by the wire fraud statute.

Dismissal of the Indictment is not only mandated by precedent, it is consistent with Congress's considered creation of the PCAOB and its regulatory role.  Congress placed the PCAOB outside the federal government and empowered it to promulgate rules governing the conduct of public company auditing.  Congress also specified how those rules would be

enforced, establishing criminal penalties for violations of only a small subset and leaving enforcement of the rest—including the confidentiality rule at issue here—to administrative and civil remedies.

This Court should reject the Indictment's attempt to stretch the defraud clause of § 371 and the wire fraud statute to criminalize conduct where Congress expressly decided not to, and where doing so would breach the statutory and constitutional boundaries the Supreme Court has established to prevent these provisions from being contorted to reach any conduct of which the Government disapproves.  The federal criminal code is not an evolving body of common law. Absent clear congressional intent, federal crimes are construed narrowly.  Because the Indictment fails to state an offense of conspiring to defraud the United States or wire fraud, it should be dismissed.

## STATUTORY AND FACTUAL BACKGROUND

Before summarizing the Indictment's allegations, it is helpful to place in context the role of the PCAOB and the enforcement framework Congress established for PCAOB rules.

### *The History and Role of the PCAOB*

Congress created the PCAOB as part of the Sarbanes-Oxley Act of 2002.  *See* 15 U.S.C. § 7211(a).  The PCAOB's function is to regulate accounting firms, like KPMG, that audit public companies.  *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010); *see also Yates v. United States*, 135 S. Ct. 1074, 1081 (2015).  Although the PCAOB serves a regulatory role, it is by statute "a private 'nonprofit corporation,' and [its] members and employees are not considered Government 'officer[s] or employee[s]' for statutory purposes." *Free Enter. Fund*, 561 U.S. at 484 (quoting 15 U.S.C. § 7211(a), (b)).  The PCAOB is funded not by the federal government, but by fees paid by regulated entities.  15 U.S.C. § 7219.  This structure, though entirely unique, "was modeled on private self-regulatory organizations in the

securities industry—such as the New York Stock Exchange—that investigate and discipline their own members subject to [SEC] oversight." *Free Enter. Fund*, 561 U.S. at 484. The PCAOB's nongovernment status was also intended to ensure that the PCAOB could "recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale." *Id.* at 484-85; *see also* S. Rep. 107-205, at 7 (2002).

Sarbanes-Oxley gives the SEC limited "oversight and enforcement authority over the [PCAOB]." 15 U.S.C. § 7217(a). The SEC approves PCAOB rules and PCAOB-imposed sanctions. *Id.* § 7217(b)(2), (c)(2). Even so, the PCAOB "has significant independence in determining its priorities and intervening in the affairs of regulated firms (and the lives of their associated persons) without [SEC] preapproval or direction." *Free Enter. Fund*, 561 U.S. at 505. As a result, the PCAOB is left to enforce its rules largely independent of the SEC, which has no "power to start, stop, or alter individual [PCAOB] investigations." *Id.* at 504.

Sarbanes-Oxley mandates that the PCAOB annually inspect public company accounting firms like KPMG. 15 U.S.C. § 7214(a). In the course of each yearly inspection, the PCAOB examines a sampling of each firm's audits. The PCAOB is required to report the results of its inspections to the SEC, to each appropriate state regulatory authority, and (in part) to the public. *Id.* § 7214(g). If an accounting firm disagrees with the results of a PCAOB inspection, it may seek review by the SEC. *Id.* § 7214(h)(1).

### *Criminalization (or Lack Thereof) of PCAOB Rules*

Sarbanes-Oxley empowers the PCAOB to enact rules governing the conduct of public accountants. 15 U.S.C. § 7213. It specifies that only a limited number of those rules can be treated as criminal offenses if violated. A violation of the PCAOB confidentiality rule at issue here is not a criminal violation under Sarbanes-Oxley.

Sarbanes-Oxley incorporates the enforcement scheme of the Securities Exchange Act of 1934. *Id.* § 7202(b)(1); *accord* Indictment ¶ 12. Section 32 of the Exchange Act, in turn, says that the willful violation of a rule or regulation can be treated as a criminal offense only if "the violation of [that rule or regulation] is *made unlawful* or [its] *observance … is required* under the terms of this chapter," i.e., by Congress in statutory language. *Id.* § 78ff(a) (emphasis added). One such example is Section 10(b) of the Exchange Act, which makes it "*unlawful* for any person … [t]o use or employ … any manipulative or deceptive device or contrivance *in contravention of such rules and regulations as the [SEC] may prescribe*." *Id.* § 78j(b) (emphasis added); *see also id.* § 78j-1(g)(9) (same structure under Sarbanes-Oxley). This is Congress using the "made unlawful" criterion for criminal penalties. And Section 17(a)(1) of the Exchange Act provides that certain persons "*shall* make and keep for prescribed periods such records … *as the [SEC], by rule, prescribes*." *Id.* § 78q(a)(1) (emphasis added); *see also id.* § 78m(*l*) (same structure under Sarbanes-Oxley). This is an example of Congress using the "observance required" criterion for criminal penalties.

Only a small number of PCAOB rules trigger criminal penalties because only a small number of Sarbanes-Oxley statutory provisions meet the "unlawful" or "observance required" criteria with respect to PCAOB rules. Those provisions largely relate to auditor independence. *See, e.g.*, *id.* §§ 78j-1(g)(9), 7233. Authorizing criminal enforcement of the auditor independence rules—and not of other rules—reflects Congress's particular concern with that issue in the wake of the Enron scandal. *See, e.g.,* S. Rep. 107-205, at 14 ("The issue of auditor independence is at the center of this legislation."); S. Rep. No. 107-146, at 3 (2002).

Violations of other PCAOB rules can be enforced only through civil or administrative actions. *See* 15 U.S.C. §§ 78u(d)(1), (3), & 7202(b)(1). This civil enforcement regime is well

developed and meaningful.  "[T]he Board itself can issue severe sanctions in its disciplinary proceedings, up to and including the permanent revocation of a firm's registration, a permanent ban on a person's associating with any registered firm, and money penalties of $15 million ($750,000 for a natural person)."  *Free Enter. Fund*, 561 U.S. at 485.

As part of the detailed statutory scheme creating this new regulatory body, Congress directed the PCAOB to promulgate an ethics code for its employees.  15 U.S.C. § 7211(g)(3); *see also* Order Approving Proposed Code of Ethics, 68 Fed. Reg. 64,672, 64,672 (Nov. 14, 2003) (promulgating ethics code pursuant to § 7211(g)(3)).  That ethics code prohibits PCAOB employees from disclosing confidential information obtained during the course of their employment.  *See* PCAOB Ethics Code ("EC") 9; Indictment ¶ 13.  Notably, Congress did not state that it would be "unlawful" to violate the ethics code or that employees were statutorily required to observe the rules promulgated under that provision.  *See* 15 U.S.C. § 7211(g)(3) ("[T]he Board shall … establish ethics rules and standards of conduct for Board members and staff ….."); *Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 921 (2015) (statute requiring TSA to issue regulations "d[id] not prohibit anything" and employee who violated TSA regulation did not violate the statute).  By choosing not to use the "unlawful" or "observance required" language that would trigger criminal penalties under Section 32 of the Exchange Act, Congress established that a violation of the PCAOB ethics code would be enforced through civil and administrative remedies, not criminal charges.

### The Allegations in the Indictment

The Defendants do not concede the accuracy of the allegations in the Indictment.  For purposes of this motion, however, the Court must accept them as true.  *See United States v. Pacione*, 738 F.2d 567, 568 (2d Cir. 1984).  The basic contours of the scheme alleged in the Indictment are as follows.

KPMG hired former PCAOB employee Brian Sweet in April 2015.  Indictment ¶ 29. Before Sweet left the PCAOB to join KPMG, he copied confidential documents from the PCAOB network onto his computer and took them with him.  *Id*. ¶ 30.  Once Sweet joined KPMG, he allegedly shared that information with others.  *Id*. ¶¶ 34-38.  In particular, Sweet shared information about which KPMG audits the PCAOB would inspect as part of its 2015 inspections.  In May 2015, when the targets of "most" PCAOB inspections had not yet been announced, Sweet shared this information with Thomas Whittle, who forwarded it to David Middendorf.  *Id.* ¶¶ 34-37.  In June 2015, Sweet shared this information with David Britt. *Id.* ¶ 38.

By this time, KPMG's audit work papers were outside the 45-day work paper assembly period during which auditors "may document previously completed work."  *Id.* ¶¶ 3, 41.  As a result, KPMG's "work papers had been archived" and no changes could be made to them under auditing standards.  *Id.* ¶ 41.  Because the Defendants did not make changes to the archived work papers, the Indictment instead alleges that the information "served the purpose of providing [KPMG] engagement partners extra time to prepare for inspections of their audits, including preparing for their opening presentations to the PCAOB."  *Id.*

For the remainder of 2015, Sweet allegedly continued to share confidential PCAOB information with individuals at KPMG.  *Id.* ¶ 42.  Some of this information he had taken with him when he left the PCAOB; other information he gleaned from continued communication with his former PCAOB colleagues.  *Id.*  Some of the confidential PCAOB information came from Cynthia Holder, Sweet's former colleague at the PCAOB, who eventually obtained employment at KPMG.  *Id.* ¶¶ 48-55.  After Holder left the PCAOB, she received confidential information from Jeffrey Wada, a PCAOB employee, which she provided to Sweet.  *Id.* ¶ 58.

