# Exhibit N

17 MAG . 6471

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of the Application of the United
States Of America for a Search and Seizure
Warrant for a Seagate hard drive with serial
number P/N: 1K9AP1-501 and an Apricorn
Aegis Padlock hard drive with serial number A-
25-3PL256-500

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Lyeson Daniel, being duly sworn, deposes and says:

## I.  Introduction

### A.  Affiant

1.      I have been a Postal Inspector with the United States Postal Inspection Service for

approximately 1 year, where I am assigned to a squad responsible for investigating white collar

crime, including securities fraud and accounting fraud.   I have received training regarding

computer and cellular telephone technology and in the execution of search warrants on such

devices. Prior to joining the United States Postal Inspection Service, I was employed for

approximately 7 years in the civil enforcement division of the New York State Department of

Taxation and Finance, where I conducted and supervised investigations into corporate financials

in order to determine whether taxes had been properly paid.  In addition, I have a bachelor's degree

in information (computer) systems and a master's degree in accounting.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search two hard drives ("Hard Drive 1" and "Hard

Drive Two," together, the "Subject Drives") containing forensic images of the electronic devices

specified below (the "Electronic Devices") for the items and information described in Attachment

A.  This Affidavit is based upon my personal knowledge; my participation in witness interviews;

2017.01.23

2

my review of documents and other evidence; my conversations with other law enforcement personnel; my conversations with counsel for KPMG ("KPMG Counsel") and counsel for the Public Company Accounting Oversight Board ("PCAOB Counsel"); and my training, experience and advice received concerning the use of computers, tablets and cellular telephones, in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Drives**

3.      Based on my review of emails and other documentation, communications by KPMG Counsel, and my participation in witness interviews, I know that in or about February and March of 2017, in connection with an internal investigation concerning the theft, misuse, and improper sharing of confidential information of the Public Company Accounting Oversight Board (the "PCAOB") by and with employees and partners of KPMG, KPMG requested certain electronic devices from certain then-KPMG employees and partners, including David Britt, Cynthia Holder, Scott Marcello, David Middendorf, Brian Sweet, and Thomas Whittle.

4.      Hard Drive 1 is particularly described as a Seagate hard drive with serial number P/N: 1K9AP1-501, containing forensic images of the following electronic devices:

   a.   A Samsung Galaxy S5 used by David Britt (the "Britt Cellphone").

   b.   An iPhone 7 Plus used by Cynthia Holder (the "Holder Cellphone").

   c.   An iPhone 6 used by Scott Marcello (the "Marcello Cellphone") and a separate partial copy of the SIM Card from Marcello's Cellphone (the "Marcello SIM Card").

   d.   An iPhone 6s Plus used by David Middendorf (the "Middendorf Cellphone").

SDNY-00000049

e.   An iPhone 6 used by Thomas Whittle (the "Whittle Cellphone").

f.   An iPhone 7 Plus used by Brian Sweet (the "Sweet Cellphone") (and together with the devices set forth in paragraphs 3(a)-(f), the "Subject Cellphones");

g.   An iPad Pro 128, which had an assigned cellular telephone number, used by Scott Marcello (the "Marcello iPad") (and, together with the Subject Cellphones, the "Electronic Devices").

5.   Hard Drive 2 is particularly described as an Apricorn Aegis Padlock hard drive with serial number A-25-3PL256-500 containing a complete forensic image of the SIM Card from the Marcello Cellphone (and together with Hard Drive 1, the "Subject Drives").

6.   Pursuant to KPMG's 2017 requests for certain electronic devices from certain then-employees and partners of KPMG:

a.   On or about February 27, 2017 the Sweet and Holder Cellphones were provided to KPMG or its counsel.

b.   On or about March 17, 2017, the Middendorf, Britt, and Marcello Cellphones and the Marcello iPad were provided to KPMG or its counsel.

c.   On or about March 31, 2017, the Whittle Cellphone was provided to KPMG or its counsel.

7.   In or about May 2017, forensic copies of the Electronic Devices were copied to Hard Drive 1.  On or about May 30, 2017, a copy of Hard Drive 1 was received by the United States Attorney's Office for the Southern District of New York, where it has remained since that time.  Due to a copying error, a duplicate and full copy of the SD Card from Marcello's Cellphone was subsequently copied to Hard Drive 2.  On or about June 2, 2017, a copy of Hard Drive 2 was

2017.01.23

SDNY-00000050

received by the United States Attorney's Office for the Southern District of New York, where it has remained since that time.[1]

8.      Based on my training, experience, and research, I know that:

a.   Cellular telephones are handheld wireless devices used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" storing and playing back audio files; and storing dates, appointments, and other information on personal calendars and/or in an "electronic notepad."  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   GPS navigation devices, including many cellular telephones, use the Global Positioning System to display their current location.  They often contains records the locations where they has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time,

---

[1] Because the Electronic Devices were produced by their users' to KPMG, and thereafter by KPMG to the United States Attorney's Office for the Southern District of New York, the Government does not believe that a search warrant authorizing a search of the Electronic Devices or the Subject Drives is necessary.  The Government has, out of an abundance of caution, nonetheless elected to seek a search warrant.

2017.01.23

SDNY-00000051

combined with a special sequence of numbers.  These signals are sent by radio, using

specifications that are publicly available.  A GPS antenna on Earth can receive those signals.

When a GPS antenna receives signals from at least four satellites, a computer connected to that

antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude

with a high level of precision.

      c.   Cellular telephones typically have voice mail and/or text-messaging features,

which permit the cellular telephone user to send and receive voice mail and/or text messages.

Voice mail and text messages are typically stored on the computer network of the provider of the

cellular telephone's telephone service, which network is external to the cellular telephone.  Sent

and received text messages may also be stored on the cellular telephone itself.

      d.   Cellular telephones with camera functions permit the cellular telephone user to

take photographs and/or videos that are stored on the cellular telephone itself.

      e.   Most cellular telephones, like the cellular telephones included on the Subject

Drives, are now "smart" cellular telephones.  Such cellular telephones are very often are linked

to an electronic mail ("e-mail") account, and emails sent to or from the "smart" cellular

telephone often are maintained on the device until they are deleted by the user.  Such telephones

also permit a user to access the internet and download information from the internet.  The user's

browser and search history may be stored on the telephone, in addition to other places.

      f.   The information described above usually remains accessible in the cellular

telephone's memory card — or SIM card — even if the cellular telephone has lost all battery

power and/or not been used for an extended period of time.

      g.   iPads, have most, if not all of the same functionality as smart cellular telephones,

and also function as compact computers.

2017.01.23

SDNY-00000052

9.      In addition, based on representations by KPMG Counsel, I know that KPMG permits employees and partners to access their KPMG email accounts through their personal electronic devices, such that David Britt, Cynthia Holder, Scott Marcello, David Middendorf, Brian Sweet and Thomas Whittle were each able to access their KPMG email through their Electronic Devices.

