*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 26, 2019

**BY ECF**

Honorable J. Paul Oetken
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    **United States v. David Middendorf, et al.,**
             **18 Cr. 36 (JPO)**

Dear Judge Oetken:

The Government writes to respond to the July 10, 2019 letter of defendants David Middendorf and Jeffrey Wada (the "Defendants' Letter"), in which they challenge the Government's calculation of loss under the United States Sentencing Guidelines (the "Guidelines," or "U.S.S.G."), as well as the amount of restitution due to the PCAOB.[1]  (Dkt. No. 370.)

## I.  Procedural History

Many of these arguments regarding loss calculations and restitution were made by Middendorf and Holder in their objections to their Presentence Reports prepared by the Probation Department, in May and June ("PSRs").  Both Holder and Middendorf now have final PSRs, reflecting their objections and the Government's response.

Holder was initially scheduled to be sentenced on July 17, 2019, and the issues of loss calculations and restitution were again addressed in Holder's sentencing submission, submitted July 3, 2019, and the Government's sentencing submission regarding Holder, submitted on July 10, 2019.

On July 10, 2019, defendants submitted the Defendants' Letter, asking to be heard on these two issues in advance of Holder's sentencing.  The Court issued on order on July 22, 2019, asking the Government to respond to the Defendants' Letter by July 26, 2019, and scheduling a hearing on the amount of loss and restitution for August 1, 2109.

---

[1] The Government has already responded to defendant Cindy Holder's arguments on these two points in its sentencing submission for Holder's sentencing.  The Government therefore responds only to Middendorf and Wada's arguments here, and refers to them as the "defendants" for purposes of this letter.

## II.   Applicable Facts

### A. Loss Calculations

The Government argues, and the Probation Department concurs, that the applicable loss amount is calculated as follows:

Development Costs of the Misappropriated Lists
| | |
|---|---|
| Planning/Preparation Cost of Misappropriated 2015 List | $623,470 |
| Planning/Preparation Cost of Misappropriated 2016 List | $123,274[2] |
| Planning/Preparation Cost of Misappropriated 2017 List | $567,228 |

PCAOB Response Costs
| | |
|---|---|
| Cost of Ten Additional 2016 Inspections | $492,622 |
| Planning/Preparation Cost of New 2017 List | $262,635 |

The explanation of how these numbers were calculated, as well as supporting documentation, was provided by the PCAOB in its June 4, 2019 Victim Impact Statement and Request for Restitution, supporting declarations from Acting General Counsel John Cook and outside counsel Justin Shur (the "Cook Declaration" and "Shur Declaration"), and supporting exhibits. (Dkt. No. 358.)

Middendorf, Whittle, and Britt, who were involved in the theft of the 2015, 2016, and 2017 lists, are responsible for all of these costs, which total $2,069,229. *(Final Middendorf PSR ¶¶ 41-42.)* This results in a sixteen-point Guidelines enhancement, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because it falls within the range of $1.5 to $3.5 million.

Holder and Wada, who were involved in the theft of the 2016 and 2017 lists, are responsible for only the 2016 and 2017 costs, which total $1,445,759. (Final Holder PSR ¶¶ 41-44.) This results in a fourteen-point Guidelines enhancement, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because it falls within the range of $550,000 to $1.5 million.

### B. Restitution

The PCAOB seeks restitution for (i) the development costs of the misappropriated lists, set forth above, as well as (ii) legal fees and expenses of $665,624.45 incurred during their participation in the investigation and prosecution of the instant offense. These costs total $1,904,990.45. The PCAOB is also seeking prejudgment interest at a rate of no less than 2.3%.

---

[2] This cost is much lower because only 12 of the 52 inspections on the 2016 list were misappropriated. The Government therefore multiplied the total cost of creating the 2016 list by 12/52, to estimate the value of the 12 inspections that were misappropriated.

