UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-

DAVID MIDDENDORF and
JEFFREY WADA,
                        Defendants.

18-CR-36 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Defendants David Middendorf and Jeffrey Wada, along with three other individuals, were charged with fraud offenses involving a scheme in which employees of KPMG LLP ("KPMG") obtained and used confidential information of the Public Company Accounting Oversight Board ("PCAOB") in order to improve KPMG's performance on PCAOB inspections. Following a jury trial in February and March 2019, Middendorf and Wada were convicted on certain counts and acquitted on one count. Both Defendants have moved for judgment of acquittal or, in the alternative, for a new trial. For the reasons that follow, the motions are denied.

## I. Background

The Court presumes familiarity with the background of this case and with the legal issues addressed in the Court's opinion denying Defendants' motion to dismiss the indictment. *See United States v. Middendorf*, No. 18-CR-36, 2018 WL 3443117 (S.D.N.Y. July 17, 2018) (Dkt. No. 114).

Trial against Defendants Middendorf and Wada began on February 11, 2019. On March 11, 2019, the jury found Middendorf guilty on Count Two (conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343), and Counts Three, Four, and Five (wire fraud in 2015, 2016, and

1

2017, respectively). The jury found Wada guilty on Count Two (conspiracy to commit wire fraud) and Counts Four and Five (wire fraud in 2016 and 2017, respectively). The jury acquitted both Defendants on Count One (conspiracy to defraud the Securities and Exchange Commission, in violation of 18 U.S.C. § 371). (Dkt. No. 325.)

Middendorf and Wada have both moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. They move, in the alternative, for a new trial pursuant to Rule 33.

## II. Motions for Judgment of Acquittal

A motion for judgment of acquittal under Rule 29 may be granted only if "no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). When considering such a motion, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (internal quotation marks omitted). A defendant challenging a jury's guilty verdict "bears a heavy burden." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (internal quotation marks omitted).

Defendants argue that the evidence at trial was insufficient to support the jury's guilty verdict for several reasons. Each is addressed in turn.

### A. Confidential PCAOB Information as Property

Defendants contend that the evidence at trial failed to establish that the PCAOB information at issue is "property" within the meaning of the wire fraud statute.

First, they argue that the information is not property because it is regulatory in character. This argument was rejected by the Court in its pretrial opinion. See *Middendorf*, 2018 WL

2

3443117, at *7-9. The Court adheres to its view that the PCAOB's confidential inspection information is property for purposes of 18 U.S.C. § 1343, for the reasons explained in that opinion. The evidence at trial — including testimony about the resource-intensive process for planning inspections and the many factors considered by the PCAOB in deciding which audits to inspect — established that the inspections lists had significant value to the PCAOB. (*See, e.g.*, Tr. 440-42, 445-54, 711-15, 2175, 2183.)[1]

Second, Defendants argue that the PCAOB's inspection lists are not "property" because the PCAOB did not treat that information as confidential. As Middendorf acknowledges, this Court correctly instructed the jury that the information must be "both considered and treated by an entity in a way that maintained the entity's exclusive right to the information." (Tr. 3446-47.) There was ample evidence at trial that the PCAOB carefully maintained as confidential its inspection information — in particular, the identity and timing of the audits it planned to inspect. (Tr. 1773, 1855.) It is true that the PCAOB eventually notified the audit firms in advance of the inspections, but it did so only two to four weeks in advance, after the 45-day documentation period was closed. (Tr. 460-61.) There was also sufficient evidence that the PCAOB took active steps to keep the inspection lists confidential. (Tr. 442, 1699-1701, 1708-25.) The fact that the PCAOB gave audit firms advance notice of certain other information, such as the topics of upcoming meetings, is irrelevant to whether the information at issue here — the inspection lists — was treated as confidential by the PCAOB.

---

[1] "Tr." refers to the trial transcript, which is at Docket Numbers 279 to 323. "GX" refers to Government Exhibits and "DX" refers to Defendants' exhibits.

