J9BVMIDS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                           18 CR 36 (JPO)

5   DAVID MIDDENDORF,

6              Defendant.                   SENTENCE

7   ------------------------------x

8                                           New York, N.Y.
                                            September 11, 2019
9                                           10:37 a.m.

10
    Before:
11
                        HON. J. PAUL OETKEN,
12
                                            District Judge
13

14                         APPEARANCES

15
    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  JORDAN L. ESTES
    MARTIN S. BELL
18  MARGARET S. GRAHAM
         Assistant United States Attorneys
19
    BRUCH HANNA LLP
20       Attorneys for Defendant
    GREGORY S. BRUCH
21       -AND-
    PETRILLO KLEIN & BOXER LLP
22  NELSON A. BOXER
    AMY R. LESTER
23
    ALSO PRESENT:  NATHANIEL COONEY, Paralegal - USAO
24

25

J9BVMIDS

```
 1              (Case called)
 2              MS. ESTES:  Good morning, your Honor.
 3              Jordan Estes, Martin Bell, and Margaret Graham, for
 4     the government.  And we're joined at counsel table by Nathaniel
 5     Cooney, a paralegal in our office.
 6              THE COURT:  Good morning.
 7              MR. BOXER:  Good morning, your Honor.
 8              Nelson Boxer, Amy Lester, and Greg Bruch, for
 9     Mr. Middendorf.
10              THE COURT:  Good morning.
11              Welcome, everybody.
12              We're here for sentencing in this case.
13              Following a jury trial in February and March of this
14     year, the defendant was found guilty of three counts of wire
15     fraud and one count of conspiracy to commit wire fraud.  He was
16     acquitted of one count of conspiracy to defraud the SEC.
17              I want to start by making sure I have everything and
18     have reviewed everything I should have.
19              I've reviewed in preparation for today the presentence
20     report by the probation department, with an addendum and
21     sentencing recommendation; the submission of defense counsel
22     dated July 26th, with many letters from members of
23     Mr. Middendorf's family, friends and neighbors, members of the
24     church community, and work colleagues, all of which I've read;
25     and the submission by the government dated September 4th.
```

J9BVMIDS

1          I've also reviewed the victim impact statement

2     submitted by the PCAOB on June 4th.  And I've also considered

3     the parties' filings regarding the guidelines loss amount and

4     restitution, including defendant's letter to the Court dated

5     July 10th; and, of course, the arguments of counsel during the

6     August 1st hearing on those issues.

7          Do I have everything I should have?

8          MS. ESTES:  Yes, your Honor.

9          MR. BOXER:  Yes, your Honor.

10          THE COURT:  Mr. Boxer, have you read the presentence

11     report and discussed it with your client?

12          MR. BOXER:  I have, your Honor.

13          THE COURT:  And Mr. Middendorf, have you read the

14     presentence report?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  All right.

17          And Ms. Estes, have you read the presentence report?

18          MS. ESTES:  Yes, your Honor.

19          THE COURT:  Before we get to the guideline

20     calculation, let's start with the factual recitation.

21          Does the government have any objections to the factual

22     portions of the presentence report?

23          MS. ESTES:  No, your Honor.

24          THE COURT:  And as I understand it from the

25     defendant's submission, pages 11 and 12, there are objections.

J9BVMIDS

1    Are those the objections --

2              MR. BOXER:  Correct, your Honor.

3              THE COURT:  -- that remain?

4              All right.  I'll go through those briefly.

5              With respect to the first objection, which is to

6    paragraph 17, defendant claims that the description of SEC's

7    use of the information is irrelevant.  That objection is

8    overruled.  I find that it is relevant and that's an

9    appropriate statement because it's relevant and accurate.

10             With respect to paragraph 18, the objection is also

11   overruled.  I find by a preponderance of the evidence based on

12   the trial evidence that the PCAOB did treat its information as

13   confidential, and indeed highly confidential.

14             With respect to paragraph 27, the objection is

15   overruled.  The second sentence, I think, is accurate and

16   correct.

17             With respect to paragraph 28, defendant argues that

18   the failure to include the fact that Mr. Middendorf was unaware

19   that Sweet possessed PCAOB documents in April of 2015, I'm

20   going to sustain that objection.  And I will add a sentence to

21   that effect, to have it added to the presentence report.

22             On paragraph 30, defendant argues that the following

23   sentence should be added:  The re-reviewers adhered to PCAOB

24   accounting standards, auditing standard AS-3, throughout the

25   re-reviews.  I'm going to sustain that objection and will add a

J9BVMIDS

1    sentence to that effect.

