

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 30, 2020

<u>BY ECF</u>

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:     <u>***United States* v. *Thomas Whittle*,***</u>
***No. 18 Cr. 36 (JPO)***

     The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Thomas Whittle has rendered in the investigation and prosecution of other persons. In light of these facts, and assuming that Whittle continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), that the Court sentence him in light of the factors set forth in Sections 5K1.1 and 3553(e).

I.     Background

     a.    <u>Whittle's Personal Background</u>

     Whittle is a 56 year old father of four. Following his graduation from LaSalle University, Whittle joined Peat Marwick Mitchell & Company, KPMG's predecessor, in its New Jersey office. Whittle was made a partner in 1997 and in approximately 2012 he joined KPMG's National Office in the Inspections Group. In approximately 2014, Whittle assumed leadership of that group. He was separated from KPMG in 2017 following an internal investigation into the conduct that gave rise to the present matter.

     b.    <u>Offense Conduct</u>

     In 2014 and 2015, KPMG recruited and then hired Brian Sweet, an Associate Director at the PCAOB, to work as an audit partner in KPMG's Inspections Group. During Sweet's first week, Sweet shared with Whittle that (i) as suspected, one of the inspections on the schedule would be Wells Fargo; and (ii) Sweet could provide a list of the KPMG inspections that the PCAOB was going to conduct that year. (Tr. 1854). Whittle understood that this was

confidential PCAOB information, which Sweet was not permitted to disclose. (Tr. 1855). Whittle nonetheless took the offer of information to Whittle's superior, David Middendorf. (Tr. 1844-55). Middendorf directed Whittle to obtain the list. (Tr. 1856). Whittle did as directed and emailed Sweet asking for the list. (GX. 753). Sweet responded with the full list of KPMG inspections for the year. (GX 754). Whittle also asked Sweet to share any insights he had about the selection with the engagement partners for certain selections on the list. (Tr. 1859). Whittle also used the list to consider whether to change the timing or selections of KPMG's internal inspections. (Tr. 1863).

On March 28, 2016, Jeffrey Wada shared with Cynthia Holder the confidential list of PCAOB's inspection selections for KPMG's banking clients, which Holder promptly passed to Sweet for use by KPMG. (GX 953, 1362, 1443; Tr. 856). After Sweet obtained the confidential 2016 PCAOB list of banking inspection targets from Wada, Whittle participated in a meeting with Middendorf, David Britt and Sweet. (Tr. 868-74). During the meeting, the conspirators agreed to "us[e] the ALLL monitoring program to conduct secret reviews of the workpapers," and discussed how to "arrange for access to workpapers so re-reviews could be conducted." (Tr. 2146-47). Whittle and Middendorf divided responsibility for gaining access to the work papers for audits on the 2016 list that were not in the ALLL monitoring program. (Tr. 1887). Whittle was also concerned that the re-reviews might cause a divergence between the results of internal inspections and the PCAOB inspections, which would look suspicious. (Tr, 1902). Accordingly, Whittle and Britt agreed to extend the re-reviews to cover certain engagements subject to internal inspection in order to keep the results consistent. (Tr. 1902).

The re-reviews worked, and comments in the ALLL area dropped significantly. (GX 1358). Although Whittle, Middendorf and Britt did not explicitly ask Sweet to seek out the 2017 inspection list, they acted in a way that made clear to Sweet he should do so. As Whittle explained: "Based on the fact that we had [been] encouraging him to get information from the PCAOB, certainly we had been positive with him with respect to receiving the 2016 list and the 2015 list. I believe there was an implied request for any information, and that would include a preliminary list." (Tr. 1919).

The encouragement worked: On January 9, 2017, Wada obtained and disclosed to KPMG the confidential preliminary inspection list for 2017. (GX 655). That night, Wada sent his resume to Holder in search of a job at KPMG. (GX 1073). After Sweet shared the list with Whittle, Whittle passed it on to Middendorf and Whittle and Middendorf decided to and did devote additional resources to engagements on the preliminary list in light of their presence on the list. (Tr. 1921-24).

On February 3, 2017, Wada shared with Holder the complete list of KPMG inspections for 2017. Once again, Wada passed the information to Sweet, who shared it with Whittle, Middendorf, and Britt. Whittle and Middendorf discussed the possibility of "using a similar scheme to what [they] did in 2016" to make use of the 2017 information. (Tr. 1930). Before they could move forward, however, the scheme came to light, an internal investigation was launched, and the conspirators were separated from the firm.

  c. <u>Guilty Plea</u>

On October 29, 2018, Whittle pled guilty to Counts One through Five of the Indictment. Count One charged a conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371.  Count Two charged a conspiracy to commit wire fraud in violation of Title 18, United States Code, Section 1349.  Counts Three through Five charged wire fraud for, respectively, April to May 2015, March to May 2016, and January to February 2017, all in violation of Title 18, United States Code Section 1343.

  d. <u>Guidelines Calculation</u>

Whittle's sentencing Guidelines range is calculated as follows:

A. Offense Level

  1. The November 1, 2018 version of the Guidelines applies.

*Count One (Group One)*

  2. U.S.S.G. § 2C1.1 applies to the offense charged in Count One ("Group One"). Pursuant to U.S.S.G. § 2C1.1(a)(2), the base offense level is 12.

  3. Pursuant to U.S.S.G. § 2C1.1(b)(2), if the value of the loss to the Government exceeds $6,500, the offense level is increased by the number of levels specified in the table contained in U.S.S.G. § 2B1.1 corresponding to that amount. Because the value of the loss to the Government is not known, no increase under this section is warranted.