In March 2016, Wada provided Holder with the names of 12 issuers whose KPMG audits the PCAOB would inspect in 2016.  *Id.* ¶ 63.  Holder passed this information to Sweet.  *Id.* ¶ 64. Based on this information, Sweet, Middendorf, Whittle, and Britt agreed "to re-review the audits on the 2016 List."  *Id.* ¶¶ 66-67.  These re-reviews occurred during the 45-day documentation period.  *Id.* ¶¶ 3, 72.  Accordingly, the Indictment alleges, the agreement to do re-reviews "focused on improving the documentation of the audit work that had already taken place"— consistent with the Indictment's description of what work is permitted in that period under auditing standards.  *Id*. ¶¶ 3, 72.  Notably, the Indictment does not allege that Sweet, Middendorf, Whittle, and Britt agreed that the "re-review" process would include changes beyond those permitted in the 45-day documentation period.

In January 2017, Wada obtained a preliminary list of KPMG audits likely to be inspected. *Id.* ¶ 73.  Once again, Wada told Holder, who told Sweet.  *Id.* ¶ 74.  Sweet then shared this information with Whittle and Britt, cautioning that it was subject to change.  *Id.* ¶ 75.  Whittle, in turn, shared the information with Middendorf.  *Id.* ¶ 77.  Whittle, Middendorf, and Britt assigned additional KPMG personnel "to take an extra look" at the audits Sweet identified.  *Id.* ¶ 78. Because those audits were still ongoing at that time, it was permissible under auditing standards for KPMG to make changes or perform new audit work.  *Id.* ¶ 3.

In early February 2017, Wada obtained the final list of KPMG audits to be inspected by the PCAOB in 2017.  *Id.* ¶¶ 80-81.  Again, Wada gave this information to Holder, who gave it to Sweet.  *Id.* ¶ 82.  Sweet shared the information with Whittle, Middendorf, and Britt.  *Id.* ¶ 83. According to the Indictment, the existence of this information was reported to KPMG's General Counsel, after which there was no use of the information.  *Id.* ¶ 84.

**ARGUMENT**

"Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) (internal quotation marks and citation omitted). Because each of the offenses charged here—conspiracy to defraud the United States and wire fraud—"includes generic terms," the Indictment had to "descend to particulars," by alleging specific agreements, acts, and attempted acts purportedly undertaken by the Defendants and their alleged co-conspirators. *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000).

At this pretrial stage of the proceedings, the Defendants are entitled to an "exacting review of the indictment." *Id.* at 92. Here, that exacting review lays bare that the facts alleged cannot support conviction under either of the Government's theories. The Indictment fails to allege that the Defendants conspired to defraud the United States. § I. It also fails to allege that the Defendants conspired, aided-and-abetted, or schemed to commit wire fraud. § II. Accordingly, the Indictment should be dismissed.

**I. The Conspiracy to Defraud the United States Count Fails to State an Offense.**

Count One of the Indictment charges the Defendants with conspiring to defraud the United States by "impeding, impairing, defeating, and obstructing the lawful function of the SEC" through "deceit, craft, trickery and dishonest means" in violation of 18 U.S.C. § 371. Indictment ¶ 91. Given the broad scope of potential prosecutions under the defraud clause of § 371, courts carefully scrutinize and narrowly construe alleged conspiracies to defraud the United States. § I.A. Count One fails such scrutiny because the Indictment does not allege essential elements of the offense. First, the Indictment does not allege that the purpose of the charged conspiracy was targeted at impeding a lawful function of the SEC. § I.B. Second, the

Indictment does not allege that the Defendants agreed to defraud the SEC by making an affirmative misstatement or breaching a duty to the SEC.  § I.C.  In addition to and independent of these pleading failures, the Government's theory of liability cannot stand because it is unconstitutionally vague.  § I.D.

> **A.     The Court Must "Scrutinize Carefully" an Indictment Charging a Conspiracy to Defraud the United States.**

The Indictment charges the Defendants with conspiring to defraud the United States under what is commonly referred to as the "defraud clause" of 18 U.S.C. § 371.  The defraud clause criminalizes both schemes "to cheat the government out of property or money [and] … to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest."  *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).  The latter half of this prohibition—conspiring to interfere with government functions through deceitful or dishonest means—is often called a "*Klein* conspiracy."  The term is derived "from the Second Circuit case of *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), and has become the generic term for a conspiracy to frustrate the government (particularly the IRS) in its lawful … functions."  *United States v. Alston*, 77 F.3d 713, 717 n.13 (3d Cir. 1996).

To charge a *Klein* conspiracy, the Government must allege: "(1) that the defendant entered into an agreement (2) to obstruct a lawful function of the Government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy."  *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012) (brackets omitted).  The Supreme Court has cautioned courts not to stretch these basic elements of a *Klein* conspiracy.  *See, e.g.*, *Tanner v. United States*, 483 U.S. 107, 131 (1987) (refusing to expand § 371's "ambiguous statutory language" in light of the rule of lenity and § 371's "stingy legislative history").  Because "there are no common-law offenses against the United States," the conduct alleged to violate § 371 "must be

plainly and unmistakably within [its] provisions." *United States v. Gradwell*, 243 U.S. 476, 485 (1917) (internal quotation marks omitted).  Accordingly, courts reject attempts to aggressively interpret what it means to conspire to defraud the United States.  *See, e.g.*, *United States v. Licciardi*, 30 F.3d 1127, 1133 (9th Cir. 1994) (courts "rebuff[] … imaginative and unjustified expansion[s] of" § 371).

In short, "conspiracy-to-defraud prosecutions are 'scrutinized carefully,'" even at the pretrial stage.  *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977) (quoting *Dennis v. United States*, 384 U.S. 855, 860 (1966)); *see also United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989) (citing *Dennis*, 384 U.S. at 860) ("Recognizing the broad scope of section 371, [courts] review indictments under it carefully, and construe it narrowly.").  Applying these standards here, Count One fails to state an offense.

### B.      The Indictment Does Not Allege a Conspiracy "Targeted" at the SEC's Lawful Functions.

Count One fails to allege an essential element of a conspiracy to defraud the United States: that the *purpose* of the Defendants' alleged conspiracy was to obstruct a lawful function of the United States or a federal agency, here, the SEC.

The Supreme Court has characterized the intentional targeting of a lawful function of the federal government as the "most important[]" of the elements the Government must allege and prove for a conspiracy-to-defraud charge under § 371.  *Tanner*, 483 U.S. at 130 (reversing convictions where the "target" of the scheme to defraud was a private corporation, not the federal agency supervising the corporation's use of a loan guaranteed by the agency).  Obstructing the United States or a federal agency "has to be a *purpose* or *object* of the conspiracy, and not merely a foreseeable consequence of the conspiratorial scheme." *United States v. Goldberg*, 105

11

F.3d 770, 773 (1st Cir. 1997); *accord United States v. Adkinson*, 158 F.3d 1147, 1155 (11th Cir. 1998).

Distinguishing between a purposeful objective and a foreseeable consequence is a "central problem" in § 371 cases, "which ought not be shirked." *Goldberg*, 105 F.3d at 774. "Consider, for example, the case of a band of bank robbers. All know that the agreed-upon robbery will generate 'income' that none of the robbers will report. Yet it would be straining to describe interference with the IRS as a purpose or object of the conspiracy." *Id.* at 773. Similarly, "[t]here are not many financial crimes without some implications for false reporting in someone's tax filings…. If section 371 embraced every foreseeable consequence of a conspiracy, many joint financial crimes … would automatically become federal conspiracies to defraud the IRS." *Id.* This is flatly inconsistent with conspiracy's "requirement of purpose." *Id.*

The Indictment fails to allege a conspiracy with the purpose of defrauding an agency of the United States. Instead, the crux of the charged conspiracy here was to obtain confidential information from the PCAOB "in order to fraudulently affect PCAOB inspection outcomes." Indictment ¶ 91. But the PCAOB is not a federal agency. 15 U.S.C. § 7211(b); *Free Enter. Fund*, 561 U.S. at 484. Accordingly, the Defendants cannot be charged with defrauding the "United States" by reason of interfering with PCAOB inspections alone. *See Tanner*, 483 U.S. at 131-32 (section 371 does not cover a conspiracy to defraud a nongovernment entity, even one that has been "delegat[ed] … a distinctly federal function"); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (statute designating Amtrak as outside the federal government is "dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control").

Faced with this clear impediment, the Indictment attempts to transform an alleged fraud on the PCAOB into one on the SEC, charging that the Defendants and others "conspired to defraud the SEC, by fraudulently attempting to affect the outcome of PCAOB inspection results, *knowing* that such results are reported to and utilized by the SEC to perform its oversight and regulatory functions."  Indictment ¶ 27 (emphasis added); *accord id*. ¶ 91.  Although the Indictment alleges that the Defendants *knew* the SEC received PCAOB inspection reports, it does not allege that a *purpose* of the charged conspiracy was to defraud the SEC.  The Indictment's affirmative allegation of knowledge instead of purpose is fatal.