10.     Britt, Marcello, Middendorf and Whittle each had access to KPMG email through their personal devices since at least January 2014.  Holder and Sweet each had access to KPMG email through their personal devices since at or around the time they began employment with KPMG in 2015.  When KPMG employees, including those specified here, updated their electronic devices to a new device, their KPMG email was transferred to the new device, including emails which predated the date on which KPMG email was made accessible on the new device. Accordingly, I believe that emails sent and received from Britt, Holder, Marcello, Middendorf, Sweet and Whittle's KPMG email accounts are located on the Electronic Devices.

**C.  The Subject Offenses**

11.     For the reasons detailed below, I believe that there is probable cause to believe that the Subject Drives contains evidence, fruits, and instrumentalities of violations of  Title 15, United States Code, Sections 7202(b)(1) & 78ff and Ethics Code 9 of the Rules of the Public Company Accounting Oversight Board (the "PCAOB") (willful violations of PCAOB Rules constituting criminal violations of the Securities Exchange Act of 1934); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Sections 1346 and 1343 (honest services wire fraud); Title 18, United States Code, Section 1503 (obstruction of justice); Title 18, United States Code, Section 1519 (destruction, alteration or falsification of records to obstruct a government investigation); conspiracy to commit such offenses in violation of Title 18, United

2017.01.23

SDNY-00000053

States Code, Section 371; and aiding and abetting such offenses in violation of Title 18, United

States Code, Section 2 (together, the "Subject Offenses").

## II.   Probable Cause

### A.   Probable Cause Regarding Subjects' Commission of the Subject Offenses

12.     Based on information provided by KPMG Counsel and PCAOB Counsel, including

information derived from their respective internal investigations, my own participation in witness

interviews, my review of documents, including emails, text messages, and personnel files, and

other information, I know the following:

### *The PCAOB and Its Employees*

13.     In general, in order to register securities with the Securities and Exchange

Commission ("SEC"), a public company must disclose annual audited financial statements.  These

financial statements are audited by an independent certified public accountant (an "Auditor") who

examines the company's financial statements and other documentation in order to ascertain

whether the financial statements are accurate, truthful, and complete pursuant to Generally

Accepted Accounting Principles ("GAAP").  After completing an examination of a company's

financial statements, an Auditor issues a written report or "audit report" as to whether the financial

statements are fairly stated and comply in all material respects with GAAP.  An Auditor must

complete its review of the financial statements prior to issuing its audit report, but may document

previously completed work within the 45-day period following the issuance of the audit report (the

"Documentation Period").  After the conclusion of the Documentation Period, an Auditor is

generally prohibited from altering or adding to its work papers for a given audit.

14.     The Public Company Accounting Oversight Board (the PCAOB or the "Board") is

a nonprofit organization created by the Sarbanes-Oxley Act of 2002 ("SOX") and modelled after

self-regulatory organizations in the securities industry that investigate and discipline their own

SDNY-00000054

members, subject to oversight by the SEC.  Among other responsibilities, the PCAOB inspects registered public accounting firms to assess compliance with various auditing and accounting rules and standards, as set forth in SOX, rules promulgated by the SEC and the PCAOB, and other professional standards in connection with accounting firms' performance of audits and issuance of audit reports, among other matters.

15.     SOX commands that the rules of the PCAOB (the "PCAOB Rules"), among other things, establish ethics rules and standards of conduct for Board members and staff.  The PCAOB Rules are subject to the approval of the SEC.  SOX also provides that a violation of a PCAOB rule shall be treated as a violation of the Securities Exchange Act of 1934 (the "Exchange Act") or rules issued pursuant to the Exchange Act, and that any person violating PCAOB Rules will be subject to the same penalties applied to a violation of the Exchange Act. [2]  One rule promulgated by the PCAOB as part of its ethics code and approved by the SEC, is Ethics Code 9 ("EC 9"), which is entitled "Nonpublic Information."  EC 9 states:

> Unless authorized by the Board, no Board member or staff shall disseminate or otherwise disclose any information obtained in the course and scope of his or her employment, and which has not been released, announced, or otherwise made available publicly. The provisions of this Section shall continue in effect after the termination of employment or Board membership.

16.     The PCAOB conducts inspections of registered accounting firms pursuant to two programs: (i) the Global Network Firm ("GNF") program, which inspects the 6 largest United States Accounting firms and their global affiliates; and (ii) a second program for all other firms. KPMG is one of the 6 largest accounting firms, and accordingly, is inspected as part of the GNF program.  PCAOB maintains a dedicated team of inspectors for each of the firms in the GNF

---

[2] Willful violations of the Exchange Act or rules issued under the Exchange Act are subject to criminal prosecution.  *See* 15 U.S.C. § 78ff.

2017.01.23

SDNY-00000055

program.  In order to determine which of KPMG's engagements to inspect in a particular year, PCAOB's inspection team receives a list of all audits conducted by KPMG the prior year, and certain data about each audit.  Typically, in or around November and December of each year, PCAOB selects which of KPMG's audits are to be inspected.  It does so based on a variety of factors including how long it has been since a particular engagement was inspected, the risk factors for the audit, and an interest in including some randomly selected engagements, among others.

17.    PCAOB generally notifies an accounting firm of an inspection approximately 2 to 4 weeks before the inspection is to take place, but in no event prior to the completion of the Documentation Period for that audit.  This is because it is important to PCAOB that it inspect a firm's actual audit work on an engagement, and not additional work done by a firm because of a known upcoming inspection.   Accordingly, the internal list maintained by the PCAOB regarding its planned intended upcoming inspections is high confidential.

18.    Once a PCAOB inspection is complete, and following an opportunity for the accounting firm to contest any findings, the PCAOB issues an Inspection Report (the "Report"). The Report contains two parts.  Part I, which is publicly available, documents instances in which the PCAOB found that the auditor failed to gather sufficient audit evidence to support an audit opinion.  Part II, which is not public, relates to any defects or systemic deficiencies noted in the inspection.  An accounting firm is given one year to remedy any deficiencies noted in Part II, after which time, if the deficiencies are not corrected, the Part II form is made public.  The number of "comments," (a term of art for negative findings) received by a firm in both Part I and Part II is publicly available, and accounting firms strive to avoid such comments.

2017.01.23

SDNY-00000056

### *Relevant PCAOB Personnel*

19.     Between approximately 2009 and approximately April 24, 2015, Brian Sweet ("Sweet") was an employee of PCAOB.  At the time Sweet left PCAOB, he was an Associate Director with PCAOB.

20.     Between approximately December 2011 and approximately July 2015, Cynthia "Cindy" Holder ("Holder") was an employee of PCAOB.  At the time Holder left PCAOB, she was an Inspections Leader with PCAOB.

21.     Between approximately 2004 and approximately 2017, Jeffrey Wada ("Wada") was an employee of PCAOB. At the time Wada left PCAOB, he was an Inspections Leader with PCAOB.

22.     PCAOB regularly trains its employees on applicable laws and PCAOB Rules. While employed at the PCAOB, Sweet, Holder and Wada each signed certifications agreeing to abide by such rules, including, but not limited to EC 9.

### *Relevant KPMG Personnel*

23.     On or about May 4, 2015, Sweet began working at KPMG as an Audit Partner in the Department of Professional Practice – Inspections.

24.     On or about August 1, 2015, Holder began working at KPMG as an Executive Director in Risk and Regulatory, Department of Professional Practice – Inspections.