### III. The Loss Amount Was Properly Calculated

Defendants argue that the applicable Guidelines loss amount is zero, because the PCAOB did not suffer any pecuniary loss from the offense conduct. Defendants further argue that even if the PCAOB suffered pecuniary loss, in counting both the development costs of the stolen inspection lists (the "List Development Costs") and the costs of the PCAOB's remedial actions once it learned of the theft (the "Response Costs"), the Government is improperly double-counting PCAOB's loss. Last, defendants argue that even if the PCAOB suffered pecuniary loss, the evidentiary record does not justify the PCAOB's calculations of the loss amounts for the List Development Costs and one set of Response Costs.

For the reasons set forth below, the PCAOB did suffer pecuniary harm, and has provided ample documentation justifying the loss amounts set forth in the PSRs. While the Government believes that the loss is properly calculated as <u>both</u> List Development Costs and Response Costs, and that combining these two distinct harms does not result in double counting, to narrow the issues before the Court at sentencing, it is prepared to proceed on just the List Development Costs at sentencing. In the alternative, the Court should consider the Response Costs, as another way of estimating the pecuniary harm to the PCAOB. Under either theory, the Court should apply a fourteen-point Guidelines enhancement to all defendants.[3]

A. <u>The PCAOB Suffered Actual Losses From Defendants' Actions</u>

The defendants argue that the PCAOB did not suffer any loss as a result of the offense. The commentary to U.S.S.G. § 2B1.1 defines loss as "pecuniary harm," or "harm that is monetary or that otherwise is readily measurable in money." U.S.S.G. § 2B1.1. cmt. 3(C). Defendants argue that "the PCAOB's interest in the inspection information was regulatory, not economic." (Defs. Letter 4, 5.) The defendants do not explain why this is so, other than to argue that the only harm that occurred here was "damage to the integrity of a regulatory system," and the undermining of the PCAOB's statutory mission. (*Id.* at 5.) These are certainly non-monetary harms that the PCAOB suffered. But the PCAOB also suffered two types of monetary harms, which are the basis of the Government's Guidelines calculation.

> i. *The Harm to the PCAOB Can Be Estimated Using the Development Costs of the Inspection Lists*

First, the PCAOB suffered a pecuniary harm because its inspections lists, which had a monetary value, were stolen. The Court has already determined at trial that the inspection lists

---

[3] If the Court determines that List Development Costs are a reasonable estimate of the loss to the PCAOB, the loss amount attributable to Middendorf, Whittle, and Britt is $1,239,366, and the loss amount attributable to Holder and Wada is $615,896. If the Court determines that Response Costs are a reasonable estimate of loss, the loss amount attributable to all defendants is $829,863.

All of these amounts falls within the fourteen-point enhancement range of $550,000 to $1.5 million. *See* U.S.S.G. § 2B1.1(b)(1)(H).

were the PCAOB's property, which had value. The defendants now try to revisit the Court's determination, arguing that the inspection lists did not have a monetary value. They should not be allowed to do so in the context of sentencing, but in any event, their argument is meritless. If the inspection lists did not have any value, KPMG employees would not have made efforts to misappropriate and use them. If they did not have any value, the PCAOB would not have spent so much time and money creating them – and indeed, continue to this day to spend significant resources creating each year's inspections list.

When the defendants misappropriated and used those inspection lists, they converted something of value from PCAOB, which caused pecuniary harm to the PCAOB. It is true that this pecuniary harm is hard to calculate with precision. But this does not mean that it does not exist. The precise monetary harm to a victim is often difficult to calculate in fraud causes, which is why the Guidelines commentary provides that courts need only make a "reasonable estimate of the loss." U.S.S.G. § 2B1.1. cmt. 3(C). To do so, the commentary offers courts a non-exhaustive list of factors that courts may consider when determining loss. *Id.*

The best way to calculate the loss to PCAOB from the misappropriation and use of the lists is by estimating the development costs of the inspection lists. This is the approach suggested by the Guidelines commentary, which states that when proprietary information, such as trade secrets, is stolen from a company, development costs may be used to calculate loss. *Id.* at 3(C)(ii). This is an apt analogy, as there are many similarities between trade secrets and the inspection lists. In both situations, the fair market value may be hard to assess, because the information has never been offered on the market. In both situations, the information derives its value from its secrecy, and once the information is misappropriated, it loses its value.