3

**B.     Evidence of Middendorf's Violation of the Wire Fraud Statute**

Middendorf challenges his convictions on Counts Two through Five, arguing that the evidence was insufficient to prove that he willfully conspired to defraud the PCAOB or aided and abetted any PCAOB employee's embezzlement of PCAOB information. Middendorf's arguments largely fail to take account of testimony by Sweet and Whittle, which the jury was entitled to credit. And to the extent that the jury disbelieved conflicting testimony by Middendorf, it was entitled to do so.

Testimony and other evidence at trial supported the following facts:

- When Sweet joined KPMG in May 2015, Middendorf asked him to share certain confidential PCAOB inspection information that Sweet had from his prior work at the PCAOB. (Tr. 761-74.)

- In May 2015, Sweet informed Whittle that he had taken the PCAOB's confidential inspection list for 2015 from the PCAOB. (Tr. 777.) Whittle informed Middendorf, who told Whittle to "get that list." (Tr. 1856.) Whittle proceeded to obtain the list from Sweet and forwarded it to Middendorf. (Tr. 1860.) Whittle's email to Middendorf said, "The complete list. Obviously, very sensitive. We will not be broadcasting this." (Tr. 1861; GX 754.) With respect to at least one audit, Middendorf put additional resources in place to improve KPMG's inspection results based on the confidential information. (Tr. 810-11, 1864, 65.)

- Middendorf and Whittle indicated to Sweet that they expected him to continue to obtain and share confidential PCAOB information. (Tr. 947, 1014, 1866, 1919.)

- In March 2016, Sweet obtained the PCAOB's banking inspection list for 2016 from Holder, who had obtained it from Wada. (Tr. 856.) On the same day that Sweet obtained the list, he participated in a meeting with Middendorf and Whittle in which they agreed to conduct secret (or "stealth") re-reviews of the work papers for certain engagements that they now knew the PCAOB was planning to inspect. (Tr. 868-74, 1887, 2146-47.) Middendorf and his co-conspirators took steps to avoid detection, including falsely characterizing the re-reviews as being part of a preexisting monitoring program. (Tr. 888, 1994, 1902-05, 2146-47; 2922-24; GX 954.) The re-reviews led to improved results for KPMG — *i.e.*, fewer comments from the PCAOB — on the 2016 inspections. (Tr. 947; GX 1358.)

- In January 2017, Middendorf received a "preliminary" inspection list for 2017, once again through the same chain of communication (Wada to Holder to Sweet to Whittle and Middendorf). Middendorf took down the list on his phone. (GX 655, 656-A, 1362.) Middendorf and Whittle then decided to and proceeded to devote additional

4

- resources to the engagements on the preliminary list of PCAOB inspections for 2017. (Tr. 1921-24.)

- In February 2017, Wada texted Holder, "Okay, I have the grocery list[.] All the things you'll need for the year[.]" (GX 1428.) This time, the PCAOB's entire inspection list of 47 KPMG audit engagements was passed from Wada to Holder to Sweet. Sweet then shared the list with Whittle and Middendorf, who took down the list on his phone. (Tr. 1065-67; GX 657.) Sweet informed them that the information was from a "former colleague at the PCAOB" but that Sweet "had not solicited this information and . . . didn't ask for it . . . and didn't know what to do with it." (Tr. 1066, 1067-68.) Middendorf responded that "this is information that's too good not to use." (Tr. 1068.) Based on the 2017 inspection list, Sweet began informing certain KPMG audit partners that their audits were going to be inspected. (Tr. 1061-63.) When Middendorf learned this, he entered Whittle's office and said, "What the fuck is Brian Sweet doing? Why is he telling people [] they're being inspected?" (Tr. 1932.)

- Whittle and Sweet knew what they were doing was wrong, although they did not know that it was criminal. (Tr. 721-22, 1080, 1107, 1881, 1940, 1977-78.)