2          Paragraph 31, there's an objection to the final

3    sentence of the paragraph that Mr. Middendorf and others had a

4    conference call where they discussed the engagement on the list

5    for the purpose of determining how the information could be

6    used to improve inspection results.  Having reviewed the

7    transcript, I think that that is also a fair objection.  The

8    evidence was not exactly clear on this, so I'm going to sustain

9    that objection and delete that sentence in the presentence

10   report.

11         On paragraph 32, there's an objection to the first

12   sentence of the paragraph:  The scheme started to unravel in

13   February 2017, etc., etc.  That objection is overruled.  I

14   think that is a fair characterization of what happened, based

15   on the trial.

16         So you've made those objections and your objections

17   are all noted for the record.

18         MR. BOXER:  Thank you very much, your Honor.

19         THE COURT:  Anything else on the factual recitation

20   that anyone wanted to raise?

21         MS. ESTES:  No, your Honor.

22         THE COURT:  Okay.

23         Now I'm going to turn to the sentencing guidelines.

24         As you know, the starting point in determining a

25   sentence is the sentencing guidelines, which is a book that

J9BVMIDS

takes account of the base offense level, which is based on the
nature of the crime that actually took place and, on the other
hand, the Criminal History Category of the defendant who's
before me.  And when you put them together, you come up with a
sentencing guideline range that is not mandatory, but it is a
benchmark and the starting point for determining an appropriate
sentence under the law.

There are a couple of disputed issues regarding the
sentencing guideline calculation.  And the first is the loss
amount.  And I think that's the one that makes the most
difference in the actual guideline calculation.

The guidelines in Section 2B1.1 define loss as
reasonably foreseeable pecuniary harm from the offense.
"Pecuniary harm," in turn, is defined as harm that is monetary
or that otherwise is readily measurable in money.  The Court
need only make the reasonable estimate of the loss under 2B1.1,
comment 3, 3C.

This case involved the misappropriation and use of
confidential PCAOB information, in particular, its confidential
inspection lists which were central to its regulatory function.
As the Court has already held, this information was property
that had value.  The defendant's misappropriation and use of it
caused actual harm to the PCAOB.  It is not easy to quantify
and measure that harm.  Certainly the reputational harm to the
PCAOB and the harm to its regulatory mission are not easily

J9BVMIDS

1    measured or quantified.

2          But distinct from those harms was a harm to the PCAOB

3    from the actual loss of its confidential work product in

4    developing the lists to carry out its function.  Substantial

5    time and expertise of PCAOB personnel was wasted as a result of

6    the misappropriation and use of those confidential inspection

7    lists.

8          Although this was not an out-of-pocket loss to the

9    PCAOB, it clearly resulted in the diversion of resources in the

10   form of employee time.  I find that while that is not an

11   out-of-pocket monetary loss for the PCAOB, it is nevertheless

12   an economic loss, and one that is reasonably measurable in

13   money.

14         The PCAOB has provided evidence that establishes a

15   basis for a reasonable estimate of this loss, including

16   response costs, an estimate of the cost to the PCAOB of

17   recreating the 2017 inspection lists, and the costs of

18   additional inspections for 2016.  As I explained in connection

19   with Ms. Holder's sentencing, I find that the response costs

20   measure provides the most reasonable estimate of the loss to

21   the PCAOB.  These response costs reflect the most direct

22   measure of the wasted efforts of PCAOB personnel, because they

23   represent the work that the PCAOB reasonably determined had to

24   be done to remediate the harm caused by the misappropriation

25   and use of the inspection lists.

J9BVMIDS

1        While development costs are a good measure in a trade

2   secrets case, the confidential information here is further

3   removed from the kind of information that has value because of

4   its marketable value.  A better proxy for the loss here is the

5   type of cost described in the guidelines in analogous

6   situations.  The cost to the victim entity of replacing the

7   property, as in 2B1.1, note 3(C)(i), or repairing damaged

8   property, 3(C)(iii), or, in government procurement fraud cases,

9   the cost to the government -- including administrative costs --

10   of repeating or correcting the compromised procurement process

11   as described in 3(A)(v)(II).

12        With respect to response costs, the PCAOB has provided

13   a reasonable estimate of its costs to create the replacement

14   inspection list for 2017.  The cost was $262,635.  And to

15   conduct the ten additional reviews for 2016, the cost was

16   $567,228.  I'm not persuaded by defendant's arguments that

17   these estimates are unreliable or inadequately supported.  All

18   that is required is a reasonable estimate, and these are

19   reasonable estimates.  Nor am I persuaded by defendant's

20   argument that there was no loss to the PCAOB because these were

21   salaried employees.  As I've explained, this was an actual

22   economic loss in terms of the PCAOB's resources.  It is

23   estimable and measurable.  A salaried employee's hourly rate,

24   with a 1.25 multiplier to account for overhead costs, is a

25   reasonable measure of the cost to the PCAOB of employing an

J9BVMIDS

1    individual.  This reasonable estimate of loss under the

2    guidelines is supported by common sense and by the Second

3    Circuit's decision in *United States v. Burns*, 104 F.3d 529

4    (2d Cir. 1997).