  4. In accordance with the above, the offense level for Count One is 12.

*Counts Two through Five (Group Two)*

  5. Pursuant to U.S.S.G. § 3D1.2(d), Counts Two through Five ("Group Two") are grouped together because the offense level is determined largely on the basis of the total amount of loss.

  6. U.S.S.G. § 2B1.1 applies to the offenses charged in Counts Two through Five. Pursuant to U.S.S.G. §§ 2B1.1(a)(1) and 3D1.3(b), because Counts Three, Four, and Five each have a statutory maximum term of imprisonment of 20 years, the base offense level is 7.

  7. Because the loss amounts for Counts Two through Five exceeded $550,000 but did not exceed $1,500,000, the offense level is increased 14 levels to 21, pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

8.  In accordance with the above, the offense level for Counts Two through Five is 21.

*Combined Offense Level*

9.  Pursuant to U.S.S.G. § 3D1.4(a), the Group with the highest offense level is counted as one Unit.  Accordingly Group Two (Counts Two through Five) is counted as one Unit.

10. Pursuant to U.S.S.G. § 3D1.4(c), any Group that is 9 or more levels less serious than the Group with the highest offense level will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.  Accordingly, Group One (Count One) is disregarded.

11. In accordance with the above, the combined offense level is 21.

*Acceptance of Responsibility*

12. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

13. In accordance with the above, the total offense level is 18.

B. Criminal History Category

Whittle has no criminal history points and is in Criminal History Category I.  Accordingly, his Guidelines range is 27 to 33 months.

II.    Whittle's Cooperation

Whittle began proffering with the Government in July 2018.  From the outset Whittle was well-prepared, forthcoming and credible.  Whittle provided detailed, specific information about his own conduct and that of his coconspirators.  Whittle never attempted to excuse or justify his behavior.  From the beginning, he accepted full responsibility for his criminal conduct.  Importantly, in addition to corroborating information already known to the Government, Whittle also provided information about significant conversations about which the Government was otherwise unaware.  For example, Whittle disclosed to the Government that (i) in 2015 Whittle

explicitly asked Middendorf whether to get the list from Sweet and Middendorf told Whittle to do so; (ii) after the PCAOB made inspection notifications in 2015, Middendorf and Whittle discussed the list and Middendorf noted that the PCAOB's inspection selections were perfectly tracking Sweet's list; (iii) in 2016 Whittle complained to Britt about the use of the term "stealth re-review," which Whittle believed was likely to raise suspicions and Britt acknowledged the use of the term but passed it off as not a big deal; and (iv) that Whittle and Britt discussed the risk that the re-review work might cause KPMG to do so much better on the 2016 vs. 2015 audits (as well as on the PCAOB vs. internal audits) that red flags would be raised and agreed to fraudulently improve internal inspection results as well in order to avoid discrepancies that would raise suspicions.

As the Court is aware, Whittle was also a key witness at the trial of co-defendants Middendorf and Britt.  Whittle was able to provide important context to KPMG's inspection troubles, its decision to hire Brian Sweet, and to walk the jury, step-by-step through the acquisition and use of inspection lists in 2015, 2016, and 2017.  Whittle was also able to corroborate huge swaths of the testimony of the Government's other cooperating witness, Brian Sweet, which was especially significant given the trial defendants' specific attacks on Sweet's credibility.  And as described above, Whittle was able to describe for the jury certain key conversations with Middendorf to which Sweet was not privy.  There is no question that Whittle's clear, credible, and corroborated testimony significantly aided the jury in reaching its guilty verdict. Similarly, because Whittle's cooperation was publicly known far before trial, it is likely that knowledge of his cooperation played a significant role in the decision of Holder, and later Britt, to plead guilty.

III.     Restitution/Forfeiture

The Government is not seeking the imposition of forfeiture.  With respect to restitution, this Court has already determined that the PCAOB suffered pecuniary harm in the amount of $829,863 in the form of the PCAOB's response costs to the criminal conduct in 2016 and 2017. The Government submits that this amount is also a "reasonable approximation" for restitution purposes.  *See United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) (noting that restitution "requires only a reasonable approximation of losses supported by a sound methodology"). The Government further submits that this restitution amount should be joint and several among all defendants – David Middendorf, Jeffrey Wada, Cynthia Holder, David Britt, Thomas Whittle, and Brian Sweet – because each of the defendants participated in the criminal scheme in 2016 and 2017.

Further, as set forth in further detail in the Government's October 22, 2019 letter addressing restitution, (Dkt. No. 446), the PCAOB is further entitled to expenses incurred during its participation in the Government's investigation and prosecution of the offense.  *See* 18 U.S.C. § 3663A(b)(4).  Whittle is thus jointly and severally liable with all defendants for the $125,265.90 incurred between the inception of the investigation and Brian Sweet's guilty plea. Whittle is also jointly and severally liable with Wada, Holder, Middendorf, and Britt for the $18,204.05 in legal fees incurred after Sweet's plea but prior to Whittle's plea.  Thus, Whittle should be ordered to pay restitution as follows:

$829,863 (jointly and severally with all defendants)

    + $125,265.90 (jointly and severally with all defendants)
    + $18,204.05 (jointly and severally with Wada, Holder, Middendorf and Britt)
    = $973,332.95

IV.    Conclusion

      As described above, Whittle's cooperation was critical to the conviction after trial of co-defendants David Middendorf and Jeffrey Wada.  In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to request at sentencing pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e).


              Respectfully submitted,

              AUDREY STRAUSS
              Acting United States Attorney

by:  /s/  Rebecca Mermelstein
              Rebecca Mermelstein
              Jordan Estes
              Margaret Graham
              Assistant United States Attorneys
              Tel.:  (212) 637-2360/2543/2923

cc:    Nola Heller, Esq.
       Bradley Bondi, Esq.