And even if one could ignore the allegation of knowledge instead of purpose in the statutory allegations, a fair reading of the Indictment, even in the light most favorable to the Government, shows that the only target of the Defendants' alleged conduct was the PCAOB. *See, e.g.*, Indictment ¶ 41 (alleging that obtaining PCAOB information in 2015 "served the *purpose* of providing engagement partners extra time to prepare" for PCAOB inspections (emphasis added)).  That is not sufficient to sustain the charge.

The allegations about the SEC's oversight of the PCAOB and its inspections process do not change this fatal flaw.  Indictment ¶¶ 10-11.  The Supreme Court has squarely rejected the argument that even "substantial ongoing federal supervision" of an intermediary necessarily transforms a fraud directed at that intermediary into a fraud on the federal government. *Tanner*, 483 U.S. at 131-32.

Moreover, the Indictment fails to allege that the Defendants agreed to impede any particular lawful function of the SEC. *Compare* Indictment ¶ 91 (charging the Defendants with "impeding … the lawful function of the SEC"), *with e.g., Tanner*, 483 U.S. at 133 (charging conspiracy to defraud the United States "by impeding … the lawful function of the Rural

Electrification Administration *in its administration and enforcement of its guaranteed loan program*" (emphasis added)), *and Klein*, 247 F.2d at 915 (charging conspiracy to defraud the United States "by impeding … the lawful functions of the Department of the Treasury *in the collection of the revenue; to wit, income taxes*" (emphasis added)).  Instead, the Indictment pleads, in conclusory fashion, that PCAOB inspection reports "were utilized by the SEC to carry out its regulatory and enforcement functions."  Indictment ¶ 91.  But the statutory allegations in the Indictment never specify what lawful function of the SEC relating to PCAOB inspection reports the Defendants targeted their conspiracy at impeding.

The Indictment's factual allegations add that "the SEC Office of the Chief Accountant ('OCA') reviews Inspection Reports to monitor Auditor quality."  *Id*. ¶ 11.  But the Indictment fails to describe what that means or how it relates to a lawful function of the SEC that the Defendants intended to impede.  And while the Indictment states that "[n]egative inspection results carry various consequences for accounting firms," *id*. ¶ 11, the Indictment's use of the passive voice is telling.  There is no allegation that OCA, or the SEC more broadly, has the authority to impose consequences on auditors based solely on poor PCAOB inspection performance.  Nor does the Indictment allege that the Defendants intended to obstruct the SEC's ability to impose consequences as a result of negative PCAOB inspection results.

The failure to allege as much is underscored by the specificity of the next sentence, which states: "OCA also reviews Inspection Reports to identify any comments revealing weaknesses with respect to the financial statements of particular Issuers and refers such matters to the SEC's Division of Corporation Finance and the SEC's Division of Enforcement."  *Id.* ¶ 11.  But there is no allegation that the conspiracy to improve KPMG's audit inspection performance was intended to interfere with the SEC's ability to detect financial weaknesses in Issuers, or that it even

14

impacted Issuer financial statements at all.  To the contrary, one would expect that better audit documentation would make it *easier* for the SEC to identify weaknesses in Issuer accounting.

Similarly, the Indictment describes a meeting between OCA and KPMG in early 2016, during which OCA explained that it "was frustrated with KPMG, especially in light of concerns about audit quality stemming from KPMG's poor PCAOB inspections results," and expressed particular concern with KPMG's treatment of allowances for loan and lease losses ("ALLL"). *Id*. ¶ 59; *see also id.* ¶¶ 16, 60-61.  But there are no allegations that the conspirators agreed to use the PCAOB information to improve the substantive quality of KPMG's audit treatment of ALLL. *See also id*. ¶ 18 (alleging that KPMG had already created an "ALLL monitoring program [that] was designed principally to provide real-time assistance to engagement teams working on ALLL issues"); *id*. ¶ 72 (describing scope of alleged revisions based on PCAOB information without any reference to substantive quality of the audit treatment of ALLL).  Nor is there an allegation that the purpose of the conspiracy was to interfere with OCA's ability to monitor that issue.

In sum, Count One alleges a scheme to defraud the PCAOB with knowledge of foreseeable secondary effects on the SEC; it does not charge that those secondary effects—the SEC's alleged review and use of PCAOB inspection reports—were the purpose of the alleged scheme to defraud.  Knowledge is not purpose.  Because the Indictment does not allege that obstructing any lawful function of the SEC was the intended "target" of the conspiracy, Count One must be dismissed for failing to allege an essential element of the offense.

### C.    The Indictment Does Not Allege an Agreement to Use Deceitful or Dishonest Means to Defraud the SEC.

Count One also fails for a second reason:  It does not allege the essential element that the Defendants agreed to obstruct the SEC by any "deceitful or dishonest means" as that term has been interpreted in *Klein* conspiracy cases.  In charging a *Klein* conspiracy, an indictment must

allege a fraud against the United States in the form of either an affirmative misrepresentation to the government or the breach of a duty owed to the government.  *See Tuohey*, 867 F.2d at 537 ("We have rejected indictments [under § 371] that did not involve a violation of a duty to the government."); *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993) (citing *United States v. Murphy*, 809 F.2d 1427, 1431-32 (9th Cir. 1987)) ("[N]ot disclosing something that one has no independent duty to disclose isn't conspiracy to defraud, even if it impedes the [government]."), *overruled on other grounds by Neder v. United States*, 527 U.S. 1, 8-9 (1999); *United States v. Caso*, 935 F.2d 1288, 1991 WL 101559, at *4 (4th Cir. June 14, 1991) (unpublished) ("[D]efendants are right that courts have required under § 371 evidence of some duty running from the defendant to the government.").  The misrepresentation or breach of a duty owed to the government is what makes the conduct fraudulent, and thus what transforms conduct that impedes a lawful government function into a fraud against the United States prohibited by § 371.  *See Hammerschmidt*, 265 U.S. at 186-89.

A defendant can agree to a *Klein* conspiracy that defrauds the United States in several ways.  He can do so directly where he and his co-conspirators agree to make false statements to the government, *see, e.g.*, *Dennis*, 384 U.S. at 861; *Klein*, 247 F.2d at 913-14, or where they agree to violate a duty they owe to the government, *see, e.g.*, *United States v. Peltz*, 433 F.2d 48, 50-52 (2d Cir. 1970); *Tuohey*, 867 F.2d at 538.  Or the conspirators can use an intermediary to defraud the United States by agreeing to cause the intermediary to submit a false statement to the government, *see, e.g.*, *Tanner*, 483 U.S. at 129, 132, or breach a duty it owes to the government, *see, e.g.*, *United States v. Shellef*, 507 F.3d 82, 104-05 (2d Cir. 2007); *United States v. Nersesian*, 824 F.2d 1294, 1311 (2d Cir. 1987).  Where an intermediary is involved, the conspirators must

agree to "cause[] [the] third party to perpetrate the fraud" on the government. *United States v. Hope*, 901 F.2d 1013, 1018 (11th Cir. 1990).

Courts have rejected the rare attempts to prosecute a *Klein* conspiracy where, as here, there was no false statement made to the government or breach of a duty owed to the government. *See, e.g.*, *Murphy*, 809 F.2d at 1431-32 (reversing § 371 conviction and holding that where relevant statute and regulations did "not impose a duty to disclose information, failure to disclose is not conspiracy to defraud the government"). For example, in *Coplan*, the Second Circuit relied on the absence of a false statement or breach of a duty to reverse the convictions of two defendants, Ernst & Young ("E&Y") partners who were convicted with other E&Y employees for conspiring to defraud the IRS. *Coplan*, 703 F.3d at 54. The essence of the alleged scheme was to "hid[e] the truth from the IRS" regarding the purpose of tax shelters created and marketed by E&Y "by withholding information and making affirmative misstatements" to the IRS. *Id.* at 58.

The Second Circuit held that there was insufficient evidence that the two defendants had agreed to lie to the IRS by making affirmative misstatements or withholding information they were required to disclose. *Id.* at 63-64, 69-70. And it rejected the Government's argument that one of the defendants conspired to defraud the IRS by discouraging E&Y personnel from leaving marketing materials with clients in order to prevent the marketing materials from falling into the hands of the IRS. *Id.* at 64. The Court explained that there was no evidence that "the IRS ever *requested* copies of the promotional materials held in E&Y's own files, or that *governing ethical standards required E&Y to disclose those materials in the absence of such a request*." *Id.* (emphasis added). Accordingly, the Second Circuit held that keeping these materials from the

IRS where there was no duty to disclose them could not support a *Klein* conspiracy conviction. *Id.*[1]

Under this framework, the Indictment alleges no fraud against the United States. The Defendants are not alleged to have agreed to make an affirmative misrepresentation to the SEC or to violate a duty they owed to the SEC. Instead, the Indictment focuses exclusively on allegations of conduct aimed at the PCAOB. The statutory allegations in Count One charge the Defendants with "using deceit, craft, trickery and dishonest means … by misappropriating, embezzling, obtaining, sharing, and using confidential information from the PCAOB in order to fraudulently affect PCAOB inspection outcomes." Indictment ¶ 91. Consequently, the Indictment does not fit in the direct fraud category.