25.     At all relevant times David Britt ("Britt") was an Audit Partner in the Department of Professional Practice, Banking and Capital Markets.

26.     At all relevant times, George Hermann ("Hermann"), was a KPMG Audit Partner in the Audit Quality and Professional Practice Group and held the title of Chief Auditor.

2017.01.23

SDNY-00000057

27.     At all relevant times, Scott Marcello ("Marcello") was a KPMG Audit Partner and, as of July 2015, was also the Vice Chair of Audit.

28.     At all relevant times, David Middendorf ("Middendorf") was KPMG's National Managing Partner for the Audit Quality and Professional Practice Group.

29.     At all relevant times Thomas Whittle ("Whittle") was a KPMG Audit Partner in the Audit Quality and Professional Practice Group and was the National Partner-in-Charge for Quality Measurement.

30.     As a result of, among other things, aspects of the conduct described herein, Britt, Holder, Marcello, Middendorf, Sweet and Whittle were each separated from KPMG sometime after approximately February 2017.

### *KPMG's Attempts to Remedy Its Poor Performance in Inspections*

31.     In or about 2015, KPMG was in the process of addressing concerns raised by the PCAOB concerning the firm's timeliness in responding to written comments relating to PCAOB engagement inspections, as well as the sufficiency of resulting audit documentation remediation. In particular, KPMG was focused on reducing the number of "comments" it received and on improving its performance with respect to the large number of banking engagements which had received written comments related to the auditing of loan and lease losses ("ALLL"), among other matters.

32.     Beginning in approximately 2015, KPMG took various steps in an effort to improve its inspection performance.  Such steps included, but were not limited to:

     a.   Recruiting PCAOB employees, including Sweet and Holder.

     b.   Retaining Palantir, a data analytics firm, to assist in predicting which engagements would be inspected.

2017.01.23

12

SDNY-00000058

c.   Implementing a financial bonus incentive system for members of audit teams which received no comments.

d.   Implementing an ALLL Monitoring program to add an additional level of review to KPMG's auditing of the accounting of "loan and lease losses."

### *Dissemination of PCAOB Inspection Lists*

#### *2015*

33.      Based on my participation in interviews of Sweet, I know the following:

a.   Prior to leaving PCAOB, Sweet made a copy of his computer hard drive, which contained thousands of PCAOB documents, including, for example, internal planning documents and non-public comment forms.   After beginning employment at KPMG, Sweet transferred these PCAOB documents to his KPMG laptop computer.  Sweet also took hard copies of certain PCAOB documents, including a non-public list of engagements that had been selected for inspection in 2015 (the "2015 List") from PCAOB.

b.   In approximately May 2015, during his first week of employment at KPMG, Sweet had lunch with Middendorf and others.   During lunch, Middendorf asked Sweet to disclose information about which KPMG engagements would be inspected by PCAOB.  Middendorf also told Sweet to remember where Sweet's paycheck came from.

c.   Also during his first week of employment at KPMG, Sweet had lunch with Whittle and Hermann.  During lunch, Whittle asked Sweet which KPMG engagements would be inspected that year.  During the same conversation, Whittle told Sweet that Sweet was most valuable to the firm at the present moment and that soon Sweet would be less valuable.  Sweet understood this to mean that his knowledge of present PCAOB inspection activity was one of the primary "values" he brought to KPMG.

2017.01.23

13

d.   On or about Friday, May 8, 2015, at the end of Sweet's first week of employment at KPMG, Sweet provided a copy of the 2015 List to Whittle.  Whittle shared the list with other KPMG personnel, including Middendorf.

*2016*

34.      Based on my participation in interviews of Sweet and my review of emails and text messages provided by KPMG Counsel I know the following:

a.   Holder was close friends with Wada while at PCAOB and remained so following her departure from PCAOB.

b.   In March 2016, Holder received a telephone call from Wada in which he told her to "write this down" and proceeded to provide her with a list of stock ticker symbols.  The list of ticker symbols was the list of KPMG issuers to be inspected in 2016 (the "2016 List").

c.   Holder subsequently called Sweet and told him about her call with Wada.  Sweet told Holder that Sweet would tell Whittle about the call from Wada.

d.   Sweet called Holder back that same day and told her that he had discussed the list with at least Whittle, Britt and Middendorf.  Sweet told Holder that Sweet had been told that the information was "too good to pass up" and Sweet directed Holder not to share the information with anyone else.

e.   On or about March 28, 2016, Sweet spoke to Whittle, Middendorf and Britt by phone.  During that conversation, Sweet told Whittle, Middendorf and Britt that he had obtained a list of banks to be inspected from a colleague at PCAOB.  During the conversation they agreed to use an existing monitoring system for ALLL-related issues to re-review work papers for the bank audits subject to inspection.  Following that conversation, Britt arranged for Sweet, Holder, and

2017.01.23

SDNY-00000060

several others to be given access to the audit files in the ALLL system in order to conduct "on top monitoring" of the relevant audits.

35.     Based on information provided by KPMG Counsel concerning their interview(s) of Middendorf, on or about March 28, 2016, following the conversation described above, Middendorf notified Marcello that Sweet had acquired information concerning PCAOB inspections from an anonymous PCAOB source.[3]

36.     Based on information provided by KPMG Counsel, I know that, in connection with the "on top monitoring" done in connection with the receipt of the 2016 List, KPMG discovered an error in an aspect of KPMG's audit of company called Ambac.   At the time the error was discovered, an Ambac opinion had already been issued.    As a result of discovering the error, KPMG withdrew its opinion with respect to internal controls.

*2017*

37.     Based on my participation in interviews of Sweet and my review of emails and text messages provided by KPMG Counsel, I know the following:

38.     On or about January 9, 2017, Wada and Holder spoke by cellphone.   Shortly after the call, Holder spoke to Sweet and told Sweet that Wada had provided her with the names of certain banks that were at high risk to be selected for inspection as well as certain audits of other issuers that were raising red flags (the "2017 Preliminary List").    Sweet then relayed the

---

[3] With regard to the contents of interviews conducted by KPMG Counsel of current or former KPMG employees, KPMG has made clear that it has not intended or elected to waive the attorney-client privilege to the extent the privilege applies to such interviews.  Instead, KPMG Counsel has relayed the information or answers that they "hypothetically" believe a particular witness would provide.  Additionally, in certain cases, the description of events attributed to a particular witness varies from, or is contradicted by, the account attributed to another witness. Where facts are attributed to one witness, the different or contradictory account of another witness is not included herein.

2017.01.23

SDNY-00000061

information to both Whittle and Britt.  Sweet understood that Whittle would share the information with Middendorf.

39.     On January 10, 2017, one day after providing Holder with confidential PCAOB information, Wada emailed his resume to Holder.

40.     On or about January 10 and January 11, 2017, Sweet reached out to a number of KPMG engagement partners to set up times to speak.  During those communications – and based on the information provided by Wada – Sweet told the engagement partners that he believed their respective engagements would be inspected.