But even if the trade secrets analogy is not perfect, the general principle applies that "where goods have no readily ascertainable market value, 'any reasonable method may be employed to ascribe an equivalent monetary value to the items.'" *United States v. Wilson*, 900 F.2d 1350, 1356 (9th Cir. 1990) (quoting *United States v. Drebin*, 557 F.2d 1316, 1331-32 (9th Cir. 1977) and *United States v. Lester*, 282 F.2d 750, 755 (3rd Cir. 1960)). Using development costs to estimate loss, as evidenced by this Guidelines commentary, is a reasonable method. Indeed, several courts have accepted that development costs can be an appropriate metric to estimate loss in fraud or theft cases, although they have sometimes taken issue with sufficiency of the factual record before them at sentencing. *See, e.g.*, *United States v. Ameri*, 412 F.3d 893, 900 (8th Cir. 2005); *United States v. Wilson*, 900 F.2d 1350, 1356 (9th Cir. 1990); *United States v. Nosal*, 2014 WL 121519, at *1 (N.D. Calif. Jan. 13, 2014); *United States v. Yan Zhu*, 2012 WL 359734, at *3-4 (D.N.J. Feb. 2, 2012).[4]

---

[4] *Yan Zhu* is surprisingly cited by defendants as an example of a court rejecting the use of development costs as an estimate of loss. (Defs. Letter 5.) The Court in *Yan Zhu* did no such thing: it accepted, as did the parties, that development costs were the appropriate way to estimate loss. It then held that, under the factual record established by the parties in the case, the Government had not shown that there was any actual loss to the employer whose information had been stolen. 2012 WL 359734, at *4-*6. *Yan Zhu* therefore supports the Government's argument in the instant case, as it acknowledges that development costs are an appropriate metric in this

### ii. The Harm to the PCAOB Can Be Estimated Using the Response Costs of Measures Taken After the Fraudulent Scheme Was Discovered

The second type of pecuniary harm suffered by the PCAOB is its Response Costs, that is, the cost of the steps that it took to address the harm caused by the misappropriation and use of the lists.[5] Defendants argue that including these response costs double counts the losses in 2016 and 2017. (Defs. Letter 10.) As noted above, without conceding this point, the Government is prepared to proceed only on Development Costs or, in the alternative, Response Costs.

Defendants do not argue that the Response Costs are not pecuniary harms, nor could they. The Guidelines clearly provide that such remedial measures, where reasonably foreseeable, may be counted as losses. In one example, the commentary states that if the fair market value of the property unlawfully taken is impracticable to determine or inadequately measures the harm, the court should take into account the cost to the victim of replacing that property. U.S.S.G. § 2B1.1 cmt. (3)(C)(i). In another example, the commentary states that the court may consider the "cost of repairs to damaged property." U.S.S.G. § 2B1.1 cmt. (3)(C)(iii). And in the specific context of procurement fraud cases, the commentary provides a specific "rule of construction" noting that loss may include the costs to the Government of repeating or correcting the affected procurement

---

situation, while noting that the Government had not met its burden of proof to demonstrate specific development costs in that case.

The other cases cited by defendants are similarly inapplicable or unpersuasive. In *United States v. Pu*, 814 Fed 818 (7th Cir. 2016), the defendant stole company trade secrets from two employers. There, the Government did not argue actual loss, but only intended loss. *Id.* at 824. The Seventh Circuit held that, given the absence of any evidence of the defendant's intent, the Government had not shown that the defendant intended to cause a loss to the victims that equaled the cost of development. *Id.* at 826. This is very different from the instant case, where the Government is arguing actual loss, and has put sufficient evidence on the record of the actual loss to PCAOB.

In *United States v. Snowden*, 806 F.3d 1030 (10th Cir. 2015), the Tenth Circuit affirmed the district court's sentencing of a defendant who stole proprietary data from his employer. The Tenth Circuit noted in *dicta* that "[d]evelopment costs seem to us to be a reasonable measure of the severity of offenses such as Defendant's," but that the Government had not adequately tied the development costs to any loss suffered by the former employer. *Id.* at 1033. Unlike *Snowden*, this case has ample record evidence that supports a loss calculation based on development costs.