With respect to the conspiracy charge, Middendorf argues that there was no evidence that he agreed with anyone to obtain confidential PCAOB information. This argument is unavailing. As the jury was properly instructed, a conspiracy does not require an explicit agreement. Rather, an unlawful agreement "may be inferred from entirely circumstantial evidence." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004). It was a permissible inference from the evidence that Middendorf encouraged if not directed Sweet to continue to obtain confidential PCAOB inspection information so that KPMG could use the information for its benefit. Nor is the jury's verdict undermined by the fact that Middendorf did not know exactly from whom the information was coming. "[I]t is well settled law that an individual need not know the identities of all coconspirators in order to be found guilty of being a member of a conspiracy." *United States v. Dove*, 884 F.3d 138, 147 (2d Cir. 2018) (quoting *United States v. Harris*, 8 F.3d 943, 946 (2d Cir. 1993)). It was certainly reasonable for the jury to infer that Middendorf understood the confidential inspection information to be coming from a PCAOB employee who was breaching his or her duty to the PCAOB.

Middendorf also argues that the Government failed to prove that he acted with the requisite criminal intent. Based on all the evidence at the trial, the jury reasonably could have found that Middendorf knew his conduct to be wrongful, notwithstanding his testimony to the contrary. Indeed, the direct evidence of Middendorf's efforts to conceal his conduct support such a finding.

Finally, Middendorf contends that he should be acquitted on the substantive wire fraud counts (Counts Three, Four, and Five) because he did not aid and abet any PCAOB employees' acts of embezzlement.

With respect to 2015 (Count Three), Middendorf has a point. The evidence showed that Sweet arrived at KPMG in May 2015, having already taken the 2015 PCAOB inspection list entirely on his own. (Tr. 720-21, 1128.) While Middendorf elicited certain limited confidential information from Sweet on his first day at KPMG (Tr. 760-63), there was no evidence that Middendorf (or anyone else at KPMG) had encouraged Sweet to take the 2015 inspection list from his former employer. Therefore, if Middendorf is correct that Sweet's embezzlement or misappropriation of the 2015 inspection list was "complete" when Sweet took the list from the PCAOB, then Middendorf could not have aided and abetted that crime. *See United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) ("A defendant may not properly be convicted of aiding and abetting a crime that was completed before his accessorial acts were performed.").

The Court concludes, however, that the misappropriation of confidential information, at least in the circumstances of this case, is not complete until the information is disseminated or used. *See United States v. Czubinski*, 106 F.3d 1069, 1074 (1st Cir. 1997). That conclusion is particularly apt here, where the confidential information is highly specialized: it is essentially meaningless to everyone outside the PCAOB except a limited universe consisting of audit firms

6

that are subject to inspection by the PCAOB. The presence of this information in the heads or the files of a former PCAOB employee is harmless unless and until it is leaked to someone in that universe of audit firms. Put another way, the scheme to defraud charged in this case was a scheme to "*obtain and use*" the PCAOB's confidential information, and the PCAOB was defrauded of its property — that is, its right to the exclusive use of its own inspection lists — when that confidential information was disseminated to and used by KPMG. Thus, the fact that Middendorf had not encouraged Sweet to take the 2015 inspection list in the first place does not exculpate him. When Middendorf learned in May 2015 that Sweet had taken the 2015 PCAOB inspection list, he promptly told Whittle to "get that list" from Sweet. (Tr. 1856.) That directive by Middendorf did two things: it effectuated the *obtaining* of the 2015 inspection list by "KPMG" — specifically, by a senior executive at KPMG with the capacity and authority to make use of it; and it set in motion Middendorf's *use* of the confidential inspection information to improve KPMG's performance on PCAOB inspections.