5          Therefore, I find that the reasonable estimate of loss

6    to the PCAOB from defendant's criminal conduct is $829,863,

7    i.e., the total of the response costs in conducting the

8    additional reviews for 2016, and recreating inspection the

9    inspection list for 2017.

10          With respect to obstruction of justice, I am not

11    adding points for obstruction of justice.  I cannot conclude by

12    a preponderance of the evidence that Mr. Middendorf gave

13    intentionally false testimony, including when he said that he

14    believed the conduct was lawful and when he could not remember

15    certain conversations.

16          So with respect to the guideline calculation, Counts

17    Two through Five are grouped under Section 3D1.2(d).  The base

18    offense level is 7.  Because the loss amount exceeded $550,000,

19    but did not exceed 1.5 million, the offense level is increased

20    14 levels to 21.  So the total offense level is 21.  The

21    defendant has no prior criminal convictions and, therefore,

22    he's in the lowest Criminal History Category.  Therefore, the

23    guideline range is 37 to 46 months' imprisonment, and there's a

24    fine range of $15,000 to $150,000.

25          Now, I'd like to give each of you an opportunity to

J9BVMIDS

1    speak, although I've read all of your submissions.

2              I'll start with defense counsel, Mr. Boxer.

3              MR. BOXER:  Thank you, your Honor.

4              First, I would just like to note for the record that

5    three close friends of Mr. Middendorf are present this morning:

6    Tom Dudek, Clark Sullivan, and Steve Newby.  His wife remained

7    home with their two high school daughters, and his third

8    daughter is in graduate school.

9              First, your Honor, I'd like to take issue with some of

10   the representations and arguments in the government's September

11   4th submission and, in particular, the way it's characterized

12   the case for purposes of sentencing.  And by the way, in that

13   submission they made no reference whosoever to the count of

14   acquittal; to the fact that there was a not guilty verdict on

15   the client conspiracy.  And they made no mention of the

16   probation department's recommendation of a year and a day; they

17   didn't address it, they didn't confront it, they didn't deal

18   with it in any way.

19             But to begin with, as far as Mr. Middendorf, in this

20   case there were no burner phones, there was no scheming to lie

21   with others, there was no destroying or hiding evidence.  In

22   fact, Mr. Middendorf turned over his cell phone.  And, as we

23   all remember during the trial, his note file, which contained

24   all the entries of the companies he received from Mr. Sweet in

25   2017, was displayed to us and to the jury.  He was cooperative.

J9BVMIDS

And some of the other behavior that's relevant in this
indictment certainly doesn't apply to him.

He also sat with KPMG counsel nearly immediately after
the previously referenced phone call by him and Mr. Marcello
disclosing the investigation.  And during one of those calls he
volunteered something that at that point nobody else had known,
and that was the 2016 re-reviews.  The phone calls were about
the information that was received in 2017.

My client, in the course of that discussion,
volunteered what had happened in 2016, the only year really
when anything was actually done.  And I think that is strong
evidence of his character, his honesty, irrespective of the
counts of conviction.  He then sat for three interviews with
KPMG's outside counsel, including after he was fired.

There is absolutely no money in this case, as far as
Mr. Middendorf.  There's no enrichment, there's no swindle,
there's no taking of money by him.  It's clearly a very unique
wire fraud.  And, once again, in the government's submission,
they invoke Enron and Arthur Andersen and the reason for
Sarbanes-Oxley and the PCAOB; but there's also not any evidence
whatsoever of shareholder harm in this case or any harm to the
capital markets.  It's completely absent in the evidence in
this case.  So references to the purpose and history of the
PCAOB, I appreciate the institutional role it plays, but
nothing that happened here had any impact on any public

J9BVMIDS

1    shareholders.

2            And then just a few of the specific arguments the

3    government made, one of which was that Mr. Middendorf has had

4    every opportunity in life and has supportive family and

5    friends, and committed the charged crimes, despite these

6    advantages.

7            Well, the first part of that statement is false.  As

8    your Honor knows from reading the PSR, it demonstrates that

9    Mr. Middendorf grew up in very modest circumstances.  His

10   father was a wood cabinet maker.  He was the youngest of five

11   children.  He worked his way through college.  And nothing was

12   ever given to Mr. Middendorf.  To say he's had every

13   opportunity in life is divorced from the reality of his

14   experience.  Whatever he's achieved in life he's earned and

15   he's worked hard for.