The Indictment's allegations also do not fit the framework for a fraud on the SEC through the PCAOB as an intermediary. The Indictment does not allege that the Defendants agreed to cause the PCAOB to send inspection reports to the SEC that would include false statements. There is no allegation that the PCAOB made any false statement to the SEC, let alone any false statement that can be imputed to the Defendants. Indeed, the Indictment never once discusses the contents of the PCAOB's inspection reports for the years in question or whether they were even issued. *Compare Tanner*, 483 U.S. at 132 (indictment could allege fraud by proxy by charging that the "defendants would and did cause Seminole Electric to falsely state and

---

[1] *United States v. Ballistrea*, 101 F.3d 827 (2d Cir. 1996), is not to the contrary. There, the defendants were convicted of conspiring to defraud the FDA by instructing their salespeople to hide illegal health benefits claims from the FDA. *Id.* at 830-31. On appeal, the defendants argued that "actual contact between the defendant and the Government" was necessary to sustain a § 371 conviction. *Id.* at 832. The Second Circuit rejected that argument as contrary to fraud-by-proxy cases like *Nersesian*. *Id.* at 832-33. The defendants, however, did not argue that they did not intend to make a misrepresentation or violate a duty to the FDA.

represent to the [REA, a federal agency] that an REA-approved competitive bidding procedure had been followed").

The Indictment instead merely states that the Defendants agreed to "fraudulently affect" PCAOB inspection outcomes, knowing the results would be sent to the SEC.  Indictment ¶ 91. This conclusory language, undefined in the Indictment, provides no notice as to what is alleged to be the fraud *on the SEC*.  One unstated and uncharged possibility the Government may implicitly be attempting to invoke is a theory of fraud by omission, e.g., that the Defendants did not disclose to the PCAOB that they purportedly knew in advance which audits it would inspect and re-reviewed those audits.  But there can be no fraud on the SEC based on an omission unless the Defendants intended for the PCAOB to breach a duty to disclose specific information to the SEC.  *See Tuohey*, 867 F.2d at 538 ("[A] section 371 conviction may not be based upon a failure to volunteer information that is not required to be provided to the government."); *see also United States v. Finnerty*, 533 F.3d 143, 150 (2d Cir. 2008) (rejecting, in securities fraud prosecution, government's claim of "self-evidently deceptive" fraud based on nondisclosure of conduct prohibited by a NYSE rule absent a specific duty to disclose).

There is no allegation that the Defendants agreed to cause the PCAOB to breach a duty to the SEC.  The only duty to the SEC that the Indictment cites is the PCAOB's obligation to transmit a written report of its inspection findings to the SEC, to each appropriate state regulatory authority, and to the public.  Indictment ¶¶ 11, 91; 15 U.S.C. § 7214(g).  But there is no allegation that the Defendants intended to *prevent* the PCAOB from complying with its duty to send the SEC its inspection reports.  *See Murphy*, 809 F.2d at 1431-32 (holding no conspiracy to defraud the United States where defendants complied with duty to file report and law imposed no duty to report additional undisclosed information); *Nersesian*, 824 F.2d at 1311-12

(describing the theory of fraud in "structuring" § 371 cases as conspiring to *prevent* the bank from submitting a report it has a legal duty to file).

Because the Indictment does not allege that the Defendants intended to breach a duty they owed to the SEC or to make an affirmative misrepresentation to the SEC, or that they agreed to use the PCAOB as an intermediary to do the same, Count One fails.

### D.   The Government's Theory of Defrauding the United States Is Unconstitutionally Vague.

In addition to and independent of the Indictment's failure to allege the essential elements of a *Klein* conspiracy, the Indictment suffers from a deeper problem:  Its interpretation of the defraud clause is unconstitutionally vague.  § I.D.1.  Limiting § 371, if possible, to a core of non-vague criminal conduct would place the allegations in this Indictment outside any discernable core.  § I.D.2.  Although the statutory arguments articulated in the previous sections permit, and indeed compel, dismissal of the Indictment without reaching this constitutional question, the gravity of the constitutional concerns here provide further justification for dismissal.

### 1.   The Indictment's application of Section 371's defraud clause is unconstitutionally vague.

Under the void-for-vagueness doctrine, a criminal statute violates the "first essential of due process" if "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).  The "principal element of the doctrine" is the "requirement that a legislature establish minimal guidelines to govern law enforcement"; otherwise, "a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'"  *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (brackets omitted).

The text of § 371 makes it unlawful to "conspire … to defraud the United States … in any manner or for any purpose."  18 U.S.C. § 371.  The *Klein* conspiracy doctrine adds a judicial

gloss to this text that makes it unlawful to conspire "to obstruct a lawful function of the Government … by deceitful or dishonest means."  *Coplan*, 703 F.3d at 61.  Neither the Supreme Court nor the Second Circuit has passed on the constitutional validity of § 371's defraud clause or the *Klein* conspiracy gloss.  But courts and commentators have long acknowledged that *Klein* conspiracies raise constitutional vagueness concerns.  *See, e.g.*, Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405, 441-48 (1959) ("All the evils against which the 'void for vagueness' doctrine is said to guard exist in 'conspiracy to defraud the United States' as interpreted by the Supreme Court."); *Dennis*, 384 U.S. at 860 (the "wide net" of *Klein* conspiracies "may ensnare the innocent as well as the culpable"); *Rosenblatt*, 554 F.2d at 40 (describing the doctrine's "peculiar susceptibility to a kind of tactical manipulation which shields from view very real infringements on basic values of our criminal law" (internal quotation marks and citation omitted)).

In *Coplan*, the Second Circuit surveyed some of the bases for these concerns.  703 F.3d at 59-62.  It explained that *Klein*'s gloss on § 371's prohibition against schemes to "defraud the United States" is completely atextual and based solely on dicta from prior Supreme Court decisions.  *Id.* at 59-61.  From this, the Second Circuit concluded, "the *Klein* conspiracy is a common law crime, created by the courts rather than by Congress," that rests "on a policy judgment … rather than on any principle of statutory interpretation."  *Id.* at 61; *accord* Goldstein, *supra*, at 430-36 ("When it is stripped, as it has been, of its roots in the law of theft, fraud and perjury, 'dishonesty' stands only as an incorporation into the criminal law of current ethical standards—whatever a jury may think them to be.").  The sheer breadth of the *Klein* conspiracy doctrine, combined with the fact that it reaches conduct Congress has not seen fit to independently criminalize, *see United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988)

(*Klein* conspiracy "need not involve the violation of a separate statute"), empowers prosecutors to "pursue their personal predilections" about what is "dishonest" and obstructs government functions.  *Kolender*, 461 U.S. at 358.

The Indictment here provides a clear example of these vagueness concerns.  Based on allegations that the Defendants agreed to use information obtained from the PCAOB to "fraudulently affect" PCAOB inspection outcomes, the Indictment purports to allege that the Defendants defrauded the SEC through an intermediary, the PCAOB.  Indictment ¶¶ 11, 59-61, 91.  But no person in the Defendants' position would have fairly understood that obtaining and using confidential information from a third party would also defraud a government agency, absent any false statement made to or duty to disclose to that agency.

*Klein* conspiracies suffer from remarkably similar infirmities to those the Supreme Court considered in *Skilling v. United States*, 561 U.S. 358 (2010), where the defendant argued that the honest services fraud statute, 18 U.S.C. § 1346, was unconstitutionally vague.  *Id.* at 402-03.  The majority in *Skilling* "construed rather than invalidated" § 1346, "par[ing] that body of precedent down to its core."  561 U.S. at 404; *see also infra* § I.D.2.  But the majority had serious concerns with its constitutionality.  *See Skilling*, 561 U.S. at 405.  And Justice Scalia, in an opinion joined by Justices Kennedy and Thomas, explained that the "hopelessly undefined" and "astoundingly broad language" of the honest services theory of fraud was unconstitutionally vague because it "provide[d] no ascertainable standard of guilt."  561 U.S. at 416, 418 (Scalia, J., concurring in part and concurring in the judgment) (internal quotation marks omitted).  The same is true of the *Klein* conspiracy charged here.

"The government may, if it wants to, explicitly outlaw conduct it thinks unduly obstructs its functions."  *Caldwell*, 989 F.2d at 1060.  But it cannot constitutionally maintain a catch-all

prohibition giving prosecutors unfettered discretion to prosecute those who "conspire" to engage in conduct that impedes government functions through an undefined notion of "deceit" that need not even be independently unlawful. *Cf. Marinello v. United States*, 138 S. Ct. 1101, 1108-09 (2018) (rejecting broad interpretation of statute criminalizing obstruction of the due administration of the tax code, 26 U.S.C. § 7212(a), because of, *inter alia*, vagueness concerns). Criminal statutes must clearly state what conduct is criminalized. The Government's use of § 371's defraud clause to prosecute the Defendants here, both as applied and on its face, is unconstitutionally vague and violates due process.