41.     On or about February 3, 2017, Holder and Wada again spoke via cellphone.

42.     Shortly after the end of that call, Holder spoke to Sweet by phone.  During the call, Holder provided Sweet with a list of 47 stock ticker symbols corresponding to 47 engagements which would be inspected in 2017 and the focus areas of those inspections (the "2017 List").  Sweet wrote down the list (the "Sweet 2017 List").  Sweet then spoke separately to both Britt and Whittle and provided each of them with the 2017 List.

43.     On or about February 6, 2017, Sweet, Whittle and Middendorf spoke by phone and discussed the 2017 List.  Middendorf copied down the list.

### Other Matters

44.     Based on my review of email communications and my participation in interviews of Sweet, I know the following:

### *Sweet Maintains Relationships at PCAOB*

45.     After leaving the PCAOB, Sweet remained in contact with many then-current PCAOB employees, including but not limited to, Grady Peeler, Matt Sickmiller, Robert "Bob" Ross, Steven Schindler, David Knibbs, Karen Tyler, Jeffrey Watkins, Duane Abel, and August

2017.01.23

SDNY-00000062

Bellome.  Among other activities, Sweet stayed in email communication with PCAOB employees, participated in a "fantasy football" league with PCAOB employees, and met PCAOB employees for meals and drinks.  During some of these interactions, Sweet attempted to learn confidential PCAOB information from then-current employees.  On at least one occasion, following a meal with a PCAOB employee, Sweet made notes of the conversation to remind himself of the information he had learned.

### *Recruitment Efforts*

46.    Between at least 2014[4] and 2017, with the involvement of Britt, Marcello, Middendorf, Whittle, and others, KPMG recruited, and in some cases, hired PCAOB employees. After Sweet and Holder were hired by KPMG, they each participated in communications with other then-current PCAOB employees about the possibility of employment at KPMG.

47.    Between at least 2014 and 2017, then-current PCAOB employees, including but not limited to Sweet, Holder, Hector Santana, Jeffrey Wada, Jung Lee, David Knibbs, Jeffrey Watkins, Grady Peeler, and James Teter (i) engaged in discussions with KPMG personnel about possible employment; (ii) provided their respective resumes to KPMG personnel; and/or (iii) were in fact hired by KPMG.

48.    In several instances, PCAOB employees provided draft resumes to Sweet or Holder for review and/or provided resumes to Sweet for the purpose of having the resumes passed to KPMG.

### *Other Improper Uses of Confidential PCAOB Information*

49.    In addition to disclosing and passing on lists of engagements to be inspected in 2015, 2016, and 2017, Sweet also disclosed confidential PCAOB information to his colleagues at

---

[4] Efforts to recruit Sweet began in at least September 2014.

2017.01.23

SDNY-00000063

KPMG for use in other ways.  For example:

a.  In or about May 2015, at Sweet's request, and while still employed at PCAOB, Holder sent Sweet an internal PCAOB document summarizing various deficiencies at KPMG, for the purpose of assisting Sweet in preparing for a meeting at KPMG concerning firm deficiencies.

b.  In or about 2015, KPMG contracted with Palantir, a data analytics service, to assist in efforts to predict which KPMG engagements would be the subject of PCAOB inspections. Sweet provided KPMG personnel responsible for the Palantir project with a list of confidential PCAOB "risk factors," which would make an engagement more likely to be inspected.

c.  In or about 2016, Dabie Tsai, a KPMG partner, was engaged in efforts to secure as a KPMG client a Spanish bank, BBVA.  Sweet provided Tsai with confidential PCAOB comments concerning another GNF auditing firm's audit of a different Spanish bank in order to assist her in landing BBVA as a KPMG client.  Tsai was ultimately successful and BBVA became a KPMG client.

### *Efforts to Conceal the Illicit Receipt of PCAOB Information*

50.  On or about February 14, 2017, Sweet called Holder.  During the conversation, according to Sweet, Sweet and Holder discussed the fact that KPMG's Office of the General Counsel ("OGC") was investigating the improper receipt of confidential PCAOB information by KPMG employees.  Sweet and Holder discussed covering up their receipt of information from Wada by falsely telling OGC that Holder had received the confidential PCAOB information from an anonymous letter.

51.  Sweet and Holder also had multiple other conversations following the initiation of OGC's investigation.  For example:

2017.01.23

SDNY-00000064

a.      In or about February 2017, following the initiation of the investigation by OGC, Sweet discussed with Holder the fact that he had had deleted some of their incriminating text messages.  Holder told Sweet, in sum and substance, that she had had hidden the thumb drive that contained the confidential PCAOB documents she had taken inside an electrical outlet or light switch in a wall of her home office in her house.  Holder explained that she did this so that if necessary her spouse could retrieve the thumb drive at some future point.  During this conversation, Holder referenced her prior employment (as an FBI agent) and discussed ways that FBI conducted investigations.[5]

b.      In or about February 2017, Holder suggested to Sweet that they purchase "burner" phones (prepaid cellular telephones not subscribed in one's own name) to communicate with each other.  Around this time, Holder indicated to Sweet that she had purchased a burner phone using her mother's account, which, according to Holder, was safe because Holder and her mother did not share the same last name.  Holder attempted to give Sweet the number to her burner phone, but Sweet was out with his family and didn't write it down.  When Sweet declined to purchase a burner phone, Holder suggested that they exchange their spouses' phone numbers so that they could communicate with each other on their spouses' phones.  Holder and Sweet also devised a plan by which when they needed to speak with each other, one of them would message the other on Instagram with a football symbol, indicating that they should call into the sender's KPMG conference call number.  On or about February 24, 2017, one such call was initiated through this Instagram communication and then took place via Sweet's KPMG conference call

---

[5] On or about August 22, 2017, a search warrant issued by the Honorable Mary Milloy, United States Magistrate Judge, was executed on Holder's residence in Texas. During the search numerous thumb drives, external hard drive, and cellular telephones were recovered. Nothing, however, was found in any electrical socket or light switch.

SDNY-00000065

line.

52.    Based on information provided by KPMG counsel concerning their interview of Holder, emails between Holder and Whittle, and my review of text messages obtained by KPMG counsel from the Holder Cellphone, I know the following:

a.  In or about February 2017, Holder deleted text messages between herself and Wada concerning Wada's having provided her with confidential PCAOB information from the Holder Cellphone.  Notwithstanding this attempted deletion, KPMG counsel was able to recover text messages between Holder and Wada from the Holder Cellphone concerning Wada's having provided Holder confidential PCAOB information.

b.  On or about February 16, 2017, Whittle emailed Holder asking her to call him. During a subsequent conversation, Whittle told Holder that "we never talked about the list" and she responded, "right."

**B.   Probable Cause Justifying Search of the Subject Drives**

### *Call Records*

53.    Based on my review of call detail records provided by KPMG Counsel, I know that Sweet, Holder, Whittle, and Britt placed and received[6] multiple calls to each other and others on or about the dates on which the 2016 and 2017 Lists were received and/or shared. For example:

a.  On or about March 28, 2016:

- At approximately 1:33 p.m., Holder called Sweet.  The call lasted 1 minute.[7]
- At approximately 1:34 p.m., Holder called Sweet. The call lasted 1 minute.
- At approximately 1:56 p.m., Sweet called Holder. The call lasted 24 minutes.