[5] Defendants argue that because PCAOB was not able to do anything to fix the 2015 inspections, after learning of the theft of the 2015 list only in 2017, this shows that the theft of the 2015 list caused no loss. (Defs. Letter 6.) This is simply not true: in fact, after learning of the theft of the 2015 list, PCAOB spent about 2,900 hours reevaluating KPMG's remediation for the 2014 inspection year, and made public Part II of KPMG's 2014 and 2015 inspection reports. (Cook Decl. 18.) PCAOB did not, however, include these hours in their cost estimate. (*Id.*) Further, defendants' argument ignores the fact that the misappropriation of PCAOB's secret inspection lists, including the 2015 list, was itself a loss to PCAOB, regardless of whether any remedial steps were taken.

action, plus any increased costs to procure the product. U.S.S.G. § 2B1.1 cmt. (3)(A)(v)(II). These various formulations all address similar concerns: that where it is hard to estimate the value of the misappropriated property, the steps that the victim had to take to address the theft or fraud is a reasonable estimate of its loss. And this is of course perhaps the most direct understanding of pecuniary harm: the cost of the steps that the victim had to take to make itself whole and remedy the harm. That is exactly what the PCAOB did here – it took these steps to remedy the harm inflicted by the misappropriation and use of its inspection lists. It conducted ten additional 2016 inspections and it created a new 2017 inspection list.

    B.  <u>The Government's Loss Estimates Are Properly Supported By the Record</u>

Defendants next argue that even if the Development Costs and Response Costs can be used to estimate loss, the Government has not produced sufficient evidence of these costs. (Defs. Letter 6-10.) They claim that the Government has not carried its burden of proof because it has not shown how many hours specific employees actually worked to develop the inspection lists or conduct replacement inspections.

In fact, the PCAOB provided a detailed Victim Impact Statement and declaration from its acting general counsel, John Cook, which was accompanied by seven supporting exhibits that set forth the underlying data.[6] (Dkt. No. 358.) These documents set forth the specific tasks that the PCAOB included in the Development Costs and Response Costs, how it estimated the hours that different employees spent on each task, and how it multiplied those hours by the cost to the PCAOB of employing those employees, to reach a concrete development cost for each list, and concrete response costs. The PCAOB also provided the charts showing these calculations, broken down by employee, date range, and specific tasks, where applicable. This is in addition, of course, to the testimony at trial about the cost to PCAOB of creating the lists. This evidentiary record is more than sufficient to allow the Court to make a reasonable estimate of loss. Indeed, "a district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make 'a reasonable estimate of the loss' given the available information." *United States v. Binday*, 804 F.3d 558, 595 (2d Cir. 2015) (quoting U.S.S.G. § 2B1.1 cmt. 3(C)) (internal quotation marks omitted).

    i.    *Development Costs*

The PCAOB took care to provide the best available estimate of its Development Costs. Indeed, due to different recordkeeping among departments, it used four different methods to calculate the hours that different types of employees spent on Development Costs.

The first method was used for lower-level Division of Registration and Inspection ("DRI") employees, who entered the time that they expected to work on creating inspection lists in a PCAOB system called "StaffTrak," using the code "Planning." (Cook Decl. 10.) These accounted

---

[6] Defendants spend a significant portion of their letter criticizing the evidence introduced at trial. But this is not the relevant inquiry: the question is whether the Court <u>now</u> has before it sufficient evidence to determine loss. As discussed herein, it does.

for the majority of the hours that PCAOB employees spent creating the lists: 5,124 hours in 2015; 4,430 hours in 2016; and 3,408 hours in 2017.  (Cook Decl. Ex. 1.)

Defendants argue that these StaffTrak records are unreliable, because the "Planning" code is over inclusive. (Defs. Letter 8.)  Defendants do not explain why they believe that this code is over inclusive.  The PCAOB stated that "Planning" is used when its employees spend time on inspection planning and generating the inspection list, tasks which undoubtedly qualify as development costs of the inspection lists.  In the absence of any countervailing evidence, therefore, the Court should accept the PCAOB's use of the Planning Code to estimate time spent creating the inspection lists.