With respect to 2016 and 2017 (Counts Four and Five), the evidence was sufficient to establish that Middendorf aided and abetted an ongoing fraud by encouraging Sweet to continue acquiring confidential PCAOB inspection information for KPMG's use. Moreover, Middendorf actively participated in the fraud while it was ongoing, including by implementing the stealth re-reviews in 2016 and by allocating additional resources to the preliminary inspection targets in 2017.

Viewing all the evidence in the light most favorable to the Government, and deferring to the jury's assessment of witness credibility, the Court concludes that a rational jury could find Middendorf guilty on Counts Two through Five.

### C. Evidence of Wada's Violation of the Wire Fraud Statute

Wada challenges his convictions on Counts Two, Four, and Five, arguing that the evidence was insufficient to prove that he joined the conspiracy with the requisite intent or that he committed wire fraud in 2016 and 2017.

On the conspiracy count, Wada contends that there was insufficient evidence showing that he intended the confidential PCAOB inspection information to be used by KPMG, or that he knew how KPMG would use it to affect inspection results. These arguments ignore the evidence and fail to accord deference to the jury's reasonable inferences from the evidence. It is hardly surprising that there was no direct communication from Wada to KPMG personnel walking them through the relevance of the PCAOB's inspection lists and how KPMG might use them. It was eminently reasonable for the jury to infer from the evidence that this was obvious to all of those involved in the conspiracy. Deference to a jury's verdict is "especially important" in a conspiracy case because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Jackson*, 335 F.3d at 180 (internal quotation marks omitted).

The evidence showed that Wada was upset about being passed over for a promotion at the PCAOB and was interested in a partnership at KPMG and a "fat payday." (GX 202, 209, 1414.) Given his role as an inspector at KPMG, the jury could reasonably infer that he knew how advanced notice of inspection selections would be used by KPMG. Sweet told Holder to relay to Wada KPMG's appreciation for the confidential information. (Tr. 838, 843-44; GX 1434.) Wada used coded language, referring to the confidential inspection list as a "grocery list," supporting a reasonable inference that he was aware that his conduct was wrongful. (GX 1402, 1428.) And he referred to the final 2017 inspection list as "all the things you'll need for

the year" (GX 1428), supporting a reasonable inference that he knew how KPMG could and would use the inspection lists to improve its inspection results.

For similar reasons, the evidence, viewed in the light most favorable to the Government, was sufficient to prove that Wada engaged in a scheme to defraud in 2016 and 2017. To prove that the defendant acted with a specific intent to defraud, it is not necessary to establish that the defendant was aware of all the details of the scheme. It is sufficient to show that he "joined the venture, [that he] shared in it, and that his efforts contributed towards its success." *Reifler*, 446 F.3d at 96 (alteration in original) (internal quotation marks omitted). The testimony and other evidence supported reasonable inferences by the jury that Wada hoped to get a job at KPMG and that he provided the confidential inspection information to KPMG with the knowledge and intent that KPMG would use it to improve its PCAOB inspection results.

Wada also argues that there was no evidence that he was "entrusted" with the PCAOB inspection lists for 2016 and 2017, as required for conviction on an embezzlement theory of wire fraud. The evidence established, however, that Wada was a member of the PCAOB's inspections division, and as such, had access to the PCAOB's Inspections Information System ("IIS"), which maintained confidential audit inspection information. (GX 10, GX 138; Tr. 361-62, 383, 442, 483, 644, 646, 718-19.) The evidence also showed that Wada logged into the IIS system on the very days on which confidential information was leaked to KPMG. (GX 2352-53, GX 138.) Wada argues that because he was a member of the KPMG-*Japan* inspections team, he was not "entrusted" with KPMG-*US* inspection information because the PCAOB treats inspection information as confidential within each inspections team. (Tr. 639-40; DX 1439.) This argument cuts too finely with respect to the concept of entrustment. Wada in fact was entrusted by the PCAOB with the inspection information in the IIS system, including the

9

KPMG-US inspection lists, irrespective of company policies about proper use of and access to the information. Further, in connection with efforts to cover up the scheme, Wada told Holder that he could explain his access to the KPMG-US information on the IIS system through another role at the firm that "required him to be aware of what other schedules existed." (Tr. 1090.)