16           And the second part of that sentence really makes no

17   sense from a sentencing standpoint.  His supportive family and

18   friends, that evidences his good character; it shows he's a

19   good, decent, hardworking person.  It's not a fact to be turned

20   against him or reason to punish him.

21           The government also falls back on the word "cheat."  I

22   think they said "a criminal scheme to cheat," which, as we

23   know, was deployed frequently at trial and in many of its

24   submissions to the Court.  It's certainly catchy and it's

25   certainly simple, but it's inaccurate as a proxy for

J9BVMIDS

1    Mr. Middendorf's conduct in this case.

2           In particular, the only accounting work that was

3    actually done throughout the entire trial and the evidence was

4    in 2016.  And as we know, that was when the audits were

5    completed, and the work was done in the documentation period.

6    And as your Honor just found, it was done consistent with the

7    PCAOB standard AS-3.  So to call this case a cheating, I'm sure

8    there's some way to get from the word "cheat" to the evidence,

9    but it's not the obvious way.  And again, the government trouts

10   that out.

11          We find the government's reliance on Brian Sweet --

12   four pages of it, starting at page 2 -- astounding, given the

13   numerous lies he admitted to and the lies he was caught in.

14   Even Tom Whittle contradicted Mr. Sweet's testimony, a fact

15   ignored in the government's rendition of the offense conduct.

16          The government, pointing to the discussion about loss

17   your Honor just engaged in, perpetrated -- said that

18   Mr. Middendorf perpetrated a fraud that caused the PCAOB to

19   suffer over $1 million in lost employee time.

20          Now, I appreciate your Honor's holding and the

21   exercise of a reasonable approximation for loss under the

22   guidelines.  But to use that calculation as a basis for a jail

23   sentence is nonsensical and, frankly, I think would be unjust.

24          There's no money taken from the PCAOB; it had nothing

25   to do with the events at issue.  And this so-called lost

J9BVMIDS

1   planned employee time, while I understand the guidelines issue,

2   as your Honor just pointed out, there was absolutely no

3   out-of-pocket money loss to the PCAOB.  And so while it's a

4   legal exercise that the Court is required to engage in for

5   calculating the guidelines, to trot out that over a million

6   dollars of lost employee time is a basis to sentence

7   Mr. Middendorf to the serious time the government has proposed

8   I think is inappropriate.

9            And lastly, as far as their submission,

10   Mr. Middendorf's seniority, at least among the defendants,

11   should not be a proxy for his exposure to any jail sentence.

12   The government writes:  Of all the defendants, Middendorf held

13   the highest position at KPMG.  Well, that's a true statement

14   from that group of defendants.  But he was no more or less

15   experienced, or more or less smart than the other participants

16   in the events in this case, including Mr. Whittle, who

17   supervised Mr. Sweet; including his boss, to whom he reported

18   facts and any decisions he made in real time; including the

19   other KPMG officers and employees who were told by Mr. Sweet

20   inside PCAOB information; and including the KPMG senior

21   officers to Mr. Middendorf, who used the same information that

22   Mr. Middendorf and his boss received from two PCAOB board

23   members in private meetings.

24            The fact that he's the most senior from the group of

25   defendants the government charged is not a reason to call him

J9BVMIDS

```
 1    out for special treatment or poor treatment as far as
 2    sentencing.  The Court should address and assess what
 3    Mr. Middendorf did and did not do.  The fact that he had the
 4    highest position of the defendants in the case, which includes
 5    serious and experienced accountants, shouldn't be a basis for a
 6    jail sentence.
 7              With respect to our arguments, other than what I just
 8    said, we're relying on our July 26 submission, which I think
 9    covers some other topics that weren't addressed in the
10    government's letter.
11              As far as the PSR, as your Honor knows, the probation
12    department recommended a year and a day.  It recognized that
13    Mr. Middendorf was a first-time offender; he had worked for
14    KPMG for over 30 years; he was a good husband and father; and
15    recognized that the offense level is largely driven by a loss
16    amount derived from the planning cost related to the PCAOB's
17    inspection.  A year and a day, where, at least, by its
18    calculations, it had a higher range than the Court arrived at
19    this morning, and to me that says quite a lot.  And in my
20    experience, it is very uncommon.  I think the probation
21    officer, who had all the facts about Mr. Middendorf and about
22    the case and had all the offense conduct from the government,
23    appreciated that this is not your typical wire fraud case, and
24    recommended accordingly.
25              As your Honor knows, Mr. Middendorf received and we
```

J9BVMIDS

submitted some extraordinary letters regarding his character

that attest to his commitment to his family, the positive

influence he's been, the person he is, how he is a man of faith

and always has been, and is committed to his community, and was

committed to his profession.  And I personally, along with my

colleagues sitting here today, can attest to those very same

qualities.  It's been our privilege to represent

Mr. Middendorf.