> **2.      At a minimum, as a matter of constitutional avoidance, any permissible "core" of Section 371 does not include the conduct charged here.**

Before holding that a statute is unconstitutionally vague, the Supreme Court explained in *Skilling* that courts evaluating vagueness challenges have a duty to consider whether a limiting construction of the statute will save it. 561 U.S. at 405-06. There, while accepting that prior "honest-services decisions … were not models of clarity or consistency," the Court identified and limited honest services fraud to a "solid core" of the doctrine: "bribery or kickback schemes." *Id.* at 405-07.

In this case, the core of § 371's defraud clause encompasses, at most: (1) schemes to obtain "money or property"; (2) honest services fraud as limited by *Skilling*; and (3) schemes to obstruct a lawful function of the government that involve an affirmative misrepresentation or violation of a duty to the government. The allegations here do not fit into any part of this permissible core.

*Money or property.* Separate from *Klein* conspiracies, § 371's defraud clause reaches schemes to fraudulently obtain federal funds or property. *See Coplan*, 703 F.3d at 59. This

application of the statute is constitutional.  *Cf. McNally v. United States*, 483 U.S. 350, 360

(1987).  There is no allegation of such a scheme here.

     *Honest services fraud.*  The *Klein* conspiracy doctrine, like the honest services doctrine,

"had its genesis in prosecutions involving bribery allegations."  *Skilling*, 561 U.S. at 408.  The

first Supreme Court case to hold that the defraud clause reached impeding lawful government

functions was *Haas v. Henkel*, a bribery case.  216 U.S. 462, 479 (1910) (bribing Department of

Agriculture employee); *see also Glasser v. United States*, 315 U.S. 60, 63-64 (1942) (bribing

U.S. Attorneys); *accord McNally*, 483 U.S. at 358 n.8 (describing *Haas* and *Glasser* as "bribery"

cases).  Accordingly, honest services fraud—limited in *Skilling* to bribery or kickback

schemes—is at the core of *Klein* conspiracies.  In this case, however, the Indictment does not

charge a bribery or kickback scheme.

     *Affirmative misrepresentation or violation of a duty to the government.*  As explained

above, courts have read into the spare text of § 371 a requirement that defendants agree to cause

an affirmative misrepresentation to be made to the government or the breach of a duty owed to

the government.  *Supra* § I.C.  Given the vagueness problems discussed in § I.D.1, the duty-to-

the-government element of a *Klein* conspiracy is not only mandated by the precedent discussed

in § I.C, it is also a constitutionally necessary limitation on the scope of conspiracy-to-defraud

prosecutions.  *See Skilling*, 561 U.S. at 405-06.[2]

     The Second Circuit's decision in *Coplan* does not hold otherwise.  In *Coplan*, the

defendants did not advance a constitutional vagueness argument or assert that *Klein* should be

---

[2] Although not implicated by this Indictment, the Defendants would argue that even this duty-to-
the-government limitation on *Klein* conspiracies suffers from the same vagueness problem as
honest services fraud in *Skilling* and would be unconstitutionally vague even if a duty or
misstatement to the government had been alleged here.

limited to a permissible core.  Instead, the defendants argued that the Second Circuit should *overturn* the *Klein* doctrine altogether as a matter of statutory interpretation and limit the defraud clause to "schemes to deprive the government of money or property."  Brief for Defendant-Appellant Robert Coplan, *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) (No. 10-583), 2010 WL 3948689, at *17.  The Court, although sympathetic, held that it could not "pare" § 371's defraud clause down to only schemes to obtain "money or property" because that squarely conflicted with the existing *Klein* doctrine.  *Coplan*, 703 F.3d at 61-62 ("[S]uch arguments are properly directed to a higher authority.").  Because *Coplan* addressed only whether the defraud clause should be limited to schemes to obtain money or property as a matter of statutory construction, it does not preclude consideration of the argument that under constitutional avoidance principles, *Klein* conspiracies, if not altogether unconstitutionally vague, must at least allege that the defendant agreed to cause an affirmative misstatement to be made to the government or the violation of a duty owed to the government.[3]

Because the Indictment does not allege that the Defendants conspired to cause—either directly or through the PCAOB—any violation of a duty to the SEC or the making of a false statement to the SEC, this case falls outside the permissible "core" of *Klein* and should be rejected as beyond the scope of § 371's defraud clause.

* * *

"Congress knows how to impose duties on accountants, and expose them to liability, when it wants to do so."  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 156 (2d Cir. 2007).

---

[3] The Defendants also argue that for all of the reasons stated here and in *Coplan*, *Klein*'s interpretation of § 371 *is* flawed in the first instance and should be overruled.  But the Defendants recognize that this Court is bound by *Coplan*'s rejection of that argument and present it here merely to preserve the argument for appeal, if necessary.

By deciding not to make the PCAOB a federal agency and by choosing not to designate the violation of PCAOB ethics rules as criminal, Congress expressed its intent to leave such conduct unpunished through the criminal code, instead leaving such matters to the substantial civil enforcement powers given to the PCAOB. The Indictment's novel theory of defrauding the United States contravenes the statutory scheme put in place by Sarbanes-Oxley to enforce violations of PCAOB rules, fails to allege necessary elements of the offense, and is unconstitutionally vague. Accordingly, Count One of the Indictment should be dismissed.

## II. The Wire Fraud Counts Fail Because the PCAOB Information at Issue Here Is an Intangible Regulatory Interest, Not "Money or Property."

Counts Two through Five charge the Defendants with wire fraud, aiding and abetting wire fraud, and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 2, 1343 and 1349. Specifically, the Indictment alleges that the Defendants fraudulently schemed to deprive the PCAOB of its "confidential information and documents concerning planned PCAOB inspections." Indictment ¶¶ 97, 99, 101. But the Supreme Court has held that the mail and wire fraud statutes protect only "property" rights, not intangible regulatory interests. § II.A. Accordingly, these wire fraud counts fail because the PCAOB's interest in protecting the confidentiality of its planned inspections to further its regulatory mandate is merely an intangible regulatory interest, not "property." § II.B. Accepting the Government's contrary interpretation of "property" here would violate clear statement principles. § II.C. And the Indictment's shifting theory of fraud shows that it would be unconstitutionally vague to interpret "property" as including the confidentiality of the regulatory information at issue here. § II.D.

### A. The Mail and Wire Fraud Statutes' Protection of "Property" Does Not Include Intangible Regulatory Interests.

The Supreme Court has repeatedly explained that the federal mail and wire fraud statutes are not all-encompassing. Befitting "the original impetus behind the mail fraud statute … to

protect the people from schemes to deprive them of their money or property," these statutes are "limited in scope to the protection of property rights." *Cleveland v. United States*, 531 U.S. 12, 18 (2000) (quoting *McNally*, 483 U.S. at 356, 360); *see also Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005) ("property" is construed *in pari materia* in mail and wire fraud statutes).

Beginning with *McNally*, the Court has relied on this textual restriction to "property" to limit the scope of mail and wire fraud prosecutions and avoid abstract, shifting theories of criminal ethical violations or honest services fraud. There, the defendants were convicted of mail fraud for their "participation in a self-dealing patronage scheme" that defrauded Kentucky citizens of "the right to have the Commonwealth's affairs conducted honestly." *McNally*, 483 U.S. at 352. The Supreme Court reversed their convictions, holding that the mail and wire fraud statutes are limited to schemes to defraud victims of property rights. *Id.* at 358-61. In reaching its holding, the Court cast out "honest services fraud" and other intangible theories unrelated to money or property from the orbit of the mail and wire fraud statutes. *See Cleveland*, 531 U.S. at 18-19. The Court explained that "any benefit which the Government derives from the statute must be limited to the Government's interests as property holder" and does not include the State's right to have its "affairs conducted honestly." *McNally*, 483 U.S. at 352, 358 n.8, 360-61.

Over twenty years later, the Supreme Court emphasized in *Cleveland* the excision that *McNally* accomplished: The Court held that intangible interests and rights that serve the government's *regulatory* interests are not "property" for purposes of the mail and wire fraud statutes. *Cleveland*, 531 U.S. at 20. There, the defendants submitted false applications to Louisiana's gaming authorities to obtain video poker licenses and were convicted of wire fraud.

*Id.* at 16-17.  The Court reversed the convictions, explaining in detail that the State's poker licenses were not "property" for purposes of the wire fraud statute.

Importantly, the Court emphasized, it was "beyond genuine dispute that … the State's core concern is *regulatory*."  *Id.* at 20.  The purpose of the video poker licensing scheme was to uphold "public confidence and trust that gaming activities are conducted honestly and are free from criminal and corruptive elements."  *Id.* at 20-21 (ellipsis omitted).  The statute governing video poker licenses "establishe[d] a typical regulatory program," with agency enforcement, the promulgation of rules and regulations, and specified penalties.  *Id.* at 21.  That program—and the State's attendant interest in protecting the integrity of its unissued licenses—was a prototypical "exercise[] of state police powers," not property rights.  *Id.*  A scheme to undermine that regulatory integrity by falsely obtaining licenses therefore did not defraud Louisiana of "property" and could not be prosecuted as wire fraud.  *Id.* at 26-27.