---

[6] Unless otherwise specified, the calls and text messages attributed to Holder, Sweet, Whittle and Britt above were placed from, respectively, the numbers assigned to the Sweet Cellphone, the Holder Cellphone, the Whittle Cellphone, and the Britt Cellphone.

[7] The durations of the calls as set forth herein are approximate.

2017.01.23

SDNY-00000066

- At approximately 2:21 p.m., Sweet called Whittle's office number. The call lasted 1 minute.
- At approximately 2:23 p.m., Sweet called Holder. The call lasted 3 minutes.
- At approximately 2:26 p.m., Sweet called Britt's office number. The call lasted 1 minute.
- At approximately 2:48 p.m., Whittle called Sweet from Whittle's office number. The call lasted 11 minutes.
- At approximately 2:59 p.m., Sweet called Holder. The call lasted 5 minutes.
- At approximately 3:03 p.m., Sweet called Britt's office number. The call lasted 14 minutes.
- At approximately 3:17 p.m., Sweet called Holder. The call lasted 22 minutes.
- At approximately 5:16 p.m., Sweet called Holder. The call lasted 1 minute.
- At approximately 5:49 p.m., Holder called Sweet. The call lasted 20 minutes.
- At approximately 6:10 p.m., Britt called Sweet from Britt's office number. The call lasted 1 minute.
- At approximately 6:22 p.m., Britt called Sweet from Britt's office number. The call lasted 7 minutes.

b.  On or about March 29, 2016:

- At approximately 12:07 p.m., Holder called Sweet. The call lasted 8 minutes.
- At approximately 12:16 p.m., Sweet called Whittle's office number. The call lasted 2 minutes.
- At approximately 12:30 p.m., Sweet placed a call to a KPMG partner for the Banc of California engagement, which was one of the engagements Sweet had learned would be inspected in 2016. The call lasted 2 minutes.
- At approximately 12:31 p.m., Sweet placed a call to Holder. The call lasted 1 minute.
- At approximately 12:33 p.m., Sweet placed a call to Holder. The call lasted 1 minute.
- At approximately 12:34 p.m., Holder placed a call to Sweet. The call lasted 8 minutes.
- At approximately 1:47 p.m., Holder called Sweet. The call lasted 1 minute.
- At approximately 12:30 p.m., Sweet placed a call to a KPMG partner for the Citigroup engagement (the "Citigroup Partner"), which was one of the engagements Sweet had learned would be inspected in 2016. The call lasted 2 minutes.
- At approximately 4:10 p.m., the Citigroup Partner called Sweet. The call lasted 18 minutes.
- At approximately 5:34 p.m., Sweet placed a call to a KPMG manager for the C&J Energy Services engagement (the "C&J Manager"), which was one of the engagements Sweet had learned would be inspected in 2016.
- At approximately 5:38 p.m., the C&J Manager called Sweet. The call lasted 19 minutes.

2017.01.23

SDNY-00000067

- At approximately 5:57 p.m., Sweet called Holder.  The call lasted 20 minutes.
- At approximately 7:11 p.m., Sweet called Holder.  The call lasted 7 minutes.
- At approximately 7:51 p.m., Holder called Sweet.  The call lasted 27 minutes.
- At approximately 8:30 p.m., Sweet called Holder. The call lasted 5 minutes.
- At approximately 9:51 p.m., Sweet called Holder. The call lasted 10 minutes.
- At approximately 10:01 p.m., Sweet called Whittle's office number. The call lasted 10 minutes.

c.  On or about March 30, 2016:

- At approximately 1:06 p.m., Sweet called Britt's office number.  The call lasted 1 minute.
- At approximately 1:21 p.m., Holder called Sweet. The call lasted 8 minutes.
- At approximately 1:26 p.m., Sweet called Holder.  The call lasted 1 minute.
- At approximately 2:22 p.m., Holder called Sweet.  The call lasted 8 minutes.
- At approximately 3:21 p.m., Britt called Sweet.  The call lasted 15 minutes.

d.  On or about February 3, 2017:

- At approximately 12:15 p.m., Holder called Jeffrey Wada.  The call lasted 47 minutes.
- At approximately 1:03 p.m., Holder called Sweet. The call lasted 2 minute.
- At approximately 1:21 pm., Sweet called Holder.  The call lasted 31 minutes.
- At approximately 1:53 p.m., Sweet called Whittle.  The call lasted 8 minutes.
- At approximately 2:46 p.m., Sweet called Holder. The call lasted 11 minutes.
- At approximately 3:48, Sweet called a KPMG partner assigned to the Chemical Financial engagements, one of the engagements that was to be inspected in 2017. The call lasted 8 minutes.
- At approximately 3:57 p.m., Sweet called Britt. The call lasted 27 seconds.
- At approximately 5:07 p.m., Holder called Sweet.  The call lasted 23 minutes.
- At approximately 7:39 p.m., Britt called Sweet. The call lasted 26 minutes.

### ***Email Records***

54.     Based on my review of emails provided by KPMG Counsel and others, I also know that Sweet, Holder, Whittle, Britt, Middendorf, Marcello, and others exchanged emails concerning the topics set forth above, among other topics.  For example:

SDNY-00000068

### *Inspection Lists*

55.     On or about May 8, 2015, Whittle emailed Sweet[8] asking for the list of PCAOB banking engagements selected for inspection.   Sweet responded that he would have it sent over and that the list in his possession was "actually the full list of anticipated inspections (including non-banks)" and that Sweet would "appreciate the team's discretion to make sure it isn't too widely disseminated."  Whittle responded that he "understood the sensitivity."   Later that day, Sweet had the 2015 List scanned and sent to Whittle by email.

56.     That same day, Whittle forwarded the list to Middendorf saying, "the complete list. Obviously very sensitive.  We will not be broadcasting this."

57.     On or about June 16, 2015, Sweet emailed Middendorf and Whittle re: "Likely 2016 PCAOB Banking Selections" and said "I wanted to send you both a list of what I anticipate will be the most likely PCAOB banking inspections for 2016.  This list represents PCAOB's view of the higher-risk banking audits based on the attributes ('flags') it uses to evaluate and so these were next-in-line for inspection this year (I have tried to rank in order based on my best guess of the likelihood). . ."  Sweet included a list of 17 banks.  Sweet also said, "I am also going to pass this list along to David Britt, as this is likely a good group to include in his various monitoring programs.  If you agree, I'd also like to spend some time with each of the lead audit partners once they kick off their planning area work so that I can talk them through what the PCAOB views as their risk factors . . ."

58.     On March 28, 2016, following his receipt of the 2016 List, Britt sent an email to 35 engagement teams with engagements in the ALLL Monitoring system, requesting that Sweet,

---

[8] Unless otherwise specified, all references to emails sent or received by KPMG personnel refer to emails sent to and from the individual's KPMG email account.

2017.01.23

SDNY-00000069

Holder and several others be given access to the electronic audit files of their engagements in order "to gather information."