Defendants also argue that the StaffTrak records are not a reasonable estimate, because they are only a prospective estimate of how an inspector expects to be spending time. (Defs. Letter 8.)  The PCAOB concedes that the StaffTrak records are prospective estimates of how inspectors expect to spend their time, but notes that they provide a reasonable estimate of the time employees spent on the inspection list, and provide the best estimate available.  (Cook Decl. 10.)  The Guidelines calculation does not require more.

The second method used to estimate costs was for DRI team leadership.  These employees did not use the "Planning" code in their StaffTrak entries, and the PCAOB determined that the StaffTrak code that they did use was over inclusive, so the PCAOB undertook the laborious job of reviewing all Microsoft Outlook calendar meeting records to identify when leadership attended meetings that concerned KMPG planning.  These hours were the smallest numbers of the four categories: 72 hours in 2015; 51 hours in 2016; 191 hours in 2017.  (Cook Decl. Ex. 1.)  Defendants argue that these estimates are high because other topics may have been discussed at these meetings.  Defendants do not offer any support for this assumption, and indeed, the Cook Declaration is clear: the Outlook records were used for meetings that concerned KMPG planning.  (Cook Decl. 11.)  The PCAOB also noted that by using only these Outlook meeting records, it was almost certainly underestimating the time that the leadership spent on the lists, as it did not include time that leadership spent developing or reviewing the inspection lists outside the meetings.  (*Id.*)

The third method used to estimate costs was for Economic and Risk Analysis analysts within the Risk Analysis Group ("ERA-RA analysts").  ERA-RA analysts did not track their time, so instead PCAOB surveyed these analysts to estimate the average amount of person-hours required to perform each relevant task in 2017. (*Id.* at 6-7.)  That average time was then multiplied by the number of times each analyst performed the task, to get a total number of hours spent creating the inspection lists.  This estimate was 1,127 hours in 2015; 1,122 hours in 2016; and 1,491 hours in 2017.  (Cook Decl. Ex. 1.)

Defendants argue that the PCAOB should not assume that the average time per task for 2017 was the same in 2015 and 2016, given the difference in the total development costs in 2015 ($623,470) versus 2017 ($492,622). (Defs. Letter 9.)  As a preliminary matter, it is not clear why defendants think that this variation will benefit them.  The development costs of the 2015 list were higher than in 2017, and DRI and the other ERA group, ERA-BI, both spent more hours developing the list in 2015 than in 2017.  (Cook Decl. Ex. 1.)  So to the extent there was variation in the ERA-

RA hours required to perform each relevant task, it may well be that ERA-RA analysts spent more time on the lists in 2015 than in 2017, and the current estimate, which uses 2017 averages, is in fact an underestimate.

The fourth method used to estimate costs was for Economic and Risk Analysis analysts within the Business Intelligence Group ("ERA-BI analysts"). ERA-BI analysts also did not track their time, but were able to estimate the time they spent on the inspection lists because they perform two discrete tasks, template creation and template customization, which occupy substantially all of their time while they have those tasks. (Cook Decl. 8.) The analysts were able to reconstruct from their files the dates on which they received the tasks and the dates on which they completed the tasks, and thereby estimate the time they spent on those tasks. (*Id.* at 7-9.) Defendants argue that the PCAOB has not provided the underlying data, but the Cook Declaration is very detailed on this point, and is sufficient.

Last, the PCAOB applied an overall multiplier of 1.25 to each employee's hourly rate, to account for the overhead costs that are not captured by that employee's salary alone. (Cook Decl. Ex. 1.) These overhead costs include benefits paid to employees and taxes. As noted in the Cook Declaration, this is a common means of calculating the cost of employing an individual. (Cook Decl. 16.) Defendants argue that the PCAOB would have paid these benefits irrespective of the project worked on by employees. (Defs. Letter 9.) But this fails for the same reasons set forth in the Government's Holder sentencing submission: the fact that PCAOB workers are salaried employees who also worked on other matters does not mean that the cost of their employment while they were creating the inspection lists cannot be counted as development costs. (Gov't Holder Sent. Subm. 6-8.)