Viewing all the evidence in the light most favorable to the Government, and deferring to the jury's assessment of witness credibility, the Court concludes that a rational jury could find Wada guilty on Counts Two, Four, and Five.

## III. Motions for a New Trial

Defendants also move for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. That Rule provides: "Upon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotation marks omitted).

### A. Government Summation

Defendants contend that a new trial is warranted because of allegedly improper remarks in the Government's rebuttal summation.

First, Defendants argue that the Government improperly shifted the burden of proof by suggesting (1) that Wada could have called witnesses to establish the Government's supposedly inadequate investigation or the defense theory that the PCAOB leak was someone other than Wada, (2) that Middendorf had to prove what the interior of a restaurant (Avra) looked like, and (3) that there were certain Government arguments that Defendants "had to attack." The

10

Government "is ordinarily permitted to respond to arguments impugning the integrity of its case" and "may comment on a defendant's failure to call witnesses to support his factual theories." *United States v. Bautista*, 23 F.3d 726, 733 (2d Cir. 1994) (internal quotation marks omitted). Viewed in context, these comments did not cross the line of impropriety. None of them would have been reasonably viewed by the jury as shifting the burden of proof, as opposed to permissible commentary on the evidence, particularly given the Court's repeated instructions and clarifications that the burden rests squarely with the Government.

Second, Defendants argue that the Government relied on facts not in evidence in addressing the accuracy and thoroughness of the Government's investigation and evidence (Wada) and in discussing the interior of the restaurant Avra (Middendorf). With regard to the former, the summation was based on reasonable inferences from the evidence and was a fair response to defense counsel's closing argument. With respect to the latter, as this Court previously ruled, the Government's argument was best interpreted as simply a commentary on the evidence and was not improper. (Tr. 3496.)

Third, Wada argues that the Government improperly vouched for Sweet, a cooperating witness, by arguing that "you can believe Sweet because he told you the truth." (Tr. 3372.) Again, as the Court ruled at trial, this and similar statements by the Government, viewed in context, were permissible arguments based on the evidence in the case, made in response to defense counsel's attempts to characterize Sweet as a liar. They did not imply or suggest special knowledge on the part of the prosecutor of facts not before the jury. *See United States v. Williams*, 690 F.3d 70, 76 (2d Cir. 2012).

Finally, Wada argues that the Government improperly used the analogy of "a man who is cheating on his wife and lying to her about it," inviting the jury to question Wada's

11

trustworthiness and morality. This was simply an analogy used by the Government in making an argument about the inconsistency of certain defense arguments. It did not involve any personal accusation about Wada. The Court sees nothing improper about, and no unfair prejudice from, the use of the analogy. (Tr. 3411.) *See, e.g.*, *United States v. LaMorte*, 950 F.2d 80, 85 (2d Cir. 1991) ("[T]he government is not barred from using rhetorical devices during the trial." (internal quotation marks omitted)).

### B. Jury Instructions

Middendorf contends that the jury instructions were erroneous in four respects.

#### 1. Wire Fraud

First, Middendorf argues that the jury should have been instructed that the embezzlement was complete when the information was misappropriated from the PCAOB. As Middendorf points out, the Second Circuit held in *United States v. Sampson*, 898 F.3d 270, 277 (2d Cir. 2018), that an embezzlement is complete when a person converts the property of another with fraudulent intent. That case, however, involved the taking of funds rather than a scheme to defraud a victim by obtaining and using its confidential information. As discussed above (section II.B), the better view of the law is that in the latter scenario, the fraud is a unitary scheme encompassing both the obtaining and the dissemination or use of the confidential information. *See Czubinski*, 106 F.3d at 1074-76; *United States v. Martin*, 228 F.3d 1, 16-17 (1st Cir. 2000).