Your Honor is required to impose a sentence no greater

than necessary, to comply with the specific purposes set forth

in 18 U.S.C. 3553(a)(2).  Some salient facts in making that

determination are he is no longer employed, certainly no longer

employable as a public company accountant.  The impact on his

family has been severe.  The financial impact to him has been

extraordinary, and it gets worse every day without income.

And in the governments' sentencing submission, it

says:  A serious jail sentence is necessary to promote general

deterrence and respect for the law.  To me, that is an absurd

statement.  Mr. Middendorf was a senior partner of a major

accounting firm.  He was arrested, charged, and convicted of

federal felonies.  He lost his job.  He lost his income from

that job.  He lost his career.  He lost his reputation.  He has

been, along with his family, consumed by this case for the last

almost two years.  And the case has received widespread

reporting and notoriety; general press, accounting community.

J9BVMIDS

1    I appreciate there are reporters from various media outlets

2    present today.

3            The facts and circumstances of this case provide

4    extraordinary general deterrence.  There is not a chance -- no

5    matter the Court's sentence -- that, as the government fears

6    and writes, other executives might conclude that the benefits

7    of such a fraud outweigh the consequences.  As I said, that's

8    absurd.  The general deterrence necessary in imposing sentence

9    has clearly been achieved in this case.

10           Your Honor, as we wrote, a sentence of incarceration

11   at this point in time, after all that has occurred to

12   Mr. Middendorf for this offense, would be greater than

13   necessary to achieve the purposes set forth in 3553.  He should

14   be given the opportunity to try to return to the workforce to

15   help support his family and live a productive life.

16           In light of the entire record, your Honor, including

17   the person Mr. Middendorf is, the Court should sentence

18   Mr. Middendorf to a term of probation.

19           With respect to a fine, the probation department

20   recommended there not be one.  It noted the open issue on

21   restitution, which we agree with.  And he has obviously, based

22   on the content in the PSR, already suffered a very serious

23   financial penalty.

24           Thank you, your Honor.

25           THE COURT:  Thank you, Mr. Boxer.

J9BVMIDS

```
1              I'll hear from counsel for the government.  Ms. Estes.

2              MR. BOXER:  Your Honor?

3              THE COURT:  Yes.

4              MR. BOXER:  I know Mr. Middendorf would like to

5    address the Court.  Does that happen after Ms. Estes --

6              THE COURT:  You can do it either way.

7              MR. BOXER:  We're fine.  I just wanted to make sure --

8              THE COURT:  Why don't I have him do it now.

9         That's fine.

10             MR. BOXER:  Thank you.

11             THE COURT:  Mr. Middendorf, you're not required to

12   speak, but anything you'd like to say, you're welcome to.

13             THE DEFENDANT:  Thank you, your Honor.

14        I'm 55 years old, a devoted husband, a loving father

15   of three daughters, admitted parishioner of my church, and a

16   CPA.  I worked at KPMG for 30 years as an auditor, including

17   for 19 years as an audit partner.

18        My wife, children, and I sacrificed for KPMG by

19   uprooting and relocating our homes and our schools four times

20   to serve clients of the firm.  I mentored many, many KPMG

21   accountants to help them grow in their careers, some of whom

22   were admitted to the KPMG partnership.

23        I was elected and served for five years on KPMG's

24   board of directors.  I was committed to the auditing profession

25   and to KPMG.  I took my responsibility as a protector of the
```

J9BVMIDS

capital markets very seriously and held my clients accountable, even when they did not necessarily want to report a large impairment charge or account for a transaction in a certain way.

        There was not a penny earned or a penny taken by me in this case.  And never in my wildest imagination did I ever think that my decisions that were the subject of this trial would or could be classified as criminal behavior.  Absolutely never.

        The consequences to me from this case have been devastating:  My career is gone.  My livelihood is gone.  My reputation has been tarnished likely beyond repair.  My wife has suffered, and my three children have suffered both emotionally and physically.

        I'm afraid to contemplate what my incarceration would do to my wife and children.  I can also not imagine how what I've experienced -- I was arrested in my home at 5:45 a.m. on January 22nd, 2018, taken into court in handcuffs with my leg shackled, and have been living this nightmare ever since -- is not a deterrence to every single auditor of a public company in the United States and around the world.