The Court also rejected the Government's argument that the defendants frustrated the State's rights "to control" and "to choose the persons to whom it issues video poker licenses."  *Id*. at 23.  "[F]ar from composing an interest that has long been recognized as property," the Court explained, "these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate."  *Id*.  And Louisiana had exercised its sovereign authority to protect its rights through "the distinctively sovereign authority to impose criminal penalties for violations of the licensing scheme."  *Id*.

The Court explained that the sovereign "right to exclude"—in that case, to exclude people from obtaining a video poker license—is not equivalent to a private property right.  *Id*. at 23-24.  Rejecting the Government's analogies to patent holders licensing patents and franchisors choosing their franchisees, the Court explained that in contrast to those activities, Louisiana

28

"does not 'sell' video poker licenses in the ordinary commercial sense" and "the State may not sell its licensing authority."  *Id*. at 23.  And while a business "typically derives [its right to exclude] from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market," the State's authority to select licensees "rests on no similar asset.  It rests instead upon the State's sovereign right to exclude applicants deemed unsuitable to run video poker operations.  A right to exclude in that governing capacity is not one appropriately labeled 'property.'"  *Id*. at 24.

> **B.      The PCAOB's Nonpublic Regulatory Information Is Not "Property" under the Wire Fraud Statute.**

*Cleveland* bars the wire fraud charges here.  The Indictment alleges that the Defendants fraudulently obtained "the PCAOB's property in the form of valuable confidential information and documents concerning planned PCAOB inspections" in 2015, 2016, and 2017.  Indictment ¶¶ 97, 99, 101.  But under *Cleveland*, the PCAOB's intangible interest in maintaining the confidentiality of its planned inspections is only a regulatory interest and thus cannot be the subject of wire fraud charges.

Like Louisiana's regulation of video poker licenses in *Cleveland*, the PCAOB's "core concern" in overseeing and inspecting public accounting firms is regulatory.  The Supreme Court has described Congress's conferral of regulatory power on the PCAOB as follows:

> [T]he Board is a Government-created, Government-appointed entity, with expansive powers to govern an entire industry.  Every accounting firm—both foreign and domestic—that participates in auditing public companies under the securities laws must register with the Board, pay it an annual fee, and comply with its rules and oversight.  The Board is charged with enforcing the Sarbanes-Oxley Act, the securities laws, the Commission's rules, its own rules, and professional accounting standards.  To this end, the Board may regulate every detail of an accounting firm's practice, including hiring and professional development, promotion, supervision of audit work, the acceptance of new business and the continuation of old, internal inspection procedures, professional ethics rules, and such other requirements as the Board may prescribe.

*Free Enter. Fund*, 561 U.S. at 485 (internal quotation marks and citations omitted). The PCAOB plainly serves a regulatory role.

The PCAOB's inspections of public accounting firm audits further that regulatory role. "[T]he PCAOB conducts a continuing program of inspections of Auditors in order to ensure that such firms comply with SOX, SEC, and PCAOB rules, and professional standards …." Indictment ¶ 4. It conducts these inspections because Congress authorized it to, and indeed, mandated that it do so. 15 U.S.C. § 7214(a). And, like the purpose of the licensing scheme in *Cleveland*, which was to uphold "public confidence and trust that gaming activities are conducted honestly and are free from criminal and corruptive elements," 531 U.S. at 20-21 (ellipsis omitted), the purpose of the PCAOB's inspections is to uphold public trust and confidence in the audits of financial statements of public companies. *See* 15 U.S.C. § 7211(a) (the PCAOB "protect[s] the interests of investors and further[s] the public interest in the preparation of informative, accurate, and independent audit reports").

Similarly, the Indictment's stated reason for the PCAOB's decision to keep inspection targets confidential until a date close in time to the inspections—so that audit work papers "cannot be edited or improved upon in anticipation of a scheduled PCAOB inspection," Indictment ¶ 8—serves its regulatory interest in protecting the integrity of its inspections. *See Cleveland*, 531 U.S. at 20. Like the state licensing requirements at issue in *Cleveland*, allegedly keeping this information confidential serves the PCAOB's and Congress's interest in executing a "typical regulatory program." *Cleveland*, 531 U.S. at 21.

And like Louisiana's sovereign power to issue and regulate poker licenses, the PCAOB's authority to keep this information confidential comes from Congress's sovereign regulatory power, which it delegated to the PCAOB. *Id.* at 23-24. Congress charged the PCAOB with

promulgating an ethics code for PCAOB employees, and, pursuant to that statutory charge, the PCAOB adopted a code that prohibited the disclosure of nonpublic PCAOB information. Indictment ¶¶ 12-13. This code is part of the PCAOB's "typical regulatory program"— enforcement of a public mission backed by the power to issue rules and regulations concerning the conduct of that program. *Cleveland*, 531 U.S. at 21; *accord Free Enter. Fund*, 561 U.S. at 485. And, like Louisiana's video poker licensing scheme, Congress exercised its "distinctively sovereign authority" to impose civil penalties for violations of the PCAOB ethics code, thereby protecting the PCAOB's regulatory interest in the confidentiality of its information. *Cleveland*, 531 U.S. at 23; *see supra* at 4-6 (citing 15 U.S.C. §§ 7211(g)(3), 78u(d)(1), (3) & 7202(b)(1)). The PCAOB's right to "exclude" and "control" the dissemination of confidential information pursuant to its rules "amount[s] to no more and no less than [the] sovereign power to regulate." *Cleveland*, 531 U.S. at 23.

The sovereign power to hold regulatory information confidential is also not "an interest that has long been recognized as property." *Cleveland*, 531 U.S. at 23 (internal quotation marks omitted). To the contrary, authorities that discuss the federal government's power to keep information secret trace that ability as deriving from its inherent sovereign authority or specific constitutional sources of power.[4] The Defendants are aware of no authority suggesting that the

---

[4] *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (classification authority "flows primarily from th[e] constitutional investment of [commander-in-chief] power in the President"); *United States v. Nixon*, 418 U.S. 683, 705-08 & nn.15-17 (1974) (discussing executive privilege and the confidentiality generally of government information as "deriv[ing] from the supremacy of each branch within its own assigned area of constitutional duties"); *New York Times Co. v. United States*, 403 U.S. 713, 718 (1971) (Black, J., concurring); *id.* at 722 (Douglas, J., concurring); *id.* at 729-30 (Stewart, J., concurring); Whistleblower Protections for Classified Disclosures, 22 Op. O.L.C. 92, 97 (1998) ("[S]ince the Washington Administration, Presidents and their senior advisers have repeatedly concluded that our constitutional system grants the executive branch authority to control the disposition of secret information."). Similarly, at

government's ability to keep regulatory information secret has long been recognized as a species of property rights.

Finally, like Louisiana's position in issuing poker licenses, the PCAOB does not compete in the marketplace to regulate public accounting.  The PCAOB's ability to conduct inspections and keep information relating to those inspections confidential does not rest on its "ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market." *Cleveland*, 531 U.S. at 24.  Rather, it comes from Congress, which empowered it to inspect accounting firms in order to ensure the integrity of public company audits.  15 U.S.C. § 7214(a).  The PCAOB cannot sell its inspection reports or a list of inspection targets, nor can it sell its authority to conduct inspections to another entity.

In sum, under *Cleveland*, the PCAOB's interest in maintaining the secrecy of its inspection targets flows from Congress's interest in regulating public accounting, which it channeled in creating the PCAOB.  And, like *Cleveland*, the PCAOB's interest in protecting the confidentiality of its information to perform its mission is an intangible regulatory interest, not property, and cannot form the basis of a wire fraud charge.

Notwithstanding *McNally* and *Cleveland*, the Indictment appears to rely on *Carpenter v. United States*, where the Supreme Court held, shortly after *McNally*, that "confidential *business* information" is property for purposes of the wire fraud statute.  484 U.S. 19, 26 (1987) (emphasis

---

English common law, members of the Crown's Privy Council had a duty "to keep the king's counsel secret," a duty that "appear[ed] from the[ir] oath of office."  1 William Blackstone Commentaries *230; *accord* 4 Edward Coke, Institutes of the Laws of England *54 (1797).  The oath of office privy counsellors swore derived, like all sworn oaths at common law, from a solemn promise, not from any long recognized property right of the Crown to keep information secret.  *See* 3 Coke, *supra*, at *165.

added).  *Carpenter* is inapposite here.  The PCAOB is not a business and its interest in keeping

its information confidential serves a regulatory, not a commercial, purpose.

In *Carpenter*, a *Wall Street Journal* reporter conspired with friends to share information

from a series of upcoming *Journal* columns on stocks, allowing the conspirators to trade on that

information in advance of its market-moving publication.  484 U.S. at 22-23.  The Court upheld

the defendants' wire fraud convictions, holding that they had agreed to fraudulently obtain the

*Journal*'s "confidential business information—the publication schedule and contents of the

column."  *Id.* at 25.  While acknowledging, as it held in *McNally*, that wire fraud applied to

property rights only, the Court held that certain intangible rights, like the Journal's "interest in

the confidentiality of the contents and timing of the … column," could also be considered

property interests.  *Id.*

In determining whether the *Journal*'s prepublication information constituted "property,"

the Court noted that "[c]onfidential business information has long been recognized as property."