59.    That same day, Britt emailed Sweet asking him to "invite Chris Van Voorhies to your call, I thought it might make sense to hear from you what areas you will have the others focus on." Sweet replied, "Yes, I sure will.  Thanks David.  Have you spoken to him already?" Britt responded, "Yes.  Talking to him now.  I told him I would ask you and that the others on the call did not know what I told him and he had to keep his mouth shut."  Based on information provided by KPMG Counsel concerning their interview(s) of Britt, I understand that Chris Van Voorhies was the partner on the New Star engagement, which was one of the engagements on the 2016 List. I further understand that Britt told Van Voorhies that KPMG was conducting a "stealth review" of the New Star audit and that Voorhies should not tell the engagement team about the review.

60.    On or about March 29, 2016, Britt and Marcello, among others, emailed about a time to speak later that week and agreed to speak the following day.

61.    On or about January 9, 2017, Wada sent a text message to Holder that said, "We NEED to talk."   As described above, Wada and Holder subsequently spoke that day for 29 minutes.

62.    On or about January 9, 2017, Holder emailed Sweet saying, "let me know when you get back from lunch!!"  He responded shortly thereafter, saying, "Just got back. Swing by whenever you are free to catch up."

63.    On or about January 10, 2017, Middendorf emailed Whittle, "I need a few minutes to discuss a number of matters.  Not sure if you are travelling.  Please give me a call in the office or maybe better on my cell."

SDNY-00000070

64.     On or about January 10, 2017, Sweet emailed another individual at KPMG and said that Sweet and Whittle had been discussing "various banking projects/audit quality reviews" and that Whittle suggested Sweet check if [a particular individual] had any availability as they were "considering expanding our scope on several of our big banks in certain areas where we think the teams may be slipping."

65.     On or about January 11, 2017, Sweet emailed Stephen Penn, who was assigned to one of the engagements included on the 2017 Preliminary List and asked if Penn had a few minutes to chat so that Sweet could "run something by him." Penn responded agreeing to speak that day or the next day. Based on my participation in interview of Brian Sweet, I know that in the resulting conversation Sweet told Penn that his engagement was likely to be inspected.

66.     On or about February 2, 2017, Wada sent a text message to Holder that read, "Okay, I have the grocery list." One minute later, Wada again texted Holder, saying "All the things you'll need for the year." As described above, Wada and Holder spoke the next day, during which call Wada provided Holder with the 2017 List.

67.     As described above, on or about February 6, 2017, Middendorf, Sweet and Whittle participated in a phone call in which they discussed the 2017 List. Based on my participation in interviews of Brian Sweet, I know that during this call it was apparent to Sweet that Middendorf was copying the list onto the Middendorf Cellphone. In addition, based on information provided by KPMG Counsel concerning their interview of Middendorf, I know that Middendorf has admitted that he copied the 2017 List onto the "note" function of his cellphone.

### *Sweet Maintains PCAOB Relationships*

68.     On or about June 3, 2015, Sweet had lunch with Robert Ross of the PCAOB. That same day Sweet emailed Ross saying that it was great to see him and that it "definitely makes me

2017.01.23

SDNY-00000071

miss working with you and the 'good ol' days' that much more."

69.    On or about July 21, 2015, Sweet emailed Steve Schindler – a PCAOB employee – to confirm whether Schindler was still free for lunch the following day.  Schindler responded that he was not and Sweet and Schindler agreed to move the lunch to early August.

70.    On or about August 19, 2015, Sweet emailed with David Knibbs, a PCAOB employee, and others, about their fantasy football league.

71.    On or about January 22, 2016, Karen Tyler – a PCAOB employee – emailed Sweet's personal email account[9] to say hello, ask how he liked work at KPMG, and to provide an update on her personal life.  Sweet responded suggesting they meet for a beer if Tyler was ever in New York.

72.    On or about February 4, 2016, Sweet emailed Whittle, Britt, and Middendorf concerning the fact that Watkins had been fired from the PCAOB.  During the email conversation, Sweet said that Sweet had lunch with Robert Ross of the PCAOB that week and "probed to see if [Bob would] be going overseas on one of the possible bank inspections."

73.    On or about March 1, 2016, Sweet emailed with Robert Ross and August Bellome concerning lunch the following week.

---

[9] On or about July 21, 2017, the Honorable Sarah Netburn, United States Magistrate Judge, authorized the issuance of search warrants for the personal email accounts of Sweet, Holder, and Wada (the "Sweet Account," the "Holder Account," and the "Wada Account").  In or about August 2017, the Government received the results of the search warrants on the Holder and Wada Accounts; the Government is still waiting to receive the results of the search warrant on the Sweet Account.  The results received to date indicate that: (i) at some point between approximately April 13, 2017 (when Holder was asked to provide – and subsequently provided – certain emails to KPMG Counsel) and approximately April 26, 2017 (the date on which the Government served a preservation notice on the service provider) Holder deleted virtually the entirety of the contents of the Holder Account; and (ii) at some point prior to April 26, 2017  (again, the date on which the Government served a preservation notice on the service provider) Wada deleted all email communications between himself and Holder from the Wada Account.

2017.01.23

SDNY-00000072

74.     On or about April 8, 2016, Sweet emailed Steve Schindler at the PCAOB to propose that they catch up soon.  They discussed possible dates to meet for lunch.

75.     On or about July 20, 2016, Sweet emailed Britt and others seeking permission for himself and Holder to attend a AICPA Banking conference and said that "all of the PCAOB's banking inspectors attend as part of their annual training and so it would be extremely beneficial for both Cindy and I to attend so that we can continue to manage those relationships."  Britt responded, adding Whittle to the email chain and said he fully supported Sweet's request.   Later in the email chain, Sweet wrote back again saying the "biggest benefit is that all of the PCAOB inspectors are there and I'm certain it will be very productive based on all the hallway conversations I can have.  It's an ideal way to help maintain those relationships and a few of KPMG's inspectors have already reached out and asked me if I'd be there."

76.     On or about August 12, 2016, Sweet sent himself an email from the Sweet Cellphone using the email address bsweet@harvestfresno.com, another email account of Sweet's). The email contained the following list: "50 per; all grading – not test ILR; Materiality; It and issuer; Boston 73 mras; No eval of reg; Deric completist; San Fran; Ship sailing down the river for risk assessment."  Based on my participation in interviews of Brian Sweet, I know that on or about August 12, 2016, Sweet had dinner with Robert Ross and attempted to glean confidential PCAOB information from Ross.  In an effort to remind himself of what he had learned, Sweet sent himself the above described list.

77.     On or about September 22, 2016, Sweet emailed Matt Sickmiller, a PCAOB employee, to invite him to join a fantasy football league with Grady Peeler, David Knibbs, and others.

78.     On or about October 17, 2016, Duane Abel, a PCAOB employee, emailed Sweet

2017.01.23

SDNY-00000073

saying "I was talking to Jeff Wada today and your name came up.  Thought I'd send you a quick note to say hi.  Has it really been one and half years since you left?? Crazy. I'm going to be in NY mid-November. If you are going to be around, have time for breakfast on 11/16?"

79.     On or about January 3, 2017, Sweet emailed Robert Ross to see if Ross was free for lunch the following week.

### ***Recruitment of PCAOB Employees***

80.     On or about January 11, 2015, Middendorf emailed Whittle and others re: "PCAOB Recruiting."  In the email Middendorf said that he had spoken to others at KPMG about "potential people working at the PCAOB that we [KPMG] should pursue" including Sweet and Robert Ross.