Defendants' challenges to the PCAOB's estimates of Development Costs are therefore without merit. But even if some of these challenges had merit, thereby reducing the Development Costs estimate slightly, they would not change the Guidelines calculation. The Development Costs applicable to Middendorf were $1,239,366, and the Development Costs applicable to Wada were $615,896. These numbers are well above the threshold of $550,000 for the next-lowest Guidelines bracket.

Further, the PCAOB estimate of development costs was conservative in several important ways. Some have already been noted, such as the PCAOB's failure to include time that its leadership spent reviewing the inspection lists. The PCAOB also did not include hours spent creating inspection lists by employees outside ERA and DRI, such as the Office of the General Counsel and Office of the Chief Auditor. (Cook Decl. 17.) The Court can therefore be confident that even if some of PCAOB's Development Costs were slightly overestimated, the total costs still fall within the range for a 14-point Guidelines enhancement.

    *ii.    Response Costs*

PCAOB calculated the Response Cost of creating its new 2017 inspection list using the same methods identified above. (Cook Decl. 7; *Id.* at Ex. 1.) Defendants' challenges to the DRI costs have been discussed above. Because ERA-BI analysts did not perform any work on the new

lists, defendants' challenges to those cost estimates are inapplicable. The only new argument for the Court to consider with respect to Response Costs is Defendants' argument that ERA-RA did not need to perform any new work in connection with the new 2017 inspection list. (Defs. Letter 9.) This argument should be rejected, as the PCAOB has submitted records showing that ERA-RA analysts did, in fact, perform work for the 2017 new list. (Cook Decl. 7; *Id.* at Ex. 1.) They only spent 595.5 hours creating the new 2017 list, as opposed to 1491 hours creating the old inspection list, which may reflect that the new 2017 list required less work than the original 2017 list. But even if the Court were to find that the PCAOB has not demonstrated the need for additional work by ERA-RA analysts on the new 2017 inspection list, this only accounts for $54,432 of the $829,863 in Response Costs.[7]

PCAOB also calculated the Response Cost of performing ten additional inspections as part of its 2016 inspections using a different method, not used to estimate Development Costs. (Cook Decl. 13-15.) Defendants do not challenge the method used to calculate these costs, nor could they, as PCAOB carefully calculated the time that its inspectors spent on the new inspections. Additionally, this number was conservative. It included only the time spent conducting the additional inspections. It did not include any time associated with selecting the ten additional issuers that would be reviewed. (Cook Decl. 13.) Nor did it include the approximately 1,100 hours spent incorporating the results of these additional reviews into the 2016 inspection report, which would have added approximately $100,000 to the estimated cost. (*Id.* at 14-15, 17.)

The Response Costs estimate is also conservative because PCAOB did not include the cost of its response to the theft of the 2015 inspection list. After learning of the theft in 2017, PCAOB spent approximately 2,900 hours to reevaluate KPMG's remediation for the 2014 inspection year. (*Id.* at 18.) It also made public Part II of KPMG's 2014 and 2015 inspection reports. (*Id.*) The cost associated with that analysis and effort was not included in the estimate of response costs. For all these reasons, the Court should be confident that, should it decide to use Response Costs as an estimate for loss instead of Development Costs, the Response Costs fall within the applicable $550,000 to $1.5 million range of a 14-point Guidelines enhancement.

### IV. The Restitution Amount Was Properly Calculated

Next, defendants challenge the PCAOB's restitution request in several respects. First, they argue that the PCAOB should not receive any restitution because it did not suffer any pecuniary loss. Second, they argue that the PCAOB's request for attorneys' fees cannot be evaluated without billing statements. Third, they argue that PCAOB cannot recover attorneys' fees for responding to trial subpoenas. Each of these arguments should be rejected.

---

[7] Indeed, even without counting <u>any</u> of the costs of creating the new 2017 list, the cost of the ten additional 2016 inspections alone, $567,228, would put the defendants within the applicable range for a fourteen-point Guidelines enhancement.