The "use" of confidential information is integral to the fraud because it is when the information is used by a third party that the victim is "deprived of its right to exclusive *use* of the information." *Carpenter v. United States*, 484 U.S. 19, 26 (1987) (emphasis added); *cf. United States v. O'Hagan*, 521 U.S. 642, 656 (1997) (under Section 10(b) of Securities Exchange Act,

"the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities"). Therefore, the Court properly declined to instruct the jury that the embezzlement was complete after the information was leaked.

Middendorf also challenges other aspects of the wire fraud charge, arguing that it encouraged the jury to convict Middendorf without regard to his involvement in the origination of the embezzlement scheme. The instructions were based on Second Circuit case law and were not erroneous. As the court held in *Reifler*, a person can be guilty of aiding and abetting fraud "even if he did not learn of the crime at its inception but knowingly assisted at a later stage." 446 F.3d at 96. The Court also correctly instructed the jury on the requisite degree of knowledge. (Tr. 3448-50.)

### 2. Materiality

The Court inadvertently failed to include a materiality instruction in the wire fraud charge, although it indicated that it would do so. (Tr. 2997.) Materiality is an element of wire fraud. *Neder v. United States*, 527 U.S. 1, 20 (1999). The failure to include it in the jury charge is subject to harmless-error analysis. *Id.* at 15-16. The issue of materiality was not contested at trial, and there was extensive evidence that the confidentiality of the PCAOB's inspection lists was important to the PCAOB. There is little question, based on the evidence, that Sweet's and Wada's misappropriation of the PCAOB's confidential inspection lists, including their sharing of those lists with KPMG for its use, would have been "of concern" to the PCAOB. In light of the overwhelming evidence of materiality, and the lack of argument by Defendants on this element, the Court concludes that the omission of this instruction was harmless.

### 3. Willfulness

Middendorf challenges the Court's jury instruction on willfulness as improper and contrary to the law of the Second Circuit. Middendorf requested that the Court follow the instruction in Judge Sand's treatise on the requisite intent to commit wire fraud:

> The second element that the government must prove beyond a reasonable doubt is that the defendant participated in the scheme to defraud knowingly, willfully and with specific intent to defraud. . . . *"Willfully" means to act knowingly and purposely, with an intent to do something the law forbids; that is to say, with a bad purpose either to disobey or disregard the law*.

2 Sand et al., Modern Federal Jury Instructions ¶ 44.01, Instr. 44-5 (emphasis added). Counsel for the parties discussed the proper willfulness instruction extensively before and during the trial, including in letter briefs. After careful consideration, the Court instructed the jury that "*'willfully' means to act voluntarily and with a wrongful purpose*." (Tr. 3450 (emphasis added).) The Court also instructed the jury on the meaning of "specific intent to defraud."

As Middendorf correctly points out, some version of the Sand instruction on willfulness is frequently given by judges in the Southern District of New York in wire fraud cases. However, there is a dearth of authority supporting the correctness of that instruction in the wire fraud context, particularly in light of the fact that "willfulness" is not included in the wire fraud statute itself. Of the authorities cited by Sand, only one — an Eighth Circuit decision from the 1980s, *United States v. Massa*, 740 F.2d 629, 643 n.8 (8th Cir. 1984) — actually appears to support the Sand definition of willfulness. The problem with the Sand instruction is that it arguably can be read as requiring that a defendant must *know the law and intend to violate it* in order to be found guilty of wire fraud. But that is an incorrect statement of the law, according to the vast weight of authority. As the Seventh Circuit has made clear, the wire fraud statute

"requires a specific intent to defraud but *not wilfulness or any other proxy for knowledge of the law.*" *United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015) (emphasis added).