        As your Honor is now aware, I come from very humble beginnings.  I've never forgotten from where I came.  And I always helped my colleagues and people in my community in any way I could.  I succeeded in my career through hard work and

J9BVMIDS

1    integrity.  If I made mistakes, that's what they were,

2    mistakes, not crimes.

3          What has kept me going since this nightmare began has

4    been the support of my family and my friends and my faith.  I

5    would like to thank them, many of whom attended the trial.  And

6    without them, I would not have had the strength to stand here

7    before you.  They have stood by my side and loved me

8    unconditionally throughout this process.  And I cannot put into

9    words how much I love them and I appreciate them.

10          Thank you, your Honor.

11          THE COURT:  Thank you.

12          And now counsel for the government, anything you'd

13    like to say.

14          MS. ESTES:  Yes, your Honor.

15          Your Honor, as the trial evidence made clear, acting

16    with integrity is a bedrock principle of the auditing

17    profession.  The auditors are the ones that are the

18    gatekeepers, they have the important task of making sure

19    financial statements issued by public companies are reliable,

20    and the public counts on them to act with integrity in doing

21    that.

22          Now, defense counsel claims that Mr. Middendorf's

23    seniority at KPMG, that shouldn't be taken into account.  And,

24    your Honor, we submit that that's ridiculous.  Of course it

25    matters.

J9BVMIDS

         Mr. Middendorf was the head of KPMG's Department of
Professional Practice, the head of its national office.  And
his decision to undertake the cheating in the scheme threatened
to infect the entire firm.  He, of all people, the person in
charge of the national office, he should have been acting with
integrity; he should have known this was wrong and stopped this
scheme.  And he didn't do that.  He chose to cheat.

         And when the head of the national office of a Big Four
firm chooses to cheat, that's important.  That matters.  And a
sentence of jail time is appropriate to deter others in similar
positions, to show that this is something that cannot be
tolerated.

         And, your Honor, I want to take issue with defense's
claim that we keep throwing around the word "cheating"; that we
keep using that word.

         Now, I think, frankly, the idea that this scheme was
not cheating is ridiculous.  If you sneak into a teacher's
office and find the data for a pop quiz, and then study extra,
cram, so that you do, you know, make an excellent grade on the
quiz, that is certainly cheating.

         The jury was presented with the evidence here.  They
found it was cheating.  They found it was a scheme to defraud
the PCAOB.  Given the serious nature of the crime, an
appropriate punishment of jail time is warranted.

         And, your Honor, I'd also submit it's particularly

J9BVMIDS

1   troubling here that the defendant testified.  Now, your Honor

2   found that the defendant didn't obstruct justice, but we submit

3   that he certainly minimized his conduct.  He testified he

4   didn't see this as cheating; he testified he didn't think he

5   did anything wrong.  He didn't accept responsibility for what

6   he did, for the role he played in the scheme, and for the

7   impact his conduct had on KPMG, the PCAOB, and the auditing

8   profession more generally.  That's significant.  We submit that

9   his testimony and his refusal to accept responsibility is an

10  important factor the Court should take into account.

11          Just one final point, your Honor.  I just wanted to

12  note that under Section 3553(a) the Court should also take into

13  account, of course, the sentences of other defendants.

14  Ms. Holder, who was a much lower-level participant in the

15  scheme, was sentenced to eight months' imprisonment.  She pled

16  guilty before trial, she accepted responsibility, she certainly

17  didn't testify.  And as her counsel noted at sentencing, she

18  did even undertake some efforts to cooperate with the

19  government by providing documents.

20          We submit that that sentence there, the eight months,

21  is -- should be the floor here; and that Mr. Middendorf is a

22  higher-level employee at KPMG, is somebody who went to trial

23  and did not accept responsibility, should certainly be

24  sentenced to more time than that.

25          THE COURT:  Thank you.

J9BVMIDS

1          MR. BOXER:  Briefly, your Honor.

2          THE COURT:  Yes.

3          MR. BOXER:  On the issue of integrity, I would just

4    point your Honor to the testimony of Frank Blake, former CEO of

5    Home Depot, who, I think, during the trial very clearly laid

6    out the basis for why he felt Mr. Middendorf had high

7    integrity.  I appreciate he was convicted of these crimes, so

8    that fact speaks for itself.  But in his own words and what

9    others have said about him to the Court in letters I think

10   demonstrate his integrity.

11         As far as him having testified and minimized his

12   conduct, I think quite the opposite occurred.  He actually very

13   openly and candidly acknowledged that he was the one who

14   authorized the 2016 re-review.  He said he couldn't remember

15   the details of the conversation when it was first reported to

16   him, but he didn't blame it on his boss, who he did tell about

17   it in real time.  He didn't blame it on Mr. Whittle.  He said,

18   That was my decision.  And to me that is accepting

19   responsibility for the most serious aspect of the case.

20         And finally, I wasn't going to allude to Ms. Holder

21   directly because I didn't know that that would be appropriate,

22   but that's precisely the concern that I was driving at as far

23   as seniority.  There are aspects of her case and her behavior

24   that were diametrically different than the way Mr. Middendorf

25   conducted himself, the way he conducted himself even during the

J9BVMIDS

1    events, and even, more importantly, after the events.  The fact

2    that he was senior to her in the org chart and was paid more

3    money doesn't mean that he needs to receive a higher sentence,

4    when the statute requires a particularized assessment of the

5    defendant.  I think to compare Mr. Middendorf to her is not

6    what the Court should be doing; and if it did, I think he would

7    compare favorably.

8           There were lots of people who have a lot of experience

9    who were earning a lot of money involved in this case.  And he

10   was one of them, Mr. Middendorf.  But to say, because of the

11   five they chose to indict, he sits at the top, he therefore, by

12   reason of that fact, needs to be punished, punished more than

13   the person who sits below him, I don't think that's consistent

14   with what the statute requires.

15          Thank you, your Honor.

16          THE COURT:  Thank you.

17          Is there any reason why sentence may not be imposed at

18   this point?

19          MS. ESTES:  No, your Honor.

20          MR. BOXER:  No, your Honor.

21          THE COURT:  In preparing to sentence Mr. Middendorf,

22   I've considered the presentence report; the recommendation of

23   the probation department, which recommends 12 months and one

24   day imprisonment; I've considered the written and oral

25   statements of defense counsel, the defendant, and the

J9BVMIDS

government; as well as all of the many letters submitted in

support of the defendant; and I've considered his statement

here today as well.

I'm required to consider the factors in the statute,

Section 3553(a) of Title 18, which includes the sentencing

guidelines, but also the nature and circumstances of the

offense, the defendant's history and characteristics, and the

purposes of sentencing:  The need for the sentence to reflect

the seriousness of the offense, to provide just punishment, to

promote respect for the law, to afford adequate deterrence, and

to protect the public, and to provide any needed training or

care or treatment to the defendant in the most effective

manner.

I'm also required to consider the need to avoid

unwarranted sentencing disparities with similar defendants and

the need to provide restitution.  I'm ultimately required to

impose a sentence that is sufficient, but not greater than

necessary, to comply with the purposes in the statute.

The criminal conduct in this case was serious.  It was

serious because it involved the corruption of a regulatory

process.  That process was established by the Sarbanes-Oxley

Act to ensure that audits of public companies are done

accurately and independently.  The PCAOB was established by

Congress as the inspector of this country's auditors; its

inspection process is supposed to function with independence

J9BVMIDS

1    and integrity.  And that process was compromised by the

2    criminal conduct in this case.

3          The case was also serious because it involved a

4    misappropriation of a company's property.  It's different from

5    many fraud cases, there's no question about that.  This is not

6    a typical wire fraud case, because it did not involve the

7    taking of money or tangible property.  Instead it involved the

8    taking and use of confidential information, the PCAOB's work

9    product.  And that was a serious crime with an actual loss as

10   I've explained.  The PCAOB suffered the loss, in effect, of

11   hundreds of thousands of dollars in employee time and

12   resources.

13         The case is also different because it did not involve

14   direct personal gain to the defendants, again, unlike a typical

15   fraud case.  The defendant here was not making use of the

16   PCAOB's misappropriated property for any direct financial gain.

17   He was trying to help his employer, KPMG, do better on

18   inspections by its regulator.  And that distinction is

19   relevant, and I'm taking it into consideration, as is

20   appropriate.

21         At the same time, part of what makes this crime

22   different and serious is that it is more subtle than stealing

23   money.  It involved, as I said, the corruption of a regulatory

24   process and a pattern of self-dealing for a firm.  And it's

25   fair to say that it did involve cheating by employees of a

J9BVMIDS

regulated company to give their company a leg up in the

process.  At the end of the day, that's what it was.

Mr. Middendorf was KPMG's national managing partner

for audit quality and professional practice.  As a senior

executive of one of the major audit firms who dealt with the

PCAOB and the SEC on a routine basis, I believe -- and the jury

found beyond a reasonable doubt -- that he knew what he was

doing was wrong.

I'm also required to consider the history and

characteristics of the defendant.

Mr. Middendorf, of course, has no prior criminal

conduct.  As the many letters make clear, he is someone who is

devoted to his family, respected by members of his community,

and has made many positive contributions to the community and

to those around him.  In his career, apart from the conduct at

issue in this case, he has been regarded as an honest and

ethical professional.  And I'm taking all of that into

consideration.

I do not believe that this defendant poses any

significant risk of recidivism and, for that reason, the

statutory purposes of specific deterrence and protecting the

public do not call for a guideline sentence.  Also, it is clear

that the collateral consequences that accompany this

prosecution have been severe.  I have no illusions about that.

I know this has been a nightmare:  The job, the accounting

J9BVMIDS

1   license, what he's going to face in restitution obligation, the

2   reputation, the stress and anxiety of the case.  And that is

3   pretty much always the case in criminal prosecutions.

4           These factors lead me to conclude that a guideline

5   sentence would be greater than necessary and, therefore, that a

6   variance below the guidelines is appropriate.

7           At the same time, this is a case where the need for

8   general deterrence, the need to promote respect for the law,

9   and the need to reflect the seriousness of the offense call for

10  meaningful punishment.  That is particularly so, in light of

11  the senior position of the defendant at the company, and his

12  position of overseeing the exact conduct that was subject to

13  the PCAOB's oversight.  And for those reasons, I do think that

14  a sentence that includes incarceration is necessary and

15  appropriate.

16          I sentenced Ms. Holder to eight months.  In light of

17  Mr. Middendorf's high level of responsibility, I believe that a

18  sentence that is longer is warranted, and I agree with

19  probation's recommendation of one year and one day.

20          For those reasons, I intend to sentence the defendant

21  to one year and one day.  The reason I add a day to the

22  one-year sentence is that when one is sentenced to longer than

23  a year, they are entitled to good-conduct time, which is 54

24  months -- 54 days per year and, therefore, it will be closer to

25  ten months than 12 months that's actually served, in the event

1    that he qualifies for good-conduct credit.

2            Let me ask counsel if you have any objection you'd

3    like to state for the record or know of any legal reason why

4    that sentence may not be imposed.

5            MS. ESTES:  No, your Honor.

6            MR. BOXER:  No, your Honor.

7            THE COURT:  Mr. Middendorf, would you please stand.

8            It is the judgment of this Court that you be committed

9    to the custody of the Bureau of Prisons for a period of 12

10   months and one day.  That's on all counts running concurrently.

11           Following release, you'll be placed on supervised

12   release for three years with the following conditions:

13           You will not commit another federal, state, or local

14   crime; you will not possess or use an illegal controlled

15   substance.  I'm waiving the mandatory drug testing condition

16   because the defendant poses a low risk of substance abuse.

17   You'll cooperate in the collection of DNA as directed by

18   probation.

19           The standard conditions are imposed with the following

20   special conditions:

21           You'll provide probation with access to any requested

22   financial information; you will not incur any new credit

23   charges or open additional lines of credit without the approval

24   of probation, unless you are in compliance with the payment

25   schedule.  You shall report to the nearest probation office

J9BVMIDS

```
 1    within 72 hours of release.  And you'll be supervised by the

 2    district of residence.

 3              I am not imposing a fine in light of the restitution

 4    obligation, and restitution will be ordered in an amount that I

 5    will be setting.

 6              There is a mandatory $100 special assessment on each

 7    count, for a total of $400, which is hereby imposed.

 8              I'll be setting a surrender date.

 9              Is there any objection to October 28?

10              MR. BOXER:  Your Honor, at this point we'd ask that

11    Mr. Middendorf be -- that the surrender be adjourned and he be

12    permitted to remain out on bail pending appeal.  I've discussed

13    this with Ms. Estes, and she has no objection to that, to an

14    order to that effect being entered.

15              He's presently out on release on a $400,000 personal

16    recognizance bond, supervised in Atlanta, near his home.  And

17    we would ask that those conditions remain in place until the

18    conclusion of any appeal.

19              THE COURT:  Ms. Estes?

20              MS. ESTES:  That's correct, your Honor.

21              THE COURT:  Okay.  That application is granted.

22              Rather than setting a surrender date, the defendant

23    will remain on bail pending the appeal.  All the conditions of

24    bail will continue until otherwise ordered.

25              MR. BOXER:  Thank you, your Honor.
```

J9BVMIDS

1          THE COURT:  Thank you.

2          Mr. Middendorf, you have the right to appeal from your

3    conviction and sentence.  If you cannot pay the cost of an

4    appeal, you may apply for leave to appeal *in forma pauperis*.

5    Any appeal must be file within 14 days of the filing of the

6    judgment.

7          And I'm directing that a complete corrected copy of

8    the PSR be provided to BOP and the Sentencing Commission.

9          Is there anything further?

10          MS. ESTES:  No, your Honor.  Thank you.

11          MR. BOXER:  No, your Honor.  Thank you.

12          THE COURT:  Thank you very much.

13          We're adjourned.

14                            *    *    *