*Id.* at 26.  But it limited the scope of that "long recognized" property right to "*business*"

information, relying on prior case law that concerned the protected nature of sensitive

commercial and financial information.  *See id.* (citing *Ruckelshaus v. Monsanto*, 467 U.S. 986,

1000-04 (1984) (trade secrets); *Dirks v. SEC*, 463 U.S. 646, 653 n.10 (1983) (corporate inside

information); *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 250-51 (1905)

(commodities exchange's trading ticker information)).  Similarly, the Court cited for support

FOIA's (b)(4) exemption from disclosure for "trade secrets and commercial or financial

information obtained from a person and privileged or confidential," *see id.* (citing 5

U.S.C. § 552(b)(4) (1982)), but declined to cite the various FOIA exemptions for confidential

*regulatory* information like classified information, (b)(1), agency memoranda, (b)(5), law

enforcement investigatory files, (b)(7), and inspection reports prepared by or used by agencies to regulate financial institutions, (b)(8).

*Carpenter* further emphasized the private property aspect of the *Journal*'s business information by citing a corporate law treatise, *id.* (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed. 1986)), as well as the Court's opinion in *Associated Press*, which explained that "[n]ews matter … is *stock in trade*, to be gathered at the cost of enterprise, organization, skill, labor, and money, and *to be distributed and sold to those who will pay money for it*, *as for any other merchandise*," *id.* (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236 (1918) (emphasis added)).  It was based on these private-sector precedents that the Court concluded that "[t]he Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of [its] column," as "[t]he confidential information was *generated from the business, and the business had a right to decide how to use it.*"  *Id.* at 26 (emphasis added).

*Carpenter* holds that confidential *business* information is a species of intangible property, the taking of which can be prosecuted under the wire fraud statute, not that confidential *regulatory* information is property.  And following *Cleveland*, *Carpenter*'s narrow holding should not be extended to the confidential regulatory information at issue here.  *See Cleveland*, 531 U.S. at 19 (reiterating *Carpenter*'s limited scope).

Unlike *Carpenter*'s reliance on the commercial value of the information to the *Wall Street Journal*, *Carpenter*, 484 U.S. at 26-27, there is no commercial value to the PCAOB in controlling the confidentiality of its inspection targets; the value of that information to the PCAOB is purely regulatory.  Nor does the PCAOB have any "stock in trade"; rather, it has a statutory regulatory mission prescribed by Congress.  It does not "sell" its inspections targets or

34

reports, let alone its sovereign authority to conduct inspections of public accounting firm audits. *Compare United States v. Hedaithy*, 392 F.3d 580, 600 (3d Cir. 2004) (holding TOEFL test maker's confidential business information was "property" and did not conflict with *Cleveland* because the victim "is a private business that provides a service and reports test results in pursuit of a profit-seeking endeavor.  Unlike a state, [the victim] has no sovereign power to regulate.").

Nor does the PCAOB maintain the confidentiality of its inspections in order to protect its commercial reputation in the market or to retain clients.  *Compare United States v. Grossman*, 843 F.2d 78, 86 (2d Cir. 1988) (law firm's maintenance of confidential client information has "commercial value" to the firm even though it was not in the business of selling such information "because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients").  Accounting firms do not submit to PCAOB inspections because they are competing to obtain external validation like a *Good Housekeeping* seal of approval.  They comply with the PCAOB's demands because they are required by law to do so, pursuant to a regulatory scheme.

Similar to Louisiana's ability to control to whom it issues poker licenses, the PCAOB's right to maintain the confidentiality of its information is a "right to exclude" others from knowing that information.  *Cleveland*, 531 U.S. at 24.  But "[a] right to exclude in [a] governing capacity is not one appropriately labeled 'property.'"  *Id.*  While both government and business entities have a "right to exclude" others from knowing their confidential information, any "congruence" for purposes of defining property rights "ends there."  *Id.* at 23.  The PCAOB's right to exclude others from knowing which audits it will inspect until it tells them is not "business information," nor is it property—it is a regulatory interest derived from Congress's sovereign authority.

In light of *Cleveland*, it would make little sense to extend *Carpenter*'s recognition of a well-established property right in confidential business information to include all information the government treats as confidential in support of a regulatory function.  According to *Cleveland*, a patent holder has a property interest in licensing the patent she developed for her own business purposes, but the government does not, because it possesses sovereign power to administer patents.  *Id.* at 23-24.  Likewise, a private franchisor has a property interest in licensing its franchise for its business purposes, but the government does not, as government licensing and franchising is done pursuant to regulatory schemes that vindicate the government's sovereign interest in protecting the public.  *Id.* at 24.  The same is true here.  A company may have a property interest in maintaining the confidentiality of its information for business purposes, but the PCAOB does not, because its intangible interest in protecting the confidentiality of information is used exclusively for regulatory purposes pursuant to sovereign power and interest.

As far as the Defendants are aware, there is not a *single* decision post-*Cleveland* that treats confidential information created and used for regulatory purposes pursuant to sovereign authority as "property" under the mail and wire fraud statutes.[5]  This Court has recognized that unlike "*tangible and economic*" property interests that are adjacent to regulatory schemes—such

---

[5] *Compare, e.g.*, *United States v. Ying Wai Phillip Ng*, 578 F. App'x 38, 40 (2d Cir. 2014) (summary order) (undisputed that helping people cheat on the written portion of the New York DMV test for a commercial driver's license did not deprive the DMV of any "property" under the mail and wire fraud statutes), *with Pasquantino*, 544 U.S. at 355-57 (Canada had a property interest in expected liquor excise taxes avoided by smugglers because, unlike *Cleveland*, "Canada's entitlement to tax revenue is a straightforward 'economic' interest"), *United States v. Bengis*, 631 F.3d 33, 39-40 (2d Cir. 2011) (South Africa had a property interest in illegally harvested lobsters fished from its waters because, unlike *Cleveland*, the defendants "deprived South Africa of money it was due"), *and United States v. Rodriguez-Davalos*, No. EP-10-CR-2159-KC, 2011 WL 5509542, at \*3-4 (W.D. Tex. Nov. 10, 2011) (loan guarantee from the Export-Import Bank of the United States is "property" because it risks the Bank's money and because the Bank was "acting as a business," "not operating in a regulatory capacity").

as medical insurance payments or tax revenues—*Cleveland* holds that *intangible* interests that arise from a regulatory scheme do not become property merely because there is a private-sector analog to that interest.  *See United States v. Zemlyansky*, 945 F. Supp. 2d 438, 449 (S.D.N.Y. 2013) (emphasis added).

The Government ignores *McNally*'s lesson—a lesson the Supreme Court repeated in *Cleveland*:  Vague intangible rights relating to the integrity of the government's regulatory operations are not "property."  The PCAOB's interest in keeping its inspection targets confidential is a regulatory interest, not "property," under the wire fraud statute.

### C.   The Government's Unprecedented Theory of "Property" Violates Clear Statement Principles of Statutory Construction and the Rule of Lenity.

The Indictment's novel extension of the wire fraud statute to confidential regulatory information also violates the Supreme Court's warning that it will not "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." *Cleveland*, 531 U.S. at 24.  In *Cleveland*, the Court noted that accepting licenses as "property" "would subject to federal mail [and wire] fraud prosecution a wide range of conduct traditionally regulated by state and local authorities."  *Id.*  Rejecting that expansion, the Court explained that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes."  *Id.* at 25 (quoting *Jones v. United States*, 529 U.S. 848, 858 (2000) (internal quotation mark omitted)).

The same clear statement problem exists here.  On the Government's interpretation of *Carpenter*, all confidential information held for regulatory purposes at every level of government—federal, state, and local—pursuant to confidentiality rules imposed by statute, regulation, or agency policy is now "property" for purposes of the wire and mail fraud statutes. Any disclosure of that information through "deceitful" means in breach of a duty of

37

confidentiality—even if not a crime under the state regulatory scheme—that uses the "mails" or the "wires" would constitute a federal felony, punishable by up to 20 years' imprisonment.  18 U.S.C. §§ 1341, 1343.  This is notwithstanding the fact that states are more than capable of imposing their own penalties for improper disclosures of their information.  *See Cleveland*, 531 U.S. at 24 (noting Louisiana already imposed penalties for making false statements on license applications); *see, e.g.*, Cal. Gov. Code § 1098 (misdemeanor for a public officer to disclose "confidential information acquired by him or her in the course of his or her official duties" for "pecuniary gain"); *id.* §§ 8545 & 8545.1 (misdemeanor for employee of California State Auditor to disclose confidential records of that agency).  Adopting the Indictment's sweeping theory of confidential regulatory information as "property" would be contrary to *Cleveland* and *McNally*.  *See McNally*, 483 U.S. at 360 (declining to "construe [wire fraud] in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials").

Moreover, the Indictment's expansive application of wire fraud here threatens to upset carefully delineated *federal* statutory schemes.  *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) ("Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").  As described above, in creating the PCAOB and investing it with a regulatory mission, rulemaking authority, and backing that scheme with delineated enforcement powers, Congress made the express judgment that violations of the PCAOB ethics code would carry civil, not criminal, penalties under Sarbanes-Oxley and the Exchange Act.  *Supra* at 3-6.  Permitting the prosecution of a violation of that ethics code as felony wire fraud would undercut Congress's decision.

The Indictment's view of wire fraud would also swallow up a litany of federal statutes criminalizing the disclosure of specific types of regulatory information and nullify the judgments Congress has made about the relative seriousness, and corresponding penalties, associated with these different types of disclosures.  For example, at the highest level, improper disclosure of classified information, intelligence sources and methods, and nuclear secrets have long carried criminal penalties in specified circumstances.  18 U.S.C. §§ 793, 794 (defense information); 42 U.S.C. §§ 2014(y), 2274, 2277 (nuclear energy and weapons "Restricted Data"); 18 U.S.C. § 798 & 50 U.S.C. § 783 (classified information); *see generally* Stephen P. Mulligan & Jennifer K. Elsea, Congressional Research Service, CRS R41404, Criminal Prohibitions on Leaks and Other Disclosures of Classified Defense Information 2 (2017).  Similarly, Congress has decided to make the improper disclosure of only specific kinds of nonclassified information—including confidential business information *given* to the government in the course of its regulatory duties—a criminal offense.  *See* 6 U.S.C. §§ 131, 133(f) (critical infrastructure information); 18 U.S.C. § 1905 (trade secrets); 5 U.S.C. § 552a(i) (Privacy Act information).  Congress has also separately made it a crime to steal or embezzle any "thing of value of the United States."  18 U.S.C. § 641.  Except in highly unusual circumstances, these statutes, even those prohibiting disclosure of classified information, carry considerably less severe criminal penalties than the 20-year maximum sentence that accompanies any generic wire fraud conviction.  *Compare* 18 U.S.C. § 1343, *with* 42 U.S.C. § 2277 (fine only); 5 U.S.C. § 552a(i)(1) (misdemeanor); 6 U.S.C. § 133(f) (1-year maximum); 18 U.S.C. § 1905 (1-year maximum); § 371 (5-year maximum); 18 U.S.C. § 641 (10-year maximum); 18 U.S.C. § 793 (10-year maximum); 18 U.S.C. § 798 (10-year maximum); 50 U.S.C. § 783 (10-year maximum).  *But see* 18 U.S.C. § 794 (delivering national defense information to a foreign state during wartime, resulting

in the death of an agent of the United States, or relating to nuclear weaponry or other "major weapons system or major element of defense strategy" is a capital offense); 42 U.S.C. § 2274 (transmitting nuclear energy information to a foreign state with the intent to injure the United States is punishable by life in prison).

Given that Congress has enacted a detailed array of penalties for improper disclosures of different kinds of regulatory information held across the federal government, one cannot conclude that Congress *also* intended to allow federal prosecutors to turn into mail or wire fraud the improper disclosure of *any* information an agency deems confidential by regulation or employment policy. *See Marinello*, 138 S. Ct. at 1107 (rejecting broad interpretation of generic criminal statutory language that would "create overlap and redundancy" with other existing specific federal crimes and "would potentially transform many, if not all, of these misdemeanor provisions into felonies, making the specific provisions redundant, or perhaps the subject matter of plea bargaining"). This Court should reject the Government's effort to transform mail and wire fraud into blanketing criminal statutes that make a 20-year felony the improper disclosure of any confidential information held by regulators or government agencies. *See Cleveland*, 531 U.S. at 26 ("declin[ing] to attribute to § 1341 a purpose so encompassing where Congress has not made such a design clear").[6]

---

[6] It is also hard to see where the Government's unprecedented theory of regulatory information as "property" ends. On the Government's theory, federal prosecutors could charge a journalist with mail or wire fraud for "scheming" to convince a government employee—whether federal, state, or local—to give her confidential information in breach of an agency regulation or employee manual, even if that information is not classified or otherwise statutorily protected. *See* John C. Coffee Jr., *Hush!: The Criminal Status of Confidential Information after* McNally *and* Carpenter *and the Enduring Problem of Overcriminalization*, 26 Am. Crim. L. Rev. 121, 140-41 (1988) (noting, pre-*Cleveland*, that overextending *Carpenter* to this situation "would convert the mail and wire fraud statute into an Official Secrets Act"). And because wire fraud, unlike other nondisclosure or anti-theft federal statutes, is a predicate offense under RICO, 18

And if there were any doubt that the information at issue here is not "property" for purposes of wire fraud (and there is none), the rule of lenity has special application in the context of wire fraud.  In *Cleveland*, the Supreme Court explained that the general rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" is "especially appropriate in construing" the mail and wire fraud statutes because mail and wire fraud are predicate offenses for RICO and money laundering charges.  531 U.S. at 25.  "In deciding what is 'property' under [the mail and wire fraud statutes], we think it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."  *Id.* (internal quotation marks omitted); *accord McNally*, 483 U.S. at 359-60.  Here, even setting aside the clarity with which the Supreme Court has spoken in cases like *McNally* and *Cleveland* regarding intangible regulatory interests, the rule of lenity requires that any doubt should be resolved in favor of holding that confidential regulatory information like this is not "property" for purposes of wire fraud.

### D.     The Government's Theory of Wire Fraud Is Unconstitutionally Vague.

Finally, the Indictment's contention that the PCAOB's interest in protecting the confidentiality of the regulatory information here is "property" is undercut by the Indictment's own theory of wire fraud, which shifts between fraud in obtaining and fraud in using this information.  *See* Indictment ¶¶ 97, 99, 101 (charging scheme to defraud by "misappropriating, embezzling, obtaining, sharing, and using" the PCAOB's confidential information regarding its planned inspections in 2015, 2016, and 2017).  The heart of the Government's allegations against the Defendants is that they agreed to *use* allegedly confidential PCAOB information.

---

U.S.C. § 1961(1)(B), this theory suggests that a news organization that regularly obtains such information is a RICO enterprise, raising significant constitutional avoidance concerns.  *See Boos v. Barry*, 485 U.S. 312, 330-31 (1988); *Skilling*, 561 U.S. at 405-06.

But the Government cannot charge the Defendants with wire fraud on the theory that they used already-embezzled information to undermine the integrity of the PCAOB inspections. Under *McNally* and *Cleveland*, undermining regulatory integrity *cannot* be prosecuted as wire fraud. "The Government's shifting and imprecise characterization of the alleged property at issue betrays the weakness of its case." *Sekhar v. United States*, 133 S. Ct. 2720, 2727 (2013). And, like its § 371 theory, this shifting theory of wire fraud is unconstitutionally vague. *Supra* § I.D. This Court should reject the Government's attempt to subvert the holdings of *McNally* and *Cleveland* through its imprecise theory of the property interest underlying the alleged fraud.

\* \* \*

Counts Two through Five of the Indictment fail to allege conduct that constitutes wire fraud, conspiracy to commit wire fraud, or aiding and abetting wire fraud and should be dismissed.

## CONCLUSION

The power to define federal crimes lies with Congress. Congress chose to make the PCAOB a private regulator rather than a government agency. That choice kept the PCAOB outside the ambit of criminal statutes that apply to federal agencies, including the defraud clause of 18 U.S.C. § 371. And Congress has not expanded the scope of the mail and wire fraud statutes to reach confidential regulatory information, whether held by a private regulator like the PCAOB or by state and local governments. Instead, Congress chose to leave violations of the PCAOB ethics code to civil and administrative enforcement, not criminal prosecution.

The Government here would usurp Congress's role and contort the criminal law to fit its view of right and wrong. But as *Tanner*, *McNally*, *Skilling*, and *Cleveland* illustrate, not all allegedly undesirable conduct is a federal crime. Because the Indictment does not state an

offense under the defraud clause of the generic conspiracy statute or the wire fraud statute, the

charges against the Defendants should be dismissed.


Dated:  April 13, 2018

New York, New York

/s/* Nelson A. Boxer

Nelson A. Boxer

Amy Lester

Alexandra R. Clark

  PETRILLO KLEIN &

BOXER LLP

655 Third Avenue

22nd Floor

New York, NY  10017

Tel: (212) 370-0330

nboxer@pkbllp.com


Gregory S. Bruch

Khiran Sidhu (*pro hac vice*)

  BRUCH HANNA LLP

1099 New York Avenue NW

Suite 500

Washington, DC  20001

Tel: (202) 969-1630

*Attorneys for Defendant David Middendorf*

Respectfully submitted,


/s/ Robert M. Stern

Melinda Haag (*pro hac vice*)

Robert M. Stern

Matthew R. Shahabian

Alyssa Barnard

  ORRICK, HERRINGTON &

SUTCLIFFE LLP

51 West 52nd Street

New York, NY  10019

Tel: (212) 506-5000

mhaag@orrick.com


*Attorneys for Defendant David Britt*

/s/* Bradley J. Bondi

Bradley J. Bondi

Nola B. Heller

Sean P. Tonolli (*pro hac vice*)

  CAHILL GORDON & REINDEL LLP

80 Pine Street

New York, NY  10005

Tel: (212) 701-3000

bbondi@cahill.com


*Attorneys for Defendant Thomas Whittle*


*Signed with the consent of counsel