81.     On or about March 31, 2015, Whittle emailed Britt saying that Sweet was coming to New York for interviews "as a direct entry partner with his principal role being in the Inspection Group."  Whittle told Britt that Sweet was already scheduled to meet with Middendorf and Marcello and asked if Britt could meet with Sweet as well.  Britt responded providing his availability to meet with Sweet.

82.     On or about May 1, 2015, Whittle emailed Sweet's personal email account and said, "I look forward to seeing you next week. Please bring along a list of individuals who have expressed an interest in exploring opportunities at KPMG along with resumes as available.  I will be spending some time mid next week evaluating those names and qualifications."

83.     On or about May 5, 2015, Sweet used his personal email account to email Holder's personal email account and said, "I've got a meeting set up with the head of the group tomorrow and pulled together a list of potential hires (along with Joe Lynch) and put you as the #1 target!!!!) I really think we can make this work, and am very optimistic.  I'll fill you in after the convo tomorrow."

2017.01.23

SDNY-00000074

84.     That same day, Sweet used his personal email account to separately email both David Knibbs and Grady Peeler, who were then both current PCAOB employees. Sweet said that Sweet was meeting with KPMG personnel the following day to discuss individuals KPMG should hire, including Knibbs/Peeler. Sweet asked for a resume and said to call him on the Sweet Cellphone with any questions.

85.     On or about May 12, 2015, David Knibbs emailed Sweet's personal account attaching Knibbs' resume. Sweet then forwarded the email to Sweet's own KPMG email address. The following day Sweet used his personal email address to email Knibbs providing comments on Knibbs' resume and telling Knibbs that Sweet could "get it [the resume] in front of the group lead partner today."

86.     On or about May 28, 2015, James Teter – a PCAOB employee – emailed Sweet's personal account to ask if Sweet had had a chance to check in about Teter's efforts to obtain employment at KPMG.

87.     On or about May 30, 2015, Grady Peeler – a PCAOB employee – emailed Sweet's personal email account attaching a copy of Peeler's resume.

88.     On or about June 22, 2015, Hector Santana – then a PCAOB employee – emailed Sweet's personal email address to tell Sweet that Santana would be interviewing at KPMG and to ask if Sweet had time to give him any advice. Sweet responded directing Santana to call Sweet on Sweet's cellphone. Santana was subsequently hired by KPMG.

89.     On or about January 19, 2016, Sweet emailed Whittle a list of individuals who would be good hires for KPMG and said that they were each "strong performers at PCAOB and have a lot of international experience."

90.     On or about April 8, 2016, Jung Lee – a PCAOB employee – emailed Sweet's

SDNY-00000075

personal and KPMG email accounts and attached a copy of Lee's resume.

91.     On or about April 15, 2016, Sweet used his personal email account to email Jung Lee providing proposed edits to Lee's resume.  Sweet said that Lee should send the resume back when it is done and Sweet would "start spreading it around."  Sweet noted that "I've had a few conversations with folks already and its gone really well so I think there will be a lot of interest."

92.     On or about May 3, 2016, Deepak Chugh, who had worked on a PCAOB inspection with Sweet, emailed Sweet seeking career advice.

93.     On or about October 4, 2016, Jung Lee emailed Sweet re: "Urgent Contact" and said "I just left a voicemail on your cell but if you get this message, could you please give me a call . . ."

94.     On or about January 10, 2017, one day after providing the 2016 Preliminary List to Holder, Wada emailed Holder at her personal email account saying "It's funny how I was on the fast track to partner and clearly recognized for my talents at Deloitte and then I end up in this [expletive] place with all the [expletive] politicking that I loathe and now I can't get a goddamn promotion to save my life just because I refuse to kiss people's [expletive]  and spread the political rhetoric. God this place sucks.  Please let me know what else you need from me."  Wada attached his resume to the email.

95.     On or about January 30, 2017, Sweet emailed Holder about Wada's resume and said, "Jeff's resume looks extremely strong to me.  What a solid background and I can't wait to get him on board!!!  I've attached a few suggested edits/thoughts in the attached. The PCAOB experience is by far the most relevant, so added a couple bullets to possibly help emphasize that . . . hope this helps!"

SDNY-00000076

### *Tsai/BBVA*

96.     On or about November 27, 2015, Dabie Tsai emailed Marcello updating him on the status of BBVA's efforts to choose a new auditor.   Tsai told Marcello that it appeared BBVA would launch its request for proposal ("RFP")  on January 16, 2016 and would name a new auditor on February 16, 2016.

97.     On or about April 6, 2016, Dabie Tsai emailed Sweet to thank him in advance for his help and to say she would send a meeting invite for them to discuss the "two Spanish banks we discussed just now."   Tsai also provided Sweet with her personal email account and fax number "in case you want to use either."

98.     On or about April 8, 2016, Sweet emailed Tsai on her KPMG email account providing a publicly available PCAOB report.

99.     Shortly thereafter, Sweet used his personal account to email Tsai's personal account and said, "Dabie, it was great chatting with you today! Attached are some examples of the types of issues that have been raised in the past."   Attached to the email was an internal and confidential PCAOB comment form for Banco Santander.

100.    That same day, Tsai used her personal email account to respond to Sweet's personal email account saying "Thank YOU so much!!!! I have printed each out so it will only be on the hard copy that I read . . . I promise to take appropriate care of this. Appreciate all of your help - and I am sure you've heard it many times, but I am going to add it to all the other accolades - I am so glad you came to KPMG – you've been a huge help to the firm . . . since you joined!. . . I'll be in touch re: our current proposal effort."

101.    On or about May 10, 2016, Tsai emailed Sweet asking him if he would be interested/willing in serving in a newly created "quality partner" role if KPMG was successful in

2017.01.23

SDNY-00000077

winning BBVA's business.  In the same email chain, Tsai also asked whether Sweet had "any updates on the BBVA Inspection front per our last conversation? Would really appreciate being able to get some details for consideration into highlighting (what not to dos or what to do to prevent such) as appropriate in our written document if possible? Promise will be very sensitive and only discussing the technicals."

102.    On or about May 13, 2016, Tsai emailed Sweet re: "Follow up re: Deloitte BBVA audit," and asked Sweet if he had a few minutes to speak later that day.  Sweet and Tsai agreed to speak later that day.

### *Palantir*

103.    On or about June 30, 2015, John Amraen, a KPMG employee who had been hired from PCAOB and who was responsible for KPMG's efforts to work with Palantir, emailed Sweet saying, "thanks again for your time yesterday on the selection process.  I put the following working documents together from that conversation principally to inventory the risk factors you read off, some I documented better than others . . ."

104.    On or about September 3, 2015, John Amraen emailed Sweet and said "Thanks again for your time today. The folks at Palantir were very appreciative of your forthrightness. As a reminder, we are looking for the following from you: 2015 random selections and 2015 Top 30."

105.    On or about September 29, 2015, Sweet emailed Middendorf and Whittle re: "PCAOB Non-Bank Selections" and said "I've spent quite a bit of time with Palantir trying to guide their modeling efforts, but thought it may be beneficial to provide you both with what I suspect could be the most likely non-banking targets for potential inspection in 2016.  As a caveat, I was much closer to the banking selection process so am certainly more confident in that list of likely targets . . . However, I would suggest that these be considered as very good candidates for

2017.01.23

SDNY-00000078

our internal coaching or pre-issuance review programs as they would have a higher selection likelihood based on my analyses. At the very least this would be good to compare against Palantir's results to see how accurate their models are. Please let me know if it would be useful to talk through, or if you'd like me to pass along to George, Harry, or others. Similar to the banking list I shared, I appreciate your discretion as some of this info is sensitive." Whittle forwarded the email and the attached list to another KPMG partner.

### *Ambac*

106.    On or about May 3, 2016, Whittle emailed Marcello what appears to be a report documenting the status of PCAOB's current inspections of KPMG engagements. Marcello wrote back "so we have 1 in process (how's that looking?) 5 going into the field on Monday and 3 more going into the field on 5/23. Any concerns other than Ambac at this point? Will they move forward with a review of Ambac given the circumstances and we identified issues before it was selected."

107.    Based on my participation in interviews of Sweet, I know that Sweet was asked to, and did, lobby PCAOB to cancel the Ambac inspection.

108.    On or about May 13, 2016, Steve Schindler of the PCAOB emailed Whittle asking Whittle to call him. Whittle forwarded the email to Marcello, Middendorf, Sweet, Britt and others saying he just spoke to Schindler and that PCAOB was going to reschedule Ambac and had chosen TCF instead. Whittle responded saying that Sweet would be liaison for TCF and Broderick would stay on Ambac and prep for Phoenix.

### **Other**

109.    On or about May 12, 2015, Holder used her personal email account to email Sweet at his personal email account with the subject line, "Anonymous email." Attached to the email was an internal PCAOB Part II deficiencies comment form for KPMG, which contained "comment

33

2017.01.23

SDNY-00000079

bubbles" reflecting the thoughts of certain PCAOB personnel. As referenced above, based on my participation in interview of Brian Sweet, I know that at the time Holder sent this email, Sweet was preparing for a meeting with other KPMG personnel to discuss the firm's deficiencies.

110.    On or about December 18, 2015, Marcello sent an email to KPMG personnel announcing an audit quality bonus program pursuant to which KPMG employees whose engagements were inspected without comment would receive financial bonuses.

111.    On or about March 18, 2016, an email went to a group of KPMG personnel stating that "as communicated last night CSG/CS have NOT been selected for 2016 inspection by the PCAOB." One of the email recipients forwarded the email to a group of KPMG personnel including Marcello and Britt saying "This is really hard to believe but if Tara is correct (which I'm sure she is) Credit Suisse has NOT been selected for PCAOB review this year." Britt responded, saying it was surprising and might be because of Jeff Watkins departure. Sweet wrote back saying "I heard this was a last minute decision to change their inspection schedule. Besides Jeff Watkins, the PCAOB also fired Joe Miller a week or so ago . . ." Marcello also forwarded the email to Middendorf, Whittle and Hermann to ask if they had any insights.

112.    On or about October 21, 2016, Steve Schindler sent Marcello, Middendorf, Whittle and others the list of potential Part I comments from the PCAOB inspections. Sweet wrote back solely to the KPMG personnel saying, "Anecdotally I am hearing that Bob is having a big effect on DT's results this year - so their Part 1 count is going up - so even if we can't win on Peoples and end up with 16 in the issuer count, I don't think we'll be the outlier anymore." Jennifer Lauer writes back, "I just want their bank count up big time."

113.    Based on the foregoing, I respectfully submit there is probable cause to believe that Sweet, Holder, Whittle, Middendorf, Britt, Marcello, among others, have been engaged in willful

2017.01.23

SDNY-00000080

violations of PCAOB Rules constituting criminal violations of the Securities Exchange Act of 1934, wire fraud, honest services wire fraud, obstruction of justice, destruction, alteration or falsification of records to obstruct a government investigation, conspiracy to commit the same, and aiding and abetting the same and that evidence of this criminal activity is likely to be found on the Subject Drives.

## III.  Procedures for Searching ESI

### A.  Review of ESI

114.    Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Drives for information responsive to the warrant.

115.    In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure

35

SDNY-00000081

but that is not captured by a keyword search because the information does not contain the keywords being searched.)

116.   Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Drives to locate all data responsive to the warrant.

**B.   Return of the Subject Drives**

117.   If the Government determines that the Subject Drives are no longer necessary to retrieve and preserve the data they contain, and that the Subject Drives are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Drives, upon request.   Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**IV.   Conclusion and Ancillary Provisions**

118.   Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

2017.01.23

SDNY-00000082

119.    In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Lyeson Daniel
Postal Inspector
U.S. Postal Inspection Service

Sworn to before me on
August 25, 2017

S/Henry Pitman
HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE

2017.01.23

37

SDNY-00000083

**Attachment A**

## I. Drives Subject to Search and Seizure

The devices that are the subject of this search and seizure warrant (the "Subject Drives") contain forensic images of cellular telephones, SIM cards, and iPads (the "Electronic Devices") and are described as follows:

- **Hard Drive 1 is particularly described as a Seagate hard drive with serial number P/N: 1K9AP1-501.**

- **Hard Drive 2 is particularly described as an Apricorn Aegis Padlock hard drive with serial number A-25-3PL256-500.**

## II. Review of ESI on the Subject Drives

Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Drives for evidence, fruits, and instrumentalities of violations of Title 15, United States Code, Sections 7202(b)(1) & 78ff and Ethics Code 9 of the Rules of the Public Company Accounting Oversight Board (the "PCAOB") (willful violations of PCAOB Rules constituting criminal violations of the Securities Exchange Act of 1934); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Sections 1346 and 1343 (honest services wire fraud); Title 18, United States Code, Section 1503 (obstruction of justice); Title 18, United States Code, Section 1519 (destruction, alteration or falsification of records to obstruct a government investigation); conspiracy to commit such offenses in violation of Title 18, United States Code, Section 371; and aiding and abetting such offenses in violation of Title 18, United States Code, Section 2 (together, the "Subject Offenses") described as follows:

- Evidence of any efforts to obtain, embezzle, misappropriate, transfer, share or exploit confidential information obtained by virtue of employment at PCAOB ("confidential PCOAB information"), and evidence of any agreement to do the same.

- Evidence concerning the identity or location of, and communications with, any co-conspirators, including: (i) records of all call activity, including incoming and outgoing calls and other communications and lists of stored telephone numbers and other identifying information, such as names; (ii) address books and contact lists; and (iii) calendar or other scheduling information;

- Voicemail and all SMS (simple message service) messages, data messages, text messages, stored e-mail, MMS (Multimedia Messaging Service), and any other messages or other information stored on the Electronic Devices pertaining to the Subject Offenses;

- All files or media containing text, photos, sound recordings, or videos stored on the Elect pertaining to the Subject Offenses including, but not limited to, media related to the

2017.01.23

SDNY-00000084

Subject Offenses;

- Any other user or system files and data on the Electronic Devices that would constitute evidence of violations of the Subject Offenses; and

2017.01.23

SDNY-00000085