First, restitution is appropriate—and indeed mandatory—here. The Mandatory Victim Restitution Act ("MVRA") requires restitution in cases where there has been an "offense against property" that was "committed by fraud or deceit," or in cases where the victim has suffered "pecuniary loss." 18 U.S.C. §§ 3663A(c)(1)(A)(ii), 3663A(c)(1)(B). The MVRA further provides that, "in the case of an offense resulting in . . . loss . . . of property of a victim," the restitution order must require the defendant to "return the property" or make restitution in "the value of the property." 18 U.S.C. §§ 3663A(b)(1)(A)-(B). Here, the wire fraud scheme was an offense resulting in loss of property committed by fraud or deceit, and as discussed above, the defendants' actions caused the PCAOB to suffer a pecuniary loss. Accordingly, restitution, totaling the value of the property, is required by the MVRA.

Defendants argue that *Gaind v. United States*, 871 F. Supp. 186 (S.D.N.Y. 1994), supports their argument that there was no loss. There, the Environmental Protection Agency ("EPA") was the victim of a scheme where the defendant caused his company to submit false statements to the EPA by backdating tests. The defendant argued that the EPA did not lose the full amount the EPA paid for the backdated tests, because parts of the tests were usable. The court found that the full amount was recoverable because the tests were "undermined by fraudulent entries into the record," and thus "their use in obtaining compliance with environmental laws is destroyed." *Id.* at 189. The court further noted that the EPA suffered "nonmeasurable losses of public confidence," and that "additional restitution for intangible losses could properly have been imposed." *Id.* *Gaind* does not in any way undermine the PCAOB's request for restitution. Rather, it shows that a regulator may recover quantifiable pecuniary losses from a fraud.

Second, defendants argue that the PCAOB's request for attorneys' fees cannot be evaluated without reviewing the underlying billing entries. This argument ignores, however, that the PCAOB's outside counsel put in a detailed declaration summarizing the legal fees and expenses requested. (Shur Decl., Dkt. No. 358-1). The Shur Declaration delineates whether the attorneys' fees and expenses relate to (1) the Government's pre-indictment investigation; (2) the Government's post-indictment investigation and trial preparation; or (3) trial proceedings. (Shur Decl. 2-13.) The declaration also specifically notes that the PCAOB has not included in its request any fees or expenses incurred in connection with outside counsel's own investigation. (*Id.* at 1.) In this light, the Shur Declaration, alone, is more than sufficient to support the PCAOB's request for attorneys' fees and expenses. Further, the PCAOB has made clear that it is willing to make the billing entries available for *in camera* review if necessary.

Third, the defendants argue that the PCAOB cannot recover legal fees and expenses associated with responding to trial subpoenas submitted by the defense. This strained argument is contradicted by the plain language of the MVRA, which provides that victims may recovered "expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Responding to subpoenas issued by the defendants, in connection with an upcoming trial, is undoubtedly an expense incurred during the prosecution of the offense. *See United States v. Wong*, 2014 WL 2700925, at *2 (N.D. Cal June 13, 2014 ("Whether the subpoena issues from the government or a defendant, the result is the same from the perspective of the victim—both require the victim to

incur costs and participate in the prosecution."). If there had not been any prosecution, there would not have been any defense subpoenas requiring a response.

*Lagos v. United States*, 138 S. Ct. 1684 (2018), is not to the contrary. There, the Court considered whether "investigation" and "proceedings" was limited to government investigations and criminal proceedings, or whether it include private investigations and civil or bankruptcy litigation. *Id.* at 1688. The Court concluded that the words were limited to "government investigations and criminal proceedings." The Court in no way limited expenses recoverable in criminal proceedings to expenses connected to the Government's side of the case. Defendants' argument to the contrary is frivolous and should be rejected.

### V.  Conclusion

The Court should find that a fourteen-point loss enhancement applies to all defendants in this case, and find that the restitution amount proposed by the PCAOB is appropriate.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____/s/_____
Rebecca Mermelstein/ Jordan Estes/ Margaret Graham/ Martin Bell
Assistant United States Attorneys
(212) 637-2360/ 2543/ 2923/ 2463

cc: Counsel of Record (by ECF)