That is because "mistake of law is not a defense." *Id.*; *accord United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) ("The specific intent required under the mail fraud statute is the intent to defraud, and not the intent to violate a statute." (citation omitted)); *United States v. Stewart*, 590 F.3d 93, 110 (2d Cir. 2009). Indeed, in the context of securities fraud under Section 10(b) — which explicitly includes "willfully" as an element, unlike wire fraud — the Second Circuit has held that willfulness "do[es] not require a showing that a defendant had awareness of the general unlawfulness of his conduct, but rather, that he had an awareness the general wrongfulness of his conduct." *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010).

Based on these authorities, the Court concluded that Sand's willfulness instruction is at least misleading and likely incorrect. The Court adheres to that conclusion.

### 4. Multiple Conspiracies

Finally, Middendorf argues that the Court should have instructed the jury on multiple conspiracies, as he requested. He contends that the evidence at trial supported the existence of more than one conspiracy because the source of the PCAOB information was attenuated from the end users at KPMG: Middendorf did not know who Wada was, and vice-versa.

If only one conspiracy has been alleged and proved, a multiple-conspiracies charge is not warranted. *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990). A single conspiracy may be found where there is "mutual dependence . . . among the participants, a common aim or purpose or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Vanwort*, 887 F.2d 375,

383 (2d Cir. 1989) (formatting modified). A single conspiracy "may encompass members who neither know one another's identities, nor specifically know of one another's involvement." *United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994) (citation omitted).

For reasons similar to those discussed above, the evidence at trial supported a single conspiracy to defraud the PCAOB of its right to the exclusive use of its confidential inspection information. The fact that Middendorf and Wada did not specifically know of each other is not dispositive, nor is it surprising. Middendorf had every reason to believe that the inspection information was coming from someone at the PCAOB — and every reason to avoid knowing the details about from whom it was coming. Wada, for his part, was hoping to get a job at KPMG, and had every reason to believe that the information would be useful to KPMG — which plainly involved the firm's using the information in connection with PCAOB inspections.

Based on the evidence at trial, the Court properly declined to instruct the jury on multiple conspiracies.

### C. Prejudicial Variance

Wada argues that the evidence at trial showed multiple, smaller conspiracies, rather than the single conspiracy alleged in the indictment. He contends that this was a prejudicial variance warranting a new trial. A variance occurs "when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (internal quotation marks omitted).

As explained in the previous section, the evidence at trial supported a single conspiracy rather than multiple conspiracies. Wada cites *United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001), an insider trading case involving a remote tippee in which the conviction was reversed

16

based on a prejudicial variance. In contrast to *McDermott*, here there was nothing remote or unforeseeable to Wada about KPMG's use of the inspection information that he provided to Holder, a KPMG employee. Unlike a stock tip, the confidential information leaked by Wada — PCAOB's inspection list for KPMG — was useful to precisely one entity: KPMG. It was certainly foreseeable to Wada that the information would be passed along to others at KPMG so that it could be used to improve KPMG's performance on PCAOB inspections.

There was no variance from the indictment, much less a prejudicial variance.

### D. Weight of the Evidence

Finally, Wada seeks a new trial on the ground that the weight of the evidence does not support a conviction. To obtain a new trial on the basis that the jury's verdict was against the weight of the evidence, a defendant has the burden of establishing that a manifest injustice would result from allowing the guilty verdict to stand. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013). As with a Rule 29 motion, the Court must defer to the jury's assessment of the credibility of witnesses and the weight of the evidence. *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir. 1982).

For the reasons addressed in connection with Wada's motion for judgment of acquittal under Rule 29, the evidence was sufficient for the jury to find Wada guilty on Counts Two, Four, and Five. Accordingly, Wada's motion for a new trial is denied.

## IV. Conclusion

For the foregoing reasons, Defendants' motions for judgment of acquittal under Rule 29 and for a new trial under Rule 33 are denied.

SO ORDERED.

Dated: September